## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE OXBOW CARBON LLC | ) | C.A. No. 12447-VCL |
| UNITHOLDER LITIGATION | ) | |

## MEMORANDUM OPINION

Date Submitted: November 20, 2017
Date Decided: February 12, 2018

Kenneth J. Nachbar, Thomas W. Briggs, Jr., Richard Li MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; R. Robert Popeo, Michael S. Gardener, Breton Leone-Quick, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, P.C., Boston, Massachusetts; *Attorneys for Oxbow Carbon LLC*.

Stephen C. Norman, Jaclyn C. Levy, Daniyal M. Iqbal, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; David B. Hennes, C. Thomas Brown, Daniel V. McCaughey, Adam M. Harris, Elizabeth D. Johnston, ROPES & GRAY LLP, New York, New York; *Attorneys for Oxbow Carbon & Minerals Holdings, Inc., Ingraham Investments LLC, Oxbow Carbon Investment Company LLC, and William I. Koch.*

Kevin G. Abrams, Michael A. Barlow, April M. Ferraro, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Michael B. Carlinsky, Chad Johnson, Jennifer Barrett, David Elsberg, Silpa Maruri, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Attorneys for Crestview-Oxbow Acquisition, LLC, Crestview-Oxbow (ERISA) Acquisition, LLC, Crestview Partners, L.P., Crestview Partners GP, L.P., Crestview Advisors, L.L.C., Robert J. Hurst, and Barry S. Volpert.*

Brock E. Czeschin, Matthew D. Perri, Sarah A. Galetta, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Crestview-Oxbow Acquisition, LLC, Crestview-Oxbow (ERISA) Acquisition, LLC, Crestview Partners, L.P., Crestview Partners GP, L.P., Crestview Advisors, L.L.C., Robert J. Hurst, and Barry S. Volpert.*

J. Clayton Athey, John G. Day, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Dale C. Christensen, Jr., Michael B. Weitman, SEWARD & KISSEL LLP, New York, New York; *Attorneys for Load Line Capital LLC.*

**LASTER, V.C.**

This post-trial decision addresses whether Oxbow Carbon LLC ("Oxbow" or the "Company") must be sold. Two minority members, who together own approximately one-third of Oxbow's equity, contend that they have a contractual right under Oxbow's limited liability company agreement[1] to force the Company to engage in an "Exit Sale."[2] The LLC Agreement defines an "Exit Sale" as "a Transfer of all, but not less than all, of the then-outstanding Equity Securities of the Company and/or all of the assets of the Company."[3] The principal contractual dispute concerns language in the Exit Sale Right which states that the exercising party "may not require any other Member to engage in such Exit Sale unless the resulting proceeds to such Member (when combined with all prior distributions to such Member) equal at least 1.5 times such Member's aggregate Capital Contributions through such date."[4]

One reading of the 1.5x Clause is that if an Exit Sale does not satisfy its terms for a particular member, then that member can choose to participate in the Exit Sale, but cannot

---

[1] The operative LLC Agreement consists of the Third Amended and Restated Limited Liability Company Agreement of Oxbow Carbon LLC plus six subsequent amendments (collectively, the "LLC Agreement"). A complete set of these documents appears at JX 2859. This decision uses the abbreviation "LLCA" when citing to the Third Amended and Restated Limited Liability Company Agreement. It uses abbreviations such as "First. Am." and "Second Am." when citing to the respective amendments.

[2] This decision refers to this right as the "Exit Sale Right."

[3] This decision refers to the requirement that a member-level transaction involve "all, but not less than all, of the then-outstanding Equity Securities of the Company" as the "All Securities Clause."

[4] This decision refers to this aspect of the Exit Sale Right as the "1.5x Clause."

1

be forced to sell. If the member does not choose to participate, then the member gets left behind when the other members sell. This interpretation relies on the fact that the 1.5x Clause speaks in terms of whether the exercising party can "require any other Member to engage in such Exit Sale."[5]

Another reading of the 1.5x Clause interprets the provision in light of the All Securities Requirement. Under this reading, if the Exit Sale does not satisfy the 1.5x Clause for any member, and that member chooses not to participate, then the Exit Sale cannot go forward because it no longer would involve "all, but not less than all, of the then-outstanding Equity Securities of the Company." Under this reading, failing to satisfy the 1.5x Clause for a particular member enables the member to block the Exit Sale.[6]

A response to the Blocking Theory posits that if an Exit Sale does not satisfy the 1.5x Clause for certain members, then the Exit Sale should be able to go forward if those members are topped off with additional funds sufficient to satisfy the 1.5x Clause.[7] The Top Off Theory comes in two variants. One is the "Waterfall Top Off," in which the transaction proceeds are used first to satisfy the 1.5x Clause, then the remaining proceeds are distributed *pro rata* among all holders. The other is the "Seller Top Off," in which the

---

[5] Depending on context, this decision refers to this approach as the "Leave Behind Theory," "Leave Behind Option," or "Leave Behind Interpretation."

[6] Depending on context, this decision refers to this approach as the "Blocking Theory," "Blocking Option," or "Blocking Interpretation."

[7] This decision refers to this reading as the "Top Off Theory" or "Top Off Option." Sometimes it refers to the concept as a "Top Off."

minority members who exercised the Exit Sale Right can provide additional consideration to any members who need it to satisfy the 1.5x Clause.

A response to the Top Off Theory points out that under the LLC Agreement, an Exit Sale must treat members equally by offering "the same terms and conditions" to each member and allocating the proceeds "by assuming that the aggregate purchase price was distributed" *pro rata* to all unitholders.[8] Using the Top Off Theory violates the Equal Treatment Requirements by providing different consideration to different members and distributing proceeds contrary to a *pro rata* allocation. Incorporating the Equal Treatment Requirements into the analysis means that all members must receive the same per unit consideration in an Exit Sale. If the members need different amounts to satisfy the 1.5x Clause, then the Equal Treatment Requirements mean that all members must receive the highest amount necessary to satisfy the 1.5x Clause for any member.[9]

The Exit Sale Right specifies that the consideration generated by the Exit Sale must exceed "Fair Market Value."[10] The LLC Agreement defines this concept as a valuation determined "on a going concern basis, without any discount for lack of liquidity . . . or minority interest." The LLC Agreement establishes a contractual valuation process in

---

[8] A complex set of provisions produce these results. This decision calls them the "Equal Treatment Requirements." This term includes the provisions governing distributions, which this decision calls (unsurprisingly) the "Distribution Provisions."

[9] Depending on context, this decision refers to this reading as the "Highest Amount Theory," "Highest Amount Interpretation," or "Highest Amount Option."

[10] This decision refer to this aspect of the Exit Sale Right as the "FMV Clause."

3

which investment bankers determine Fair Market Value. In this case, the contractual valuation process generated a Fair Market Value for Oxbow of $2.65 billion, which equated to $169 per unit.[11]

The minority members in this case exercised the Exit Sale Right and secured a buyer who made an offer that satisfied the FMV Clause. But if the consideration contemplated by the offer was distributed *pro rata*, then the Exit Sale would not satisfy the 1.5x Clause for two members who own 1.4% of the Company's equity.[12] The Small Holders invested in the Company in 2011 and 2012 at a price of $300 per unit. Taking into account distributions they have received to date, the Exit Sale would have to provide them with $414 per unit to satisfy the 1.5x Clause. The other members already have received sufficient distributions from Oxbow to satisfy the 1.5x Clause. The Company's majority member controls both of the Small Holders.

The majority member filed this lawsuit, invoking the Highest Amount Theory and claiming that the minority members could not enforce the Exit Sale Right because the proposed transaction did not generate proceeds of $414 per unit. The minority members responded with the Leave Behind Theory, contending that they could force everyone else to engage in the Exit Sale.

---

[11] Under the LLC Agreement, the aggregate member interest of the Company is divided into units.

[12] Because they own such a small percentage of the Company's equity, this decision refers to them as the "Small Holders."

4

The parties filed cross-motions for summary judgment. I held that the plain language of the LLC Agreement foreclosed the Leave Behind Interpretation and supported the Highest Amount Interpretation. I recognized, however, that this reading produced a harsh result by effectively blocking an Exit Sale, and I observed that the implied covenant of good faith and fair dealing might have a role to play.

After the summary judgment ruling, the minority members amended their pleadings to contend that the implied covenant warranted reading a Top Off Option into the LLC Agreement. They appeared to prefer a Waterfall Top Off, which is economically superior for them, but they seemed satisfied with a Seller Top Off. The minority members also contended for the first time that the Small Holders had never been admitted as members. The parties litigated the case through trial.

The record at trial demonstrated that the minority members knew about the admission of the Small Holders in 2011 and 2012, but failed to challenge their admission until 2016. Laches bars the minority members' attempt to claim belatedly that the Small Holders are not members.

The record at trial demonstrated that during the negotiations over the LLC Agreement, the majority member revised the 1.5x Clause to implement a Blocking Option. When read together with the Equal Treatment Requirements, the 1.5x Clause calls for reading the LLC Agreement to implement the Highest Amount Interpretation.

The record at trial demonstrated that the original LLC Agreement intentionally left open the terms on which Oxbow would admit new members, thereby leaving a gap. The LLC Agreement empowers the board of directors (the "Board") to fill that gap by

determining the terms and conditions on which the Company will admit new members. In 2011 and 2012, when the Company admitted the Small Holders, the Board did not fill the gap. Oxbow largely failed to follow proper formalities, and Oxbow did not obtain approvals that the LLC Agreement required. Consequently, a gap exists as to whether the 1.5x Clause covers the Small Holders.

The record at trial demonstrated that if the parties had addressed the issue in 2011 or 2012, when the Small Holders became members, then the majority member would not have insisted on a Highest Amount Option, nor would the minority members have insisted on a Leave Behind Option. It is possible that they would have agreed on using a Waterfall Top Off to satisfy the 1.5x Clause for the Small Holders. The most likely result is that they would have agreed to a Seller Top Off.

Issues of compelling fairness call for deploying the implied covenant to fill the gap created when the Company admitted the Small Holders. Without it, the fortuitous admission of the Small Holders guts the Exit Sale Right and enables the majority member to defeat a commitment he made in 2007 and otherwise would have to fulfill. Until March 2016, the majority member and his counsel believed that the minority members could use a Top Off to satisfy the 1.5x Clause for the Small Holders. Only at that point did the majority member and his counsel stumble across the combination of provisions that leads to the Highest Amount Interpretation. Although the Highest Amount Interpretation is the only reading that gives effect to the LLC Agreement as a whole, it produces an extreme and unforeseen result in this case because of the failure to address the Small Holders' rights when the Company admitted them as members in 2011 and 2012. It would be inequitable

6

for the majority member to benefit now from Oxbow's failure to follow proper formalities then. Under the circumstances, the implied covenant of good faith and fair dealing calls for interpreting the Exit Sale Right to incorporate a Seller Top Off for the Small Holders.

Separately, the minority members proved at trial that the majority member breached a requirement in the LLC Agreement to use reasonable efforts to support an Exit Sale. Rather than using reasonable efforts, the majority member set out, in his own words, to "obstruct," "derail," and "delay" an Exit Sale. He acted in accordance with these purposes, ultimately firing a key executive and filing this lawsuit to scare off the buyer that the minority members had found.

The transaction that the minority members had secured met the requirements for an Exit Sale. Contrary to the majority member's allegations, the minority members are not guilty of unclean hands such that they should be deprived of their right to an Exit Sale.

The parties' briefing focused predominantly on liability and only minimally on remedies. This decision adjudicates the issues that the parties briefed but does not take the next step of crafting a remedy. The parties shall provide supplemental briefing on an appropriate remedy in accordance with this decision.

# I.     FACTUAL BACKGROUND

Trial took place over six days. The record encompasses 4,379 exhibits, live testimony from four fact witnesses, testimony by video deposition from ten fact witnesses, testimony by lodged deposition from thirty-nine fact witnesses, and reports from eight different experts.[13] The parties reached agreement on eighty-three stipulations of fact. They submitted strident pre- and post-trial briefs spanning 629 pages.

On many issues, the evidence conflicts, or the parties seek divergent inferences. The witness testimony frequently complicates matters. The four trial witnesses were intelligent, sophisticated, and savvy. They were thoroughly prepared, and they knew the documentary record inside and out. Each was any effective advocate for his position, but it often seemed that the position was shaping the testimony, rather than the testimony reflecting an unvarnished recollection of events. The same was true, albeit to varying degrees, for many witnesses who testified by deposition.

This problem is endemic to litigation. Human perception is fallible, and human memory provides an imperfect channel for transmitting a noisy signal. The exigencies of litigation create a high-pressure environment that affects recollection and presentation. Although true to some degree in every case, the scope of the problem varies. In this bet-the-company dispute involving a negotiation in 2007, the issuance of units in 2011 and 2012, and an exit process that began in 2013, the litigation environment had a profound

---

[13] JX 2991 (Gompers); JX 2992 (Ferrell); JX 2995 (Henson); JX 2996 (Marcus); JX 2997 (McCarty); JX 2999 (Foster); JX 3001 (Jarrell); JX 3003 (Alfonso).

effect. This decision attempts to harmonize the evidence to the extent possible. Generally speaking, contemporaneous documents have received the most weight.

## A. Oxbow

Oxbow is a Delaware limited liability company with its principal place of business in Florida.[14] Oxbow was formed on January 18, 2005, and for a time was known as Oxbow Mining Holdings, LLC. The LLC Agreement governs its internal affairs.

Oxbow's primary business is the sourcing, production, marketing, and distribution of refinery byproducts and solid carbon fuel, including fuel grade petroleum coke, calcined petcoke, sulfur, and coal. Today, Oxbow is the leading third-party provider of marketing and logistics services to the global petcoke market.[15]

William I. Koch controls Oxbow. In 1983, after receiving an undergraduate degree, master's degree, and Doctorate in Chemical Engineering from the Massachusetts Institute of Technology, Koch founded what became the Oxbow group of companies.[16] He currently serves as Oxbow's CEO and Chairman of its Board.[17]

---

[14] PTO ¶ 1. This decision cites to the Pre-Trial Order as the "PTO." All citations to paragraphs in the Pre-Trial Order are to Section II, which contains the parties' factual stipulations.

[15] *Id.* ¶ 18.

[16] Koch Tr. 641-43.

[17] PTO ¶ 5.

Koch controls Oxbow through Oxbow Carbon & Minerals Holdings, Inc., which owns a majority of Oxbow's units.[18] The documents often refer to this entity as OCMH. Because it serves as a holding company, this decision calls it "Oxbow Holdings." Koch owns the majority of Oxbow Holdings and serves as its CEO and President.[19]

## B. The 2007 Investment

The current dispute traces its roots to a transaction that occurred in May 2007. In 2006, Oxbow Holdings was considering two acquisitions.[20] To finance them, Oxbow Holdings explored a variety of alternatives.[21] Oxbow Holdings had sufficient resources to fund the acquisitions on its own, but business considerations made a private equity financing attractive.[22] Interest was high, with a number of private equity firms competing to make a minority investment.[23]

---

[18] *Id.* ¶ 2.

[19] *Id.* ¶ 5.

[20] *See* JX 2 (presentation summarizing transactions under consideration and soliciting financing); JX 28 (confidential financing memorandum describing transactions under consideration).

[21] Koch Tr. 649-50.

[22] JX 3 (email describing transactions and potential private equity role).

[23] Hurst Tr. 58-59; Koch Tr. 650-51; *see also* JX 6 (referring to indications of interest from multiple firms); JX 11 (confidential financing memorandum being sent to multiple firms); JX 12 (referring to discussions with four firms).

Crestview Partners, L.P. was one of the private equity firms,[24] but it was a relatively new player. A group of ex-partners from Goldman, Sachs & Co. founded Crestview in 2004, and the fund made its first investment in 2005.[25] Crestview had no positions in energy companies and was hoping an investment in Oxbow could diversify its portfolio.[26]

Robert J. Hurst and Barry S. Volpert were and remain principals of Crestview.[27] Hurst received his undergraduate degree from Clark University and an MBA from The Wharton School of the University of Pennsylvania.[28] Before co-founding Crestview, he worked at Goldman for thirty years, including as co-head of investment banking and as Vice Chairman.[29] Volpert received his undergraduate degree from Amherst College and a JD/MBA from Harvard University.[30] Before co-founding Crestview, he worked at Goldman for almost two decades, including as co-Chief Operating Officer of its private equity business.[31]

---

[24] PTO ¶ 14.

[25] Hurst Tr. 57-58.

[26] *Id.* at 56-57.

[27] PTO ¶¶ 16-17.

[28] Hurst Tr. 60.

[29] *Id.* at 6.

[30] Volpert Tr. 341-42.

[31] *Id.* at 342.

11

Koch considered Crestview as a potential investor because of his social relationship with Hurst.[32] Koch also sent information about the potential investment to his friend John Coumantaros, a wealthy shipping magnate.[33]

### 1.     The ArcLight Term Sheet

After discussions with various investors, Oxbow Holdings determined that a private equity firm named ArcLight Capital Partners LLC had provided the most attractive term sheet.[34] Negotiations moved forward on a transaction with ArcLight as the lead investor and potentially one other, secondary investor.[35] After exchanging multiple drafts, Oxbow Holdings and ArcLight agreed on a non-binding term sheet.[36]

The term sheet addressed many points, but for purposes of this litigation, the sections addressing exit rights loom largest. In general terms, the parties agreed on scenarios in which each side could seek liquidity unilaterally. For Oxbow Holdings, that

---

[32] *See* Hurst Tr. 56; Koch Tr. 652; *see also* JX 4 (noting that Koch proposed Crestview and describing firm); JX 5 (letter from Crestview describing firm); JX 56 at CRESTVIEW000116907 (Crestview internal memorandum stating that "[b]ased on a personal relationship, Bill Koch approached Bob Hurst").

[33] *See* PTO ¶¶ 9, 22; JX 26 (email exchange within Coumantaros's company evaluating investment); Koch Tr. 666, 683.

[34] *See, e.g.*, JX 17 (email from ArcLight describing "proposed acquisition and equity investment" as "attractive"); JX 18 (email from Koch to ArcLight: "We are very impressed with what you have accomplished and the quality of your team"); JX 21 (ArcLight Letter of Intent).

[35] *See* JX 55 (email between Koch and banker discussing moving forward with ArcLight and holding off on secondary investor "for the foreseeable future").

[36] JX 57.

right ripened after two years and gave Oxbow Holdings the ability to sell its units and drag along the minority members. The term sheet framed the Drag-Along Right as follows:

> Following the earlier of the second anniversary of the Closing Date or upon the death of William I. Koch, in the event [Oxbow Holdings] proposes to sell all of its Membership Interests in a transaction or series of related transactions, [Oxbow Holdings] shall have the right to require all other Members (including Arclight and Other Strategic/Financial Investor) to sell their Membership Interests alongside [Oxbow Holdings] (provided, ArcLight or Other Strategic/Financial Investor, as the case may be, shall only be required to participate if the proceeds to such party from such sale (when combined with prior distributions to such party) equal or exceed 2.5 times the amount of its Equity Investment.[37]

By stating that "ArcLight or Other Strategic/Financial Investor, as the case may be, shall only be required to participate" in a deal satisfying its return hurdle, the term sheet incorporated a Leave Behind Option into the Drag-Along Right for the named investors.

ArcLight gained the right to offer its units to Oxbow after seven years. The term sheet contemplated a "soft put," meaning that Oxbow was not required to buy the units.[38] If Oxbow failed to purchase them, however, then ArcLight could effectuate a whole-company sale. The term sheet framed the Put as follows:

> At the earlier of (i) the 7th anniversary of the Closing Date and (ii) the resignation, retirement, death or other failure of William I. Koch to spend substantially all of his for-profit professional time on the Company or Gunnison Energy, ArcLight and Other Strategic/Financial Investor shall each have the right to offer the Company the ability to purchase its

---

[37] *Id.* at Oxbow_00164923. This decision refers to this concept as the "Drag-Along Right."

[38] This decision refers to this concept as the "Put" or "Put Right."

13

Membership Interests at fair market value. The Company shall have up to 180 days to consummate such purchase.[39]

The term sheet backed up the Put with the Exit Sale Right: "If the Company declines to purchase the offered Membership Interests at fair market value, ArcLight shall have a drag-along right to enable the sale of 100% of the Company at a price greater than the fair market value [of the Company]."[40] This version of the Exit Sale Right did not contain any limitations based on return hurdles, and it contemplated a sale involving all members.

## 2. Oxbow Holdings' First Draft Of The LLC Agreement

On March 30, 2007, Oxbow Holdings sent ArcLight an initial draft of the transaction documents, including a draft LLC Agreement. Article XIII, Section 9(a) of the draft LLC Agreement framed the Drag-Along Right as follows:

> Subject to the terms and conditions of this Section 9, following the earlier of (i) the second anniversary of the Closing Date or (ii) the death of William I. Koch, [Oxbow Holdings] may require all of the members to participate in a Transfer of all, but not less than all, of the then-outstanding Equity Securities of the Company and/or all of the assets of the Company to any Person(s) in a bona fide arms'-length transaction or series of related transactions (including by way of a purchase agreement, tender offer, merger or other business combination transaction or otherwise) (an "Exit Sale"); provided, that such Exit Sale must result in proceeds to ArcLight (when combined with all prior distributions to ArcLight) equal to at least 2.5 times its aggregate Capital Contributions as of such date.[41]

---

[39] *Id.*

[40] *Id.*

[41] JX 58 art. XIII, § 9(a).

14

This provision defined the term "Exit Sale" as requiring a sale of "all, but not less than all, of the then-outstanding Equity Securities of the Company and/or all of the assets of the Company." This was the source of the All Securities Clause. The Drag-Along Right picked up ArcLight's return hurdle of 2.5 times invested capital, but reframed it as a requirement for an Exit Sale, rather than as an option for ArcLight to remain behind. The Leave Behind Option had flipped into a Blocking Option.

Just as the initial version of Article XIII, Section 9(a) contained the progenitor of the All Securities Clause, Article XIII, Section 9(b) included a predecessor to one of the Equal Treatment Requirements. It stated, "Allocation of the aggregate purchase price payable in an Exit Sale will be determined by assuming that the aggregate purchase price was distributed to [Oxbow Holdings] and the remaining Members in accordance with Article XI, Section 1 hereof."[42] This mechanism persisted into the final LLC Agreement and calls for a *pro rata* distribution of the proceeds from an Exit Sale to all members.

Article XIII, Section 8 of the initial draft addressed the Put. Section 8(e) gave ArcLight an Exit Sale Right if the Company did not buy its units. It stated:

> If the Company rejects the Put Notice in writing or fails to respond to the Put Notice within 180 calendar days of its receipt, ArcLight may require all of the Members to engage in an Exit Sale, on the terms set forth in Section 9(b) below, in which the aggregate consideration to be received by such Members at the closing of such Exit Sale equal or exceed Fair Market Value.[43]

---

[42] *Id.* art. XIII, § 9(b).

[43] *Id.* art. XIII, § 8(e).

This initial version thus deployed the concept of an Exit Sale, required that "all of the Members" engage in the Exit Sale, and only included the FMV Clause. It did not include the 1.5x Clause.

### 3. Koch Expands The Capital Raise.

Meanwhile, Koch decided to expand the size of the capital raise so that Crestview, Coumantaros, and members of Koch's family could participate alongside ArcLight.[44] Oxbow Holdings introduced ArcLight to Crestview, and they had discussions between themselves about how to proceed.[45]

As its financial advisor, Oxbow Holdings was using Jim Freney, the managing partner of Callisto Partners LLC, a boutique investment bank.[46] On April 23, 2007, Freney met with Crestview and Arclight. He described their proposal on exit rights as follows:

> Both ArcLight and Crestview would have the ability to exercise their respective put rights as currently contemplated, but Crestview would not have the right to drag along ArcLight unless the proceeds from the sale (when combined with prior distributions) equal or exceed 1.5 times the amount of its initial investment.[47]

The private equity firms thus proposed that if Crestview initiated an Exit Sale, but ArcLight would not receive 1.5 times its invested capital, then ArcLight could decline to participate

---

[44] *See* JX 63 (email from banker to Koch transmitting proposed capital structures); JX 67 (email from banker discussing steps to "maintain flexibility for Oxbow in terms of structuring the optimal mix of private equity investors").

[45] JX 70.

[46] *See* Koch Tr. 653, 725; Hurst Tr. 108, 300.

[47] JX 72.

and remain behind. This was the first appearance of what became the 1.5x Clause. In speaking with Oxbow's attorneys, Freney described the overall response from the private equity firms as "quite favorable" but noted that "Bill [Koch] has not opined on the matter."[48]

At the summary judgment stage, I was dubious that a minority member would want to be left behind in an Exit Sale, because the minority member would be agreeing to remain in an entity with an unknown future controller who might use its powers aggressively. The record at trial, however, showed that ArcLight was bargaining for strong governance rights, including a range of minority veto rights, and those rights would remain in place after an Exit Sale. Those rights would enable ArcLight to protect itself against a new controller, mitigating the risk of being left behind.

At the summary judgment stage, I was equally dubious that the other members would want anyone to be left behind. It seemed to me that leaving investors behind would depress the price that the other investors would receive for their interests, because a buyer would have to deal with the remaining minority. Looking forward and reasoning back, the other members would realize that they could receive more for their units if they could force a sale of 100% of the Company and not leave anyone behind. The record at trial indicated that Koch in fact viewed the matter this way. As the majority member, he either wanted an Exit Sale involving 100% of the members, giving Oxbow Holdings and its affiliates their

---

[48] *Id.*

17

best chance of the highest possible price, or no Exit Sale at all. Crestview had a different preference. It wanted a path to liquidity. In an ideal world, Crestview would have preferred to drag along all of the members, but having the ability to exit was more important.[49] Crestview's preference ultimately was for an Exit Sale to happen, even if it had to happen without ArcLight and hence potentially at a lower price.

On April 24, 2007, Oxbow Holdings circulated a revised version of the LLC Agreement that addressed ArcLight and Crestview's proposals.[50] This version revised Article XIII, Section 8 to give both ArcLight and Crestview an Exit Sale Right if Oxbow did not satisfy the Put. The new language stated:

> If **(x)** the Company rejects the Put Notice in writing or fails to respond to the Put Notice within 180 calendar days of its receipt **and (y) the Company has no publicly traded equity**, ArcLight **or Crestview, as applicable,** may require all of the Members to engage in an Exit Sale, on the terms set forth in Section 9(b) below, in which the aggregate consideration to be received by such Members at the closing of such Exit Sale equal or exceed Fair Market Value**; provided, that Crestview may not require ArcLight to engage in such Exit Sale if the resulting proceeds to ArcLight (when combined with all prior distributions to ArcLight) do not equal at least 1.5 times ArcLight's aggregate Capital Contributions through such date.**[51]

Consistent with what ArcLight and Crestview had told Freney, this language contemplated a Leave Behind Option for ArcLight if Crestview exercised the Exit Sale Right. Oxbow Holdings did not make any changes to other provisions in the LLC Agreement that the

---

[49] Volpert Tr. 343-44, 517-18; *see also* Hurst Tr. 8-9.

[50] JX 75.

[51] JX 75 at OXBOW_LATHAM_00010531 (formatting in original; bold represents added text)

concept of a partial Exit Sale would affect, such as changes to the All Securities Clause or the Equal Treatment Requirements.

Days earlier, on April 22, 2007, Koch had decided to become personally involved in negotiating the deal documents.[52] On April 25, he revised the Exit Sale Right as follows:

> If (x) the Company rejects the Put Notice in writing or fails to respond to the Put Notice within 180 calendar days of its receipt and (y) the Company has no publicly traded equity, ArcLight or Crestview, as applicable, may require all of the Members to engage in an Exit Sale, on the terms set forth in Section 9(b) below, in which the aggregate consideration to be received by such Members at the closing of such Exit Sale equal or exceed Fair Market Value; <u>provided</u>, that **neither ArcLight nor** Crestview may ~~not~~ require **the Members** ~~ArcLight~~ to engage in such Exit Sale **unless** ~~if~~ the resulting proceeds to **each Member** ~~Arclight~~ (when combined with all prior distributions to **such Member** ~~ArcLight~~) ~~do not~~ equal at least 1.5 times **such Member's** ~~ArcLight's~~ aggregate Capital Contributions through such date.[53]

Koch weighed in again that evening by giving the following instructions to Dave Clark, a senior lawyer in the Oxbow legal department: "You should insert the words 'any other' and delete the word 'the' before the word 'Members' in Section 8(e) page 38 line 6 of Section 8(e). It should read 'neither ArcLight nor Crestview may require any member to engage in such Exit Sale unless . . . ."[54]

After Koch's revisions, the Exit Sale Right read as follows:

> If (x) the Company rejects the Put Notice in writing or fails to respond to the Put Notice within 180 calendar days of its receipt and (y) the Company has no publicly traded equity, ArcLight or Crestview, as applicable, may require

---

[52] *See* JX 71.

[53] JX 74 at Oxbow_00368193 (formatting in original; bold text reflects additions; strikethrough text reflects deletions).

[54] JX 77.

all of the members to engage in an Exit Sale, on the terms set forth in Section 9(b) below, in which the aggregate consideration to be received by such Members at the closing of such Exit Sale equal or exceed Fair Market Value; provided, that neither ArcLight nor Crestview may require any other Member to engage in such Exit Sale unless the resulting proceeds to each Member (when combined with all prior distributions to such Member) equal at least 1.5 times such Member's aggregate Capital Contributions through such date.[55]

To my eye, Koch's revisions eliminated the Leave Behind Option and created a Blocking Option.

At trial, Koch testified that he revised the Exit Sale Right to implement a Blocking Option.[56] Koch explained that his family members were becoming minority members and that he wanted them to have the same minimum return protection as ArcLight and Crestview, but he did not want them at risk of being left behind as minority members in a successor company under new ownership. Unlike ArcLight and Crestview, who were bargaining for strong governance rights, Koch's family members were investing based on his control over Oxbow, and they would not have enjoyed continuing minority protections if a new controller took over. Koch cited his own past experience in litigation with two of his brothers in which he and another brother spent nearly two decades trying to vindicate their rights as minority investors. Based on that experience, Koch never wanted any of his family members to have their personal wealth tied up in a company controlled by others.[57]

---

[55] JX 76 at OXBOW_LATHAM_00013801.

[56] Koch Tr. 656-63, 666-72; *accord* JX 2911 ¶ 11 (Koch affidavit).

[57] Koch Tr. 656-63, 712-13 (describing "almost a religious fanaticism about getting people treated equally based upon what I had been through"); *accord* JX 2911 ¶¶ 8-12.

20

Koch's testimony was logical and credible. He either wanted the Exit Sale to involve everyone or not to occur at all.

### 4. ArcLight Drops Out, and Crestview Moves Forward.

Koch met in person with ArcLight on April 26, 2007.[58] After the meeting, ArcLight dropped out because Koch refused to accept some of ArcLight's governance demands.[59] Crestview was willing to compromise, so they went forward. On April 27, Crestview circulated comments on the draft LLC Agreement.[60]

Crestview proposed many changes, but did little with the provisions at issue in this case. Crestview proposed stylistic revisions to the Drag-Along Right but made no substantive changes, other than to replace "ArcLight" with "Crestview." In a note written in the margin of its markup, Crestview stressed that "Exit Sale must be on same terms for all members."[61] Crestview wanted to ensure that Koch could not receive superior terms for his control block; they wanted everyone to receive the same terms in an Exit Sale.

For the Exit Sale Right, Crestview proposed eliminating the FMV Clause, but did not make any substantive changes to Koch's rewrite of the 1.5x Clause:

> If (x) the Company rejects the Put Notice in writing or fails to respond to the Put Notice within 180 calendar days of its receipt and (y) the Company **is not** ~~has no~~ **P**~~p~~ublicly **T**~~t~~raded ~~equity,~~ ~~ArcLight or~~ Crestview~~, as applicable,~~ may require all of the members to engage in an Exit Sale, on the terms set

---

[58] *See* JX 78.

[59] Koch Tr. 672-73; *accord* JX 2911 ¶ 6.

[60] JX 81.

[61] JX 81 at Oxbow_0013512.

21

forth in Section 9(b) below~~, in which the aggregate consideration to be received by such Members at the closing of such Exit Sale equal or exceed Fair Market Value~~; **provided**, that ~~neither ArcLight nor~~ Crestview may require any other Member to engage in such Exit Sale unless the resulting proceeds to each Member (when combined with all prior distributions to such Member) equal at least 1.5 times such Member's aggregate Capital Contributions through such date.[62]

Crestview's stylistic edits did not scan, since Crestview had eliminated the "neither . . . nor" without adding a "not."

Crestview proposed adding a new section (f) after Article XIII, Section (e). It stated:

If ArcLight or Crestview elects to require all of the Members to engage in an Exit Sale pursuant to Section 8(e) above, at the request of ArcLight or Crestview, as the case may be, the Company shall engage a nationally recognized investment banking firm designated by ArcLight or Crestview to initiate a process for the orderly sale of the Company. The Company agrees to pay all fees and expenses of such investment bank, as well as one law firm retained by ArcLight or Crestview, in connection with such Exit Sale. In such event, each party hereto agrees to use its reasonable best efforts to take or cause to be taken to do or cause to be done all things necessary or desirable to effect such Exit Sale. Without limiting the generality of the foregoing, each Member shall vote for, consent to and raise no objections against any Exit Sale pursuant to this Section 8(f) and shall enter into customary definitive agreements in connection therewith.[63]

The references to "all of the Members" and "each Member" evidence Crestview's belief, after Koch's revisions, that if an Exit Sale took place, then all members would participate.

---

[62] *Id.* (formatting in original; bold text represents additions; strikethrough text represents deletions).

[63] JX 81 at Oxbow_0013536-37. It is not clear why Crestview included references to ArcLight in this rider when it was striking them in other sections of the LLC Agreement. I suspect this was accidental. Things were moving fast at this point, with the parties negotiating many elements simultaneously.

The bulk of the revisions focused on the governance rights that Crestview would receive.[64] On April 30, 2007, Coumantaros finally weighed in with comments. One of his representatives asked that the Put Right include his entity. On the Drag-Along Right, he asked why the other minority members would not receive the same return floor of 2.5 times invested capital before Oxbow Holdings could exercise the right.[65]

### 5. The April 30 and May 1 Drafts

The last two days of the negotiations were hectic. At 1:58 a.m. on April 30, 2007, Oxbow Holdings circulated a revised version of the LLC Agreement.[66] This version fixed the problem created when Crestview struck "neither . . . nor" from the Exit Sale Right. The new language stated that Crestview "may **not** require any other Member to engage in such Exit Sale unless the resulting proceeds to each Member (when combined with all prior distributions to such Member) equal at least 1.5 times such Member's aggregate Capital Contributions through such date."[67] The language continued to contemplate a Blocking Option, consistent with Koch's revisions.

---

[64] *See* JX 85; JX 86; JX 89; JX 90; JX 92; JX 105.

[65] JX 94 at DPW-001985.

[66] JX 98.

[67] *Id.* at Oxbow_00075506 (formatting in original; bold text indicates additions).

On the afternoon of April 30, 2007, Oxbow Holdings circulated another draft.[68] It moved the definition of "Exit Sale" from the Drag-Along Right to a stand-alone collection of definitions in Article I. The relocated definition stated:

> *"Exit Sale"* means a Transfer of all, but not less than all, of the then-outstanding Equity Securities of the Company and/or of the assets of the Company to any non-Affiliated Persons(s) in a bona fide arms'-length transaction or series of related transactions (including by way of a purchase agreement, tender offer, merger or other business combination transaction or otherwise).[69]

In response to a comment from Crestview,[70] the April 30 draft specified that if Oxbow Holdings exercised its Drag-Along Right, it could "require all of the Members to participate in an Exit Sale on the [sic] substantially the same terms and conditions as" Oxbow Holdings.[71] Crestview wanted this language so that Oxbow Holdings would not be able to demand better terms for its controlling block. Koch liked the "same terms and conditions" concept.[72] In a later draft, the parties added comparable language about "the same terms and conditions" to Article XIII, Section 7(d), where it persisted as one of the Equal Treatment Requirements.[73]

---

[68] JX 96.

[69] *Id.* at Oxbow_00013835.

[70] *See* JX 95 at LL0013828.

[71] JX 96 at Oxbow_00013871; *see also* Hurst Tr. 76-77; Koch Tr. 677.

[72] Koch Tr. 676-77.

[73] *See* JX 105 at DPW-001454.

The April 30 draft did not make any changes to the language of Article XIII, Section 8(e), which set out the core Exit Sale Right. The draft tweaked the procedures for hiring an investment bank in Article XIII, Section 8(f). The revision stated:

> If Crestview elects to require all of the Members to engage in an Exit Sale pursuant to Section 8(e) above, at the request of Crestview, the Company shall engage a nationally recognized investment banking firm mutually acceptable to Crestview and [Oxbow Holdings] to initiate a process for the orderly sale of the Company, as well as one law firm for the Company mutually acceptable to Crestview and [Oxbow Holdings]. The Company agrees to pay all customary and reasonable fees and expenses of such investment bank and law firm in connection with such Exit Sale. In such event, each party hereto agrees to use its reasonable efforts to take or cause to be taken or do or cause to be done all things necessary or desirable to effect such Exit Sale. Without limiting the generality of the foregoing, each Member shall vote for, consent to, and raise no objections against any Exit Sale pursuant to this Section 8(f) and shall enter into customary definitive agreements in connection therewith.[74]

The next several exchanges of drafts did not make meaningful changes to the Drag-Along Right or the Exit Sale Right.

On the morning of May 1, 2007, Oxbow Holdings circulated another draft reflecting numerous changes to the Exit Sale Right.[75] The bulk of the revisions addressed the right of an entity controlled by Coumantaros to exercise the Put and trigger an Exit Sale. The draft introduced the concept of "the Exercising Put Party" and revised Article XIII, Section 8 accordingly. The draft contained the following revisions to the Exit Sale Right:

> If (x) the Company rejects the Put Notice in writing or fails to respond to the Put Notice within 180 calendar days of its receipt and (y) the Company is not

---

[74] JX 96 at Oxbow_00013988.

[75] JX 108.

Publicly Traded, ~~Crestview~~**the Exercising Put Party** may require all of the Members to engage in an Exit Sale, on the terms set forth in Section 9(b) and 9(c) below, in which the aggregate consideration to be received by such Members at the closing of such Exit Sale equal or exceed Fair Market Value; <u>provided</u>, that ~~Crestview~~**the Exercising Put Party** may not require any other Member to engage in such Exit Sale unless the resulting proceeds to ~~each~~**such** Member (when combined with all prior distributions to such Member) equal at least 1.5 times such Member's aggregate Capital Contributions through such date.[76]

As part of these edits, the reference to proceeds to "each Member" changed to "such Member."

Crestview has focused on these changes to argue that they made the 1.5x Clause more consistent with a Leave Behind Option. That is a fair observation, but after tracing the evolution of the language, the edits look to me like lawyers' cleanup. Someone noticed that the phrase "such Member" already appeared in the phrase "equal at least 1.5 times such Member's aggregate Capital Contributions" and was trying to use parallel language. If the parties really were trying to create a Leave Behind Option, they would have revised other sections of the LLC Agreement to address the All Securities Clause and the Equal Treatment Requirements. The lawyers already were making significant changes to the agreement to accommodate an entity controlled by Coumantaros. If they had wanted to create a Leave Behind Option, they would have done much more to integrate that concept into the LLC Agreement. None of the contemporaneous documents suggest a substantive change. I cannot infer that the parties intended one.

---

[76] *Id.* at Oxbow_00013449 (formatting in original; bold text indicates additions; strikethrough text indicates deletions).

26

Oxbow Holdings circulated another round of edits at 4:28 p.m. on May 1, 2007.[77] The edits cleaned up cross-references in the Exit Sale Right.[78]

## C. The Final LLC Agreement

At 8:28 p.m. on May 1, 2007, Oxbow Holdings circulated fully executable versions of the transaction documents.[79] The parties signed and closed the deal on May 8.[80]

The final LLC Agreement spanned sixty-four pages, not including exhibits and signature pages. The parties intended for the LLC Agreement to be the full expression of their agreement. To that end, the LLC Agreement contained an integration clause stating:

> Entire Agreement. This Agreement constitutes the entire agreement of the Members and any Additional Members with respect to the subject matter hereof, and supersedes all prior and contemporaneous communications (whether or not oral or in writing) regarding such subject matter.[81]

Consistent with this provision and industry practice, Crestview wanted the LLC Agreement to cover its rights comprehensively, including its exit rights, rather than leaving anything to implication.[82]

---

[77] JX 110.

[78] *Id.* at OXBOW_LATHAM_0001323.

[79] JX 106.

[80] JX 115.

[81] LLCA art. XVII, § 4.

[82] Hurst Tr. 61-63.

Under the terms of the final documents, Crestview made a capital contribution to Oxbow of $190 million and received a total of 1,899,729 units, representing a 23.48% equity interest in Oxbow.[83] Crestview gained the right to appoint two members of the Oxbow Board and appointed Hurst and Volpert.[84]

Coumantaros made a capital contribution to Oxbow of $75 million through Load Line Capital LLC ("Load Line"), a newly formed entity. Load Line received 750,000 units, representing a 9.27% equity interest. Load Line gained the right to appoint one member of the Oxbow Board and appointed Coumantaros.[85]

Oxbow Holdings made a capital contribution to Oxbow of $483,038,499.86 and received 4,830,385 units, representing a 59.69% equity interest.[86] Oxbow Holdings gained the right to appoint six members of the Oxbow Board.[87] Members of Koch's family or their affiliates made capital contributions totaling $61,163,382.38. The Wyatt I. Koch 2000 Trust received 224,704 units, representing a 2.78% interest. The William I. Koch Family

---

[83] Technically, Crestview invested through Crestview-Oxbow Acquisition, LLC and Crestview-Oxbow (ERISA) Acquisition, LLC. PTO ¶ 14. Through affiliates, Crestview owns a majority interest in both entities. Crestview-Oxbow Acquisition, LLC made a capital contribution of $181,603,194.25 and received 1,802,037 units. Crestview-Oxbow (ERISA) Acquisition, LLC made a capital contribution of $8,396,805.70 and received 97,962 units. The two Crestview entities executed the LLC Agreement and became members of Oxbow. *Id.* ¶ 19.

[84] *Id.* ¶¶ 19, 20.

[85] *Id.* ¶¶ 21, 22.

[86] *See id.* ¶ 23; LLCA Ex. A.

[87] PTO ¶ 6.

Trust dated December 26, 1976 for the benefit of Charlotte Koch received 55,764 units, representing a 0.69% interest. Joan Granlund, Koch's ex-wife, received 331,167 units, representing a 4.09% interest. Together, Koch and his family members owned 67% of the equity in Oxbow.[88]

Article XI, Section 1 of the LLC Agreement required that Oxbow make a quarterly distribution to its members of all net cash flow "in accordance with their Percentage Interests."[89] Oxbow was the only investment in Crestview's initial fund in which Crestview secured a cash-flow distribution right.[90]

Beginning on May 8, 2014, Crestview could exercise the Put in Article XIII, Section 8(a) and have the Company repurchase its units at Fair Market Value.[91] Section 8(b) specified that Fair Market Value "shall be determined on a going concern basis, without any discount for lack of liquidity (including the absence of a public market and the presence of transfer restrictions) or minority interest."[92] Section 8(b) also specified a procedure by which a combination of investment banks would determine Fair Market Value. The provisions contemplated that if Crestview chose to exercise the Put, then Load Line could

---

[88] LLCA Ex. A.

[89] *Id.* art. XI, § 1; Hurst Tr. 68-69.

[90] Volpert Tr. 628-29.

[91] LLCA art. XIII, § 8(a).

[92] *Id.* art. XIII, § 8(b).

tag along, and that if Crestview did not exercise the Put, then Load Line could do so. The LLC Agreement referred to Crestview and Load Line together as the "Minority Members."

If the Company declined to buy the Minority Members' units, then the Exercising Put Party could exercise the Exit Sale Right. If Crestview was the Exercising Put Party but Load Line had tagged along, then Load Line could exercise the Exit Sale Right if Crestview declined. The final LLC Agreement described the Exit Sale Right in the following terms:

> If (x) the Company rejects the Put Notice in writing or fails to respond to the Put Notice within 180 calendar days of its receipt and (y) the Company is not Publicly Traded, the Exercising Put Party may require all of the Members to engage in an Exit Sale, on the terms set forth in Section 7(c), Section 7(d) and Section 9(b), in which the aggregate consideration to be received by such Members at the closing of such Exit Sale equal or exceed Fair Market Value; provided, that the Exercising Put Party may not require any other Member to engage in such Exit Sale unless the resulting proceeds to such Member (when combined with all prior distributions to such member) equal at least 1.5 times such Member's aggregate Capital Contributions through such date.[93]

The 1.5x Clause is the proviso to the Exit Sale Right.

The final LLC Agreement defined "Exit Sale" as follows:

> "*Exit Sale*" means as a Transfer of all, but not less than all, of the then-outstanding Equity Securities of the Company and/or all of the assets of the Company to any non-Affiliated Person(s) in a bona fide arms'-length transaction or series of related transactions (including by way of purchase agreement, tender offer, merger or other business combination transaction or otherwise).[94]

---

[93] *Id.* art. XIII, § 8(e).

[94] *Id.* art. I.

Crestview's principals understood that the definition of "Exit Sale" was one of the "Key Definitions" in the LLC Agreement.[95]

The Exit Sale Right stated that any Exit Sale had to take place "on the terms set forth in [Article XIII,] Section 7(c), Section 7(d) and Section 9(b)." These sections established requirements for *pro rata* treatment that this decision refers to as the Equal Treatment Requirements. Article XIII, Section 7(c) stated:

> In the case of both a Tag-Along Transfer and an Exit Sale, each Member shall be obligated to pay only its *pro rata* share (based on the aggregate consideration received by such Member in respect of the Units Transferred by such Member) of expenses incurred in connection with a consummated Tag-Along Transfer or Exit Sale to the extent such expenses are incurred for the benefit of all Members and are not otherwise paid by the Company or another Person.[96]

Article XIII, Section 7(d) stated:

> In the case of both a Tag-Along Transfer and an Exit Sale, (A) each Unit Transferred in such Tag-Along transfer and Exit Sale shall be Transferred on the same terms and conditions as each other Unit so Transferred and (B) each Member shall (i) make such representations, warranties and covenants and enter into such definitive agreements as are reasonably required in the proposed Transfer and as are customary for transactions of the nature of the proposed Transfer, *provided* that if the Members are required to provide any representations or indemnities in connection with such Transfer, liability for misrepresentation or indemnity shall (as to such Members) be expressly stated to be several but not joint (<u>provided</u>, that any collective escrow, holdback or adjustment may be treated as a joint obligation) and each Member shall not be liable for more than its *pro rata* share (based on the aggregate consideration received by such Member in respect of the Units Transferred by such Member) of any liability for misrepresentation or

---

[95] *See* JX 500 at CRESTVIEW000011565 (internal Crestview email listing "Exit Sale" under "Key Definitions"); Hurst Tr. 72-74.

[96] LLCA art. XIII, § 7(c).

indemnity and (ii) be required to bear their proportionate share of any escrows, holdbacks or adjustments in purchase price.[97]

Article XIII, Section 9(b) stated:

> No Member shall be obligated in connection with any such Exit Sale (i) to agree to indemnify or hold harmless the Person to whom the Units are being sold with respect to any indemnification or other obligation in an amount in excess of the net proceeds paid to the such [sic] Member in connection with such Exit Sale or (ii) to enter into any non-competition, non-solicitation or other similar arrangement; provided, further, that such indemnification or other obligations shall be *pro rata* as among the Members other than with respect to representations made individually by a Member (e.g., representations as to title or authority of such Member or the lack of any encumbrance on any of the Units to be sold by such Member). Allocation of the aggregate purchase price payable in an Exit Sale will be determined by assuming that the aggregate purchase price was distributed to [Oxbow Holdings] and the remaining Members in accordance with Article XI, Section 1 hereof.[98]

The last sentence of Article XIII, Section 9(b) called for distributing proceeds from an Exit Sale "in accordance with Article XI, Section 1 hereof." This reference incorporated a daisy chain of provisions that would result in a *pro rata* distribution. Article XI, Section 1 stated:

> Subject to such conditions as may be imposed under any Financing Arrangements and to the prior payment of distributions pursuant to Article XI, Section 2, all Net Cash Flow shall be distributed on a quarterly basis to the Members in accordance with their Percentage Interests within 45 calendar days after the end of each Fiscal Quarter. . . .[99]

This language referenced Article XI, Section 2, which stated:

---

[97] *Id.* art. XIII, § 7(d).

[98] *Id.* art. XIII, § 9(b).

[99] *Id.* art. XI, § 1.

> Prior to making any distributions in respect of any quarter pursuant to Article XI, Section 2, the Company will make quarterly distributions to each Member, to the extent of Net Cash Flow, in an amount equal to such Member's Maximum Permitted Tax Amount; provided, that if the amount of Net Cash Flow is not sufficient to make the foregoing payments in full, the amount that is available will be distributed in the same proportion as if the full amount were available . . . .[100]

These provisions call for distributing proceeds from an Exit Sale to all members in proportion to their Percentage Interests, which is a term that uses all of the units as the denominator. The provisions thus contemplated that the Company would distribute the proceeds from an Exit Sale to all unitholders in proportion to the number of units held.

In a memorandum to Crestview's investment committee, Hurst and Volpert described the Exit Sale Right as permitting Crestview to exit if the proceeds satisfied the 1.5x Clause for all members.

> If the Company declines to exercise [the Put] option, [Crestview] can elect to require a 100% exit sale, provided that the proceeds from such a sale equal at least 1.5 times any investor's aggregate capital contributions to date.[101]

GSO Capital Partners LP, which co-invested $30 million in one of the Crestview entities, described the exit rights to its investment committee in similar terms.[102]

---

[100] *Id.* art. XI, § 2. As noted, this decision refers to the provisions addressing the distribution of proceeds as the "Distribution Provisions." It regards the requirement that the proceeds from an Exit Sale be distributed *pro rata* as one of the Equal Treatment Requirements.

[101] JX 102 at CRESTVIEW000219158.

[102] JX 159 at GSO_Oxbow_0005488; *see also* Hurst Tr. 104-05.

33

The final LLC Agreement did not expressly provide for a top off right.[103] During the negotiations, Crestview never asked for a top off right and did not offer a top off right for Koch's Drag-Along Right.[104] The parties did negotiate over what categories of returns would be included when determining whether the 1.5x Clause had been met, starting with only sale proceeds, then progressing to sale proceeds plus distributions other than tax distributions, and finally settling on sale proceeds plus all prior distributions, including tax distributions.[105]

## D.     The Admission Of Family LLC and Executive LLC

In fall 2010, Oxbow was finalizing an all-cash acquisition of a large sulfur-trading business known as International Commodities Export Corporation. The sulfur company was owned by its executives, and Oxbow wanted to offer the executives an opportunity to purchase equity in Oxbow.[106]

On November 1, 2010, Koch emailed the Board about the acquisition and noted that he would be sending out "a dilution analysis resulting from offering [the sulfur-company executives] and certain Oxbow employees Oxbow [] stock via an investment trust at various amounts and prices. This is part of the deal."[107] Koch subsequently sent an email

---

[103] Hurst Tr. 114-16.

[104] *See id.* at 99-100.

[105] *See* JX 25 at Oxbow_00236397; LLCA art. XIII, §§ 8(e), 9(b); Hurst Tr. 111-14.

[106] Hurst Tr. 164-65; *see also* PTO ¶¶ 4, 29-30.

[107] JX 140; *see also* Hurst Tr. 185-86.

34

stating, "I suggest offering $30 million at $300/share to minimize our dilution from an investment trust, so that we have only one additional stockholder."[108] The email attached graphs showing the level of dilution at various prices ranging from $100 per unit to $300 per unit.

Koch's email included a summary prepared by Oxbow's then-COO, Steven Fried. It described an investment structure in which

> a newly formed entity ("Newco") will be formed, and that Newco would purchase units of Oxbow at fair market value. The amount available and the price is entirely TBD, but as a placeholder, I would analyze the case of Newco owning 100,000 units at $300/unit = $30 million.
>
> Invited participants ([sulfur-company] and Oxbow employees) would in turn hold equity interests ("Units") in Newco and would therefore indirectly own an interest in Oxbow through their investment in Newco.[109]

Fried listed eighteen bullet points describing details of the structure, including:

- "Newco would be a Delaware limited liability company."

- "Newco would be a single purpose vehicle, with no assets other than the Units and some cash."

- "Newco would become a member of Oxbow, owning the same class of units as currently exists."

- "An affiliate of Oxbow would be an investor in Newco and serve as the Manager of Newco. The Manger would not be subject to removal. This will enable Oxbow to maintain control and management of Newco."

_____

[108] JX 138. Koch's sentence elided two concepts: the economic dilution that would result from the issuance of units and the use of an investment vehicle to minimize the number of new members.

[109] JX 138 at Oxbow_00237125.

- "The information rights of Newco with respect to the operation of Oxbow would be limited (and specifically members of Newco would not be entitled to receive Oxbow's financial statements, annual budgets, etc.)."[110]

Fried envisioned that "[t]he existing members of Oxbow would be required to consent to an amendment to implement the rights of Newco as described above."[111]

Later that evening, Fried emailed the Board a memorandum about the proposed acquisition.[112] It explained that Oxbow intended "to implement an investment vehicle structure through which some former [sulfur-company] management (as well as some existing Oxbow management) may invest in [Oxbow] equity at fair market value."[113]

Around the same time, Koch proposed to have members of his family invest alongside the sulfur-company executives. On November 3, 2010, Volpert emailed Quentin Chu, one of his colleagues at Crestview, stating:

> Bill [Koch] called today. Among other things, he asked if it is okay with us for his ex-wife to invest "a few million" in Oxbow at $300/share alongside [the sulfur-company executives]. I told him I thought this would be fine. It occurred to me that we should see if either [of our co-investors] want to sell, and frankly whether we should sell a few shares, rather than accept the dilution.[114]

---

[110] *Id.* at Oxbow_00237125-26.

[111] *Id.* at Oxbow_00237126.

[112] JX 139; *see also* Hurst Tr. 24, 187-88.

[113] JX 139 at Oxbow_00237129.

[114] JX 141 at CRESTVIEW000089036.

36

Volpert's email forwarded the Newco analysis prepared by Fried and the slides showing the level of dilution at various issuance prices.[115] Crestview ultimately signed off on the investment by Koch's family members as an accommodation to Koch.[116] Hurst testified that Crestview probably understood that Koch would control the vehicle and "just didn't make a big deal out of it."[117]

In January 2011, Oxbow acquired the sulfur company for $150 million.[118] During a meeting of the Board on April 28, 2011, the directors voted unanimously to issue units worth $20 million to members of Koch's family and units worth $10 million to the sulfur-company executives, all priced at $300 per unit.[119]

Despite the Board's authorization, Oxbow did not immediately implement the transactions. There were details to hammer out with the sulfur-company executives.[120] In

---

[115] *See id.*

[116] Volpert Tr. 387 (testifying Crestview agreed to the issuance as "an accommodation to [Koch's] estate planning," that Oxbow "didn't need the capital," and that the issuance "didn't enable the company to do anything"); *accord* Hurst Tr. 22-23 ("We did this as an accommodation to Bill [Koch]."); *see also* JX 167 (Volpert emailing Chu: "Remember that we approved of Oxbow selling up to $30m of primary stock at $300/share to the [sulfur-company] management and Bill's ex-wife.").

[117] Hurst Tr. 202-03.

[118] *Id.* at 164-65.

[119] JX 155.

[120] *See*, *e.g.*, JX 153 (internal Crestview email discussing deal-structure concerns).

addition, Oxbow had not set up an equity investment program for its own executives, so the proposal to include a limited number of Oxbow executives complicated matters.[121]

Internally, Oxbow noticed a preemptive rights provision in the LLC Agreement. In an email dated April 29, 2011, Oxbow's then-CFO, Zach Shipley, explained the issue to Koch and Richard Callahan, who was Oxbow's corporate secretary at the time:

> In the context of [Oxbow] selling new equity to members of Bill's family, it has been drawn to my attention that the Operating Agreement of [Oxbow] gives all members certain rights of participation in any equity [issuance] by the Company. . . . I don't think this will have a practical effect on the ultimate outcome of the equity sales to Bill's family, but it does present a procedural requirement. Basically, we have to offer equity to all members at $300 per unit. . . . I expect that, at $300/unit, no one but the intended buyers will buy additional equity, but if they do, maybe that is a good thing.
>
> [T]his does raise a question about whether we need to get a slightly different approval from the Board.[122]

No one appears to have considered whether the issuance was a related-party transaction that would trigger a requirement for Board approval by a "Supermajority Vote,"[123] defined as approval from a majority of the Board that included the Load Line director and at least one Crestview director.[124] Oxbow did not get any further approvals from the Board for the issuance to Koch's family members.

---

[121] Koch Tr. 692-93; *see also*, *e.g.*, JX 158.

[122] JX 157.

[123] LLCA art. III, § 3(d)(11).

[124] *Id.* art. I.

During a meeting on November 9, 2011, the Board revisited its approval of the issuance of units to the sulfur-company executives. This time, the Board reached consensus to issue units worth $15 million, rather than $10 million, but still at a price of $300 per unit.[125] The Board approval did not address the question of preemptive rights.

Koch formed Ingraham Investments LLC to hold the units issued to his family members, rather than having his family members own the units directly.[126] Because the entity is an investment vehicle for members of Koch's family, this decision calls it "Family LLC." Koch has controlled Family LLC from its inception.[127]

Oxbow formed Oxbow Carbon Investment Company LLC to hold the units issued to the former executives of the sulfur-trading company. The documents frequently refer to it as "OCIC." Because the entity is an investment vehicle for executives, this decision calls it "Executive LLC." Koch is the sole manager of the managing member of Executive LLC.[128]

---

[125] JX 2545 at CRESTVIEW000027420-21.

[126] *See* JX 201; JX 208.

[127] PTO ¶ 3; JX 4322 No. 23 (response to request for admissions).

[128] *See* PTO ¶ 4; *see also* JX 170.

On December 23, 2011, Family LLC wired $20 million to Oxbow, and Oxbow issued 66,667 units to Family LLC.[129] The Board resolved to distribute the funds, and Family LLC received its proportionate share.[130]

On March 12, 2012, Executive LLC wired $15 million to Oxbow, and Oxbow issued 50,000 units to Executive LLC.[131] The Board gave Koch discretion over whether to distribute the funds from Executive LLC's investment. He elected to distribute the money.[132] Both Family LLC and Executive LLC received their proportionate share.[133]

Together, Family LLC and Executive LLC own approximately 1.4% of Oxbow's units.[134] As mentioned previously, this decision refers to the entities together as the "Small Holders."

The issuance of units to the Small Holders had potential implications for the Exit Sale Right. After four years of distributions from Oxbow, all of the existing members had received a sufficient return on their investment to satisfy the 1.5x Clause.[135] Issuing equity

---

[129] PTO ¶ 32; JX 2906 at Oxbow_00160186; *see also* Hurst Tr. 169; Volpert Tr. 505-06

[130] JX 210; Koch Tr. 698; Hurst Tr. 173-75.

[131] PTO ¶ 34; JX 234 at Oxbow_00242653; Hurst Tr. 179; Volpert Tr. 505-06; *see also* JX 2539.

[132] *See* Hurst Tr. 179-80; Koch Tr. 694; *see also* JX 234.

[133] *See* JX 212-14; JX 218; Hurst Tr. 175-80; Koch Tr. 694, 698.

[134] PTO ¶ 31.

[135] Volpert Tr. 384-86.

at $300 per unit created a new group of unitholders who had not yet received any distributions and had a return hurdle of $450 per unit.

When Oxbow issued the units to the Small Holders, Crestview's principals were aware of the 1.5x Clause,[136] and the firm was evaluating its alternatives for exiting from Oxbow.[137] They had already discussed potential exit scenarios with Koch.[138]

There is some reason to think that Crestview's principals were not overly concerned with the issuances to the Small Holders because of the valuation that they placed on Oxbow. Using multiples ranging from seven to ten times EBITDA, Crestview was forecasting exit values in a sale of Oxbow from $283.34 to $452.04 per unit.[139] Crestview generally believed that a multiple of ten times EBITDA was appropriate for Oxbow.[140] Crestview projected that Oxbow would generate EBITDA of $566 million in 2015,

---

[136] *See* Hurst Tr. 123.

[137] *See* JX 165 (Volpert requesting an analysis of returns at various multiples); JX 166 at CRESTVIEW000116078-79 (reviewing exit scenarios as part of evaluation of Oxbow investment); JX 193 (Crestview analysis of carried interest under various exit scenarios); JX 217 (same); *see also* Hurst 123-26.

[138] *See* JX 189 (Volpert email to Hurst stating, "On exits, Bill said he wants to consider every alternative possible . . . . I just agreed that he should do this and figure out what he thinks is best. I'm glad he raised this."); JX 199 at Oxbow_36221-22 (Koch reporting that "Crestview has offered to stager [sic.] the buyout date so that there is not pressure of a specific buyout day: 1/3 a year before, 1/3 on the buyout day, and 1/3 a year after."); *id.* at Oxbow_00036221 (email from Fried to Johnson explaining that "Crestview has offered up to let us buy them out 1/3 per year so the cost can be spread out. Their trigger date is May 7, 2014 but can be modified with agreement."); *see also* Koch Tr. 699-702.

[139] JX 166 at CRESTVIEW000116078.

[140] *See* Hurst Tr. 128.

41

supporting a potential exit at close to $560 per unit.[141] Oxbow in fact achieved EBITDA of $571.6 million in 2011.[142] In an email, Crestview's principals discussed whether Koch should "explore whether Petrochina is interested in purchasing 10-20% of the company at $500/share . . . , maybe as a way for us to pave the way for an eventual exit."[143] Morgan Stanley & Co. LLC was contemporaneously advising Oxbow and Crestview that Oxbow could go public at around $400 per unit and that the stock would trade up to around $500 per unit.[144] Volpert later wrote that when Crestview approved the issuance of units to the Small Holders, "[w]e thought we were giving them all a great discount."[145]

Internally at Oxbow, after Crestview began raising the possibility of an exit, Koch tasked Oxbow personnel with evaluating Crestview's exit rights and considering potential strategic alternatives.[146] As part of that process, Shipley prepared a summary of the Minority Members' exit rights.[147] It included the following analysis:

---

[141] *See* JX 164 at CRESTVIEW000116055 (EBITDA projection); JX 166 at CRESTVIEW000116078 (exit sensitivities); Hurst Tr. 130-32.

[142] Hurst Tr. 132.

[143] JX 160 at CRESTVIEW000010924.

[144] Volpert Tr. 385-86.

[145] JX 1243. There is conflicting evidence. As of May 2011, Crestview was carrying its investment in Oxbow at $374.7 million, or approximately $197 per unit. JX 164 at CRESTVIEW000116058.

[146] *See* JX 206.

[147] JX 3159; *see also* Koch Tr. 702-06.

Regarding the 1½-times-capital-contributions proviso: At this point in time, most Members' distributions have been so great that there is no lower bound on net proceeds. A key exception is [Executive LLC], which recently contributed capital of $300 per unit for newly issued equity. By 2014, [Executive LLC] will undoubtedly have received some distributions, but, by the letter of the Agreement, [Executive LLC] may have the right *not* to participate in an Exit Sale if the price is low enough. Furthermore, the Agreement defines an Exit Sale to be a sale of all (but not less than all) of the equity or assets of the Company. [Executive LLC] may therefore be in a position to prevent an Exit Sale altogether, if the price is much less than $300 per unit.[148]

Shipley appears to have thought that if an Exit Sale did not satisfy the 1.5x Clause for a particular member, then it could not go forward. This is an example of the Blocking Theory. He did not take the next step of analyzing the Equal Treatment Requirements to arrive at the Highest Amount Theory.

As noted, Oxbow did not obtain a specific waiver of the existing members preemptive rights, nor did Oxbow consider whether the issuances to the Small Holders required a Supermajority Vote. In addition, the LLC Agreement required that, "[a]s a condition to being admitted as a Member of the Company, any Person must agree to be bound by the terms of this Agreement by executing and delivering a counterpart signature page to this Agreement, and make the representations and warranties set forth in Section 7

---

[148] JX 3159 at Oxbow_00158126.

43

below as of the date of such Person's admission to the Company."[149] The Small Holders did not provide Oxbow with signed signature pages until 2016, after this litigation began.[150]

Despite not satisfying these formal requirements, everyone treated the Small Holders as members. Starting in early 2012, Oxbow listed the Small Holder as members in the monthly management reports that Crestview and Load Line received.[151] Oxbow's audited financial statements for 2011, 2012, and 2013 reported the issuance of units to the Small Holders and identified those entities as affiliated with Koch.[152] In 2012 and 2013, Oxbow's auditor identified the Small Holders as members in its reports to the audit committee, which Hurst chaired. The first time that Crestview and Load Line raised any objection to the Small Holders' status as members was after this litigation began.[153]

## E. The Third Amendment To The LLC Agreement

Under the terms of the LLC Agreement, Crestview could exercise the Put beginning on the seventh anniversary of the effective date of its investment, or May 8, 2014.[154] Koch and the executive team at Oxbow viewed the Put and the Exit Sale Right as serious threats.

---

[149] LLCA art. IV, § 5.

[150] Koch Tr. 1221-22; *see also* JX 4322 Nos. 8, 10 (responses to requests for admissions).

[151] *See, e.g.*, JX 232 at CRESTVIEW_000222549; *see also* JX 243; Hurst Tr. 139-40, 168-69, 179-80.

[152] *See, e.g.*, JX 273 at Oxbow_00167079; *see also* Hurst Tr. 196-98.

[153] *See* Hurst Tr. 178-79; Koch Tr. 694-95.

[154] LLCA art. XIII, § 8(a).

In March 2013, Brian Bilnoski of Oxbow wrote a private memorandum to Koch in which he warned that "[i]f Oxbow cannot afford to buyout [sic] the minority investors with debt, the majority shareholders will be at the mercy of either the minority shareholders in terms of exit timing (and price as determined by the market at that time) or timing of finding a new equity investor."[155] Bilnoski's memorandum reflected a belief that Oxbow's units were worth $217 per unit.[156] The fact that Bilnoski viewed the Exit Sale Right as a meaningful threat at that valuation indicates that he did not perceive the 1.5x Clause and the Equal Treatment Requirements as working together to generate the Highest Amount Theory.

By May 2013, Koch perceived that Crestview was focusing on achieving liquidity for its investment and that its interests were diverging from his.[157] By November 2013, Koch had become concerned that Crestview was "more interested than the near term than in the long term" and would be pushing for an exit.[158]

To give Koch more time to raise money and alleviate Koch's anxiety about the Put, Crestview offered to extend the exercise date.[159] The parties reached agreement on

---

[155] *See* JX 272 at Oxbow_00005424-25.

[156] *Id.* at Oxbow_00005424.

[157] *See* JX 281 (Koch's handwritten notes indicating "interest diverging now" and "Crestview need liquidity").

[158] JX 314.

[159] Hurst Tr. 27-28; *see also* Volpert Tr. 391-93.

45

Amendment 3 to the LLC Agreement, dated February 13, 2014 (the "Third Amendment").[160]

The Third Amendment extended the exercise date for the Put until January 1, 2015. It also permitted Crestview to exercise the Put for only some, but in no case less than 25%, of its units. Before the Third Amendment, Crestview had to put "all (but not less than all)" of its units.[161] The Third Amendment amended and restated the Exit Sale Right to limit its availability to situations in which Crestview owned 10% or more of the Company. The new provision stated:

> If (x) the Company rejects the Put Notice in writing or fails to respond to the Put Notice within 180 calendar days of its receipt and (y) the Company is not Publicly Traded:
>
> (A) if at such time Crestview owns ten percent (10%) or more of the outstanding Member Interests and Units of the Company, the Exercising Put Party may require all of the Members to engage in an Exit Sale, on the terms set forth in Section 7(c), Section 7(d) and Section 9(b), in which the aggregate consideration to be received by such Members at the closing of such Exit Sale equal or exceed Fair Market Value; provided, that the Exercising Put Party may not require any other Member to engage in such Exit Sale unless the resulting proceeds to such Member (when combined with all prior distributions to such Member) equal at least 1.5 times such Member's aggregate Capital Contributions through such date; and
>
> (B) if at such time Crestview owns less than ten percent (10%) of the outstanding Member Interests and Units of the Company, then notwithstanding any other provision of this Agreement the Exercising Put Party (and if applicable, the Tag-Along Put Party) shall have the right (i) to Transfer all of its or their Member Interests and Units that were subject to the Put Notice to any non-Affiliated Person at any time on such terms and conditions as the Exercising Put Party (and if applicable, the Tag-Along Put

---

[160] PTO ¶ 25(c).

[161] LLCA art. XIII, § 8(a).

Party) shall determine, or (ii) to require the Company to use commercially reasonable efforts to complete an Initial Public Offering on customary terms and conditions as promptly as practicable and to include in such Initial Public Offering all Member Interests and Units then held by the Exercising Put Party (and if applicable, the Tag-Along Put Party).

The obligation of the Company to provide cooperation and support as contemplated by Section 8(f) of this Article XIII in the event of an Exit Sale shall apply, *mutatis mutandis*, to any Transfer or Initial Public Offering pursuant to clause (B) above. For the avoidance of doubt, the provisions of Section 6 and 7 of this Article XIII shall not apply to any Transfer or Initial Public Offering pursuant to clause (B) above.[162]

The Third Amendment continued to speak in terms of all members engaging in an Exit Sale "on the terms set forth in Section 7(c), Section 7(d) and Section 9(b)," which gave rise to the Equal Treatment Requirements. The Third Amendment did not make any changes to the definition of Exit Sale, which included the All Securities Clause.

During the negotiations over the Third Amendment, Chu spoke with Oxbow's then-General Counsel, Michael McAuliffe, about the mechanics of the Put and the Exit Sale Right. In an email to Chu dated February 12, 2014, McAuliffe followed up on the conversation:

I have been thinking about the discussion yesterday regarding the "Put" and "Drag Along" provisions. I will forward some additional language that addresses the issues you raised. The challenge is to be as surgical as possible and avoid unintended consequences, but still effect the changes sought. The existing agreement is somewhat cumbersome because, as you noticed, the transfer provisions arguably are in tension with the Put/Drag along language . . . .

As a result, additional language may need to be added to the previously forwarded language amendments:

---

[162] Third Am. ¶ 4.

. . .

> -Article I Definitions—Modification of definition of "Exit Sale" to reflect that an "Exit Sale" may include a less than whole company sale pursuant to Article XIII, Section 8. This, of course, is a result of the creation of a partial put right and the elimination of a drag along in the case of a less than 10% holding by Crestview. The other possible less than whole company "Exit Sale" in Article XIII, Section 8(e), is moot given that all members have received proceeds in excess of 1.5 times their capital contributions.

> Dave Clark will draft some language . . . .[163]

McAuliffe copied Clark and Bill Parmelee, who had taken over as Oxbow's CFO.

In his email, McAuliffe recognized the conflict between the All Securities Clause and a partial Exit Sale, but he stated that "a less than whole company sale" was possible. He viewed one possibility as "of course [the] result of the creation of a partial put right and the elimination of a drag along in the case of less than 10% holding by Crestview." But that statement mixed up different concepts. Crestview was always going to exercise the Put for a minority of the Company's units. If Crestview exercised the Put for all of its units, it would offer to sell 23.5% of the Company. The fact that Crestview might offer to sell less than all of its units did not change the relationship between the Put and the Exit Sale. The point of the Exit Sale was to put teeth into the Put so that the Company would buy rather than pass. Nor did the elimination of the Exit Sale Right if Crestview owned less than 10% of the Company's securities have anything to do with a partial Exit Sale. Under those circumstances, Crestview gave up its Exit Sale Right in favor of either selling its units freely to any non-Affiliated Party or having the right to force the Company to undertake an

---

[163] JX 360.

48

initial public offering. But McAuliffe told Crestview that these scenarios contemplated a less-than-whole-company Exit Sale.

McAuliffe also indicated that he believed that the 1.5x Clause gave rise to "[t]he other possible less than whole company 'Exit Sale.'" McAuliffe did not explain why he thought this, and his comment did not take into account either the definition of an Exit Sale, which included the All Securities Clause, or the terms for an Exit Sale, which included the Equal Treatment Requirements. McAuliffe then described the possibility of a less-than-whole-company sale under this route as "moot given that all members have received proceeds in excess of 1.5 times their capital contributions." McAuliffe in fact was wrong about that, because the Small Holders had not received sufficient distributions to satisfy the 1.5x Clause. Regardless, he clearly indicated to Chu that if there had been members who had not received sufficient distributions, then a less-than-whole-company Exit Sale would have been possible. For that to happen, he must have been contemplating either the Leave Behind Interpretation or the availability of a Top Off Option.[164]

At trial, Hurst testified that Crestview did not negotiate for any changes in the definition of an Exit Sale or the general requirements for an Exit Sale Right in reliance on McAuliffe's statements.[165] To rebut McAuliffe's contemporaneous email, Koch relies on

---

[164] Two years later, McAuliffe would write explicitly that he understood the Exit Sale Right to permit either the Leave Behind Option or a Top Off, although he did not walk through the language to explain why. *See* JX 2144. McAuliffe testified in deposition that he, Clark, and Parmelee discussed the idea of a Top Off. McAuliffe Dep. 456-57.

[165] Hurst Tr. 30-31, 141-43.

a post-litigation affidavit from McAuliffe in which he averred that, after he sent the email, either Clark or Parmelee reminded him that the Small Holders had not yet received sufficient distributions to meet the 1.5x Clause. He then reached out the next evening to Chu and corrected his statement.[166] The Crestview witnesses dispute this account,[167] and one of Oxbow's attorneys testified that when he first met McAuliffe in August 2015, McAuliffe told him that all members had received enough distributions to satisfy the 1.5x Clause.[168] I think it is more likely that McAuliffe did not follow up with Chu and correct himself.

## F.     Oxbow Considers Seeking Capital For A Buyout.

During 2014, Koch tried to raise replacement capital to redeem Crestview's units, and the Oxbow team began interviewing investment banks to lead a process.[169] Also during 2014, Christine O'Donnell emerged as a key player within Oxbow.

In 2011, Koch had hired O'Donnell as a consultant to his family office, Renegade Management, Inc.[170] She performed well and gained Koch's trust.[171] In February 2014,

---

[166] *See* JX 2967 ¶¶ 14-16 (McAuliffe affidavit).

[167] *See* Hurst Tr. 136-40; Chu Dep. 134-35.

[168] Popeo Tr. 1424-25.

[169] Koch Tr. 710-11; *see, e.g.*, JX 349; JX 369; JX 409; JX 443; JX 445; JX 489.

[170] O'Donnell Dep. 37.

[171] *See, e.g.*, JX 346. For example, Koch gave O'Donnell *carte blanche* on using Oxbow's private plane. *Compare* JX 403 (executives questioning O'Donnell's private plane usage) *with* JX 428 (Koch giving O'Donnell full authority to use private plane).

Koch made her a member of the Oxbow Board.[172] In August 2014, Koch made her the CEO of Renegade.[173] She also held the positions of President of Family LLC and Vice President of Oxbow Holdings.[174] In these capacities, she had broad responsibility for overseeing Koch's personal financial holdings, including Oxbow Holdings' majority interest in Oxbow.[175]

O'Donnell appears to have believed that she could help Koch solve various issues at Oxbow and in his personal life. She thought that good relations with Crestview were critical, so she began cultivating Volpert and Hurst.[176]

Koch continued to worry that Crestview was focusing on its short-term desire for liquidity to the detriment of Oxbow's long-term success.[177] In September 2014, Koch and O'Donnell had a dinner meeting with Hurst, Volpert, and Chu during which they discussed

---

[172] PTO ¶ 10.

[173] *Id.*

[174] JX 3828 ¶ 3 (O'Donnell affidavit).

[175] *Id.* ¶ 4.

[176] *See*, *e.g.*, JX 424; JX 430; JX 439; JX 450.

[177] *See, e.g.*, JX 432-33.

51

Crestview's desire to exit.[178] Afterwards, tensions between Koch and Crestview rose.[179] O'Donnell tried to maintain good relations with both sides.[180]

Another face-to-face meeting took place in November 2014. During the meeting, Crestview reported that it would extend the life of the fund that had invested in Oxbow and therefore did not need to exit until 2017 or 2018.[181] Koch believed that détente had been achieved and halted Oxbow's efforts to hire an investment banker. After the meeting, Koch sent a detailed email to Volpert and Hurst in which he described the understandings he believed they had reached.[182] Among other points, Koch expressed a desire

> to modify the LLC/Put agreement with the current 5 year partial put to be consistent with your stated possible delay to 2017 or 2018 so that we can operate efficiently our business to achieve profits and growth without the constant uncertainty of when to raise and/or save cash for your exit.[183]

He further noted that "[i]t would also be helpful to both of us to correct much of the vagueness and contradictions that exist in the current LLC agreement."[184]

---

[178] *See* JX 452; JX 463.

[179] *See, e.g.*, JX 463; JX 465-67.

[180] *See, e.g.*, JX 466; JX 497-98.

[181] *See* JX 497-98; JX 507; Koch Tr. 714-16.

[182] JX 513.

[183] *Id.* at CRESTVIEW000023138.

[184] *Id.*

Crestview, however, did not stand down from its efforts to achieve an exit. Crestview began actively analyzing the exit provisions of the LLC Agreement.[185] Crestview also worked with GSO Capital to generate an actionable term sheet for the purchase of half of Crestview's position.[186] O'Donnell worked with Crestview and GSO Capital, believing that a partial sale could help defuse the tensions between Koch and Crestview.[187]

## G. A Management Crisis Brings Together O'Donnell, Johnson, and Crestview.

In December 2014 and early 2015, a management crisis developed at Oxbow. It was the second of the year. In April 2014, Fried had resigned from the COO position. Koch replaced Fried with Eric Johnson.[188] Now, Johnson was on the verge of resigning.[189]

Koch wanted to keep Johnson, but he and Johnson had a poor relationship.[190] Koch asked Hurst, Volpert, and O'Donnell to convince Johnson to stay.[191] After an all-hands-on-deck effort, they succeeded.[192] As part of the deal, Koch agreed to increase Johnson's

---

[185] *See* JX 500.

[186] *See* JX 501; JX 510; JX 514; JX 517.

[187] *See, e.g.*, JX 515-19; JX 521; JX 531.

[188] *See* PTO ¶ 11; Johnson Dep. 299-30; *see also, e.g.*, JX 385; JX 386; JX 389; JX 395.

[189] *See, e.g.*, JX 526; JX 534; JX 535.

[190] *See, e.g.*, JX 522.

[191] *See* JX 538; Johnson Dep. 305-06; Koch Dep. 432-37.

[192] *See, e.g.*, JX 536; JX 543-47; JX 549.

53

salary, give him equity in Oxbow, and promote him to President.[193] Johnson felt indebted

to Crestview and told his wife he had a "[m]an crush on [the] Crestview guys."[194]

Despite reaching agreement with Johnson, Koch resisted giving up day-to-day

control.[195] On January 13, 2015, Koch announced Johnson's new role as President, while

making clear that he remained in charge as Chairman and CEO.[196]

Unfortunately, the relationship between Koch and Johnson did not improve.[197]

O'Donnell had come to respect Johnson, and they became close friends.[198] She also

respected Hurst and Volpert, and their working relationship grew closer as well.[199] Whether

individually or collectively, O'Donnell, Johnson, Hurst, and Volpert all seem to have

reached the conclusion that Koch was often his own worst enemy and that Oxbow would

be best served if he stepped back, gave up control, and let Johnson lead the Company.[200]

---

[193] *See* PTO ¶ 11; JX 538 (Koch emailing O'Donnell that he told Crestview about having "offered Eric to be president with doubled salary and a lot of equity"); JX 560 (email announcing Johnson's promotion "to President and COO"); JX 570 (offer letter); *see also* Koch Dep. 431-32.

[194] JX 567.

[195] *See* JX 536-38; JX 548.

[196] JX 560; *see, e.g.*, JX 550-53; JX 559; JX 561; JX 577.

[197] *See, e.g.*, JX 578; JX 584; JX 595; JX 606; JX 614.

[198] *See, e.g.*, JX 504; JX 525.

[199] *See, e.g.*, JX 590-91; JX 606; JX 608-09.

[200] *See, e.g.*, JX 597; JX 606; JX 608; Hurst Tr. 259; Volpert Tr. 477-78.

Koch was confronting problems unrelated to Oxbow that demanded his attention, and my impression is that O'Donnell, Johnson, Hurst, and Volpert believed that taking a step back would be best for Koch personally as well.[201]

One path was for the Board to empower Johnson to run Oxbow.[202] Another was for Crestview to purchase enough units from Koch to acquire control.[203] A third was to "bring in a new investor to purchase enough of [Koch's] shares to give Crestview plus the new investor a majority interest."[204] Yet another was for Koch to agree to sell the Company.[205]

None of these options were viable unless Koch agreed,[206] so O'Donnell, Johnson, Hurst, and Volpert set out to convince him. In addition to the potential benefits for the Company and Koch, the Put loomed as leverage. If exercised, it would bring on a storm, and that danger might motivate Koch to change course. Recognizing that Koch might view their efforts as an attack, O'Donnell, Johnson, Hurst, and Volpert kept their discussions secret.[207]

---

[201] *See* Hurst Tr. 315-16.

[202] JX 622.

[203] *See* JX 615.

[204] JX 622 at CRESTVIEW000015402; *see also* JX 623.

[205] JX 622.

[206] *See* Hurst 217-18.

[207] *See* JX 624.

During January and February 2015, Crestview and O'Donnell quietly explored possible investments by other private equity firms.[208] Crestview took steps to enhance its relationship with Johnson.[209] O'Donnell and Hurst suggested to Koch that he take a brief leave of absence to attend to personal matters.[210] Koch saw these suggestions as an effort to undermine his control, and his suspicions about Crestview grew.[211]

## H. Koch Tasks O'Donnell With Raising Capital.

In March 2015, Johnson told Volpert that Oxbow could cut nearly $18 million in annual expenses, largely by eliminating programs that Koch personally valued.[212] Volpert concluded that Oxbow was spending too much to support Koch's lifestyle, and he raised these issues during a March Board meeting.[213]

Koch felt attacked.[214] On March 22, 2015, he responded with a lengthy and condescending email to Volpert that he sent to the full Board.[215] In the midst of it, he announced that O'Donnell would "start to put together a program" to raise equity financing

---

[208] *See* JX 629; JX 632: JX 644; JX 646; JX 648.

[209] *See* JX 631; JX 639.

[210] *See* Koch Tr. 719-21.

[211] *See* JX 626.

[212] *See* JX 650.

[213] *See* JX 657.

[214] *See* JX 660; JX 672; JX 675; JX 691; *see also* JX 663.

[215] JX 675.

that would provide all investors in Oxbow with liquidity.[216] By that time, Koch had learned about O'Donnell's interactions with GSO Capital,[217] but he did not know the extent of O'Donnell and Crestview's approaches to other investors, nor the degree to which O'Donnell, Johnson, Hurst, and Volpert were working together. He also did not know that O'Donnell, Johnson, Hurst, and Volpert had concluded that it would best serve Oxbow if Koch were no longer in control.[218]

On March 23, 2015, Koch sent another combative email to Volpert in which he proposed that they "work out a peace agreement" but threatened serious consequences if they did not:

> If you want peace only on your terms HELL will come down on both of us which will be both a financial and reputational disaster for all of the Oxbow unit holders. I will point [out] that I have been there before and know many of the techniques and their consequences. I have shown over and over that I am willing to accept them. On the other hand I will point out that rationally it is far better for us to cooperate than to fight. . . .
>
> I know that you have said in a macho matter that you have not thrown your first punch. Neither have I. However I have been in many more fights than you with far more nasty, powerful, and clever opponents than you, such as Koch Industries (for 20 years), the Turkey mafia, the Turkish Government, the IRS, the MAS RS, a vindictive ex-wife who threw me in jail, the NY Times, wine counterfeiters, etc., etc., etc. It makes more sense for us to come to a peace treaty than to dissipate the value we have in Oxbow by fighting.
>
> I am intelligent enough to know from Bob [Hurst's] numerous conversations with me, his continued repeated unsolicited advice to me, his secret and devious maneuvers with Oxbow employees, and you[r] waterboarding

---

[216] *Id.* at CRESTVIEW000088505; *see also* Hurst Tr. 32.

[217] *See* JX 662; Koch Tr. 717.

[218] *See* JX 615-17; JX 622; JX 653; JX 665-66; JX 786; JX 794; JX 820.

combined with your actions and behavior at the recent unofficial board meetings that Crestview has a hidden agenda, which is consistent with PE firm's exist [sic] tactics. These tactics have been and are harmful to Oxbow in spite of some good intentional and unintentional consequences of Crestview's waterboarding. Crestview's motives are very clear. I have told Bob directly that it appears that Crestview wants me out "dea[d] or alive, but putting that that label on someone can be very dangerous to the bounty hunter."[219]

The next day, Koch privately sent a *mea culpa* note to Volpert, which Volpert graciously acknowledged, but Koch had made his position clear.[220] Evidencing her role in the midst of it all, O'Donnell received and responded to requests from both Koch and Volpert for feedback on their emails.[221]

Koch's decision to put O'Donnell in charge of the financing process enabled her to meet with investors openly, but Koch wanted O'Donnell to run the financing process without any involvement from Crestview.[222] He viewed Crestview as the other side in a negotiation, and he did not want them to participate in the financing efforts. Contrary to Koch's instructions, O'Donnell and Crestview continued to work together.[223] They

---

[219] JX 691 at Oxbow_00057826.

[220] *See* JX 688; JX 699.

[221] *See* JX 657; JX 660; JX 671-74; JX 676-77; JX 686; JX 694-96; JX 701-02.

[222] Koch Tr. 726-28; *see also* JX 741.

[223] *See, e.g.*, JX 719; JX 721; JX 741; JX 763-66; *see also* JX 690.

coordinated their efforts using private email accounts, text messages, and telephone calls, many of which stressed the need to keep their interactions secret from Koch.[224]

During the next three months, O'Donnell and Johnson targeted approximately ten investors.[225] They signaled that as part of a transaction, Koch was willing to transition the CEO role to Johnson and sell enough equity to give up control. Koch had not committed to do either.[226] There is conflicting evidence about whether and how strongly O'Donnell and Johnson conveyed these messages, and there is reason to think that the investors would have inquired about CEO succession and control in any event, but I am satisfied that O'Donnell and Johnson put these points on the table. Both believed that transitioning the CEO role and having Koch give up control best served Oxbow's interests and, although Koch might not perceive it, his interests as well. Those parameters also would enable the capital raise to generate more proceeds than the sale of a minority interest, which would make it easier to buy out Crestview and potentially generate some liquidity for Koch himself. Koch has pointed out that Johnson would benefit personally from taking the CEO role and that a major capital raise would be a professional feather in O'Donnell's cap. Both observations are true, but I believe that at this stage of the process, O'Donnell and Johnson

---

[224] *See, e.g.*, JX 631; JX 741; JX 752; JX 799; JX 807; JX 817; JX 843; JX 845; O'Donnell Dep. 469.

[225] *See* JX 3772 at CWO85409; *see also* PTO ¶ 47.

[226] *See, e.g.*, JX 897 at TCP_003786 (internal investor presentation suggesting investor to "control all major decisions"); JX 995 (email from Koch to O'Donnell: "I have absolutely no interest in the 51% offer."); Johnson Dep. 409-14; O'Donnell Dep. 552-53.

saw a capital raise in which Koch gave up control and the CEO role as the outcome that served everyone best.[227]

During March 2015, the first month after Koch instructed O'Donnell to raise capital, a medical issue sidelined Koch. After his recovery, O'Donnell tried to limit his involvement with potential investors.[228] Koch views her actions as perfidious, but considerable evidence indicates that Koch was not the best pitch man for Oxbow and that his presence at meetings dampened investor interest.[229] O'Donnell was trying to achieve an outcome that she believed was best for everyone, and accomplishing that meant protecting the process from Koch and Koch from himself.

During the process, O'Donnell tried to convince Koch that the right decision for Oxbow, his family, and himself was to accept a transaction that would involve giving up control and transitioning the CEO role to Johnson.[230] As part of that effort, O'Donnell depicted candidly for Koch the effects of his spending habits. At one point, she asked

---

[227] Koch contends that Crestview co-opted O'Donnell by suggesting that Oxbow should pay O'Donnell a success bonus for raising capital and bought Johnson's loyalty by supporting an overly rich compensation package for him. Both assertions lead into factual rabbit warrens that this overly long opinion need not chart. It is possible to empathize with Koch as a human who feels aggrieved and understand why he drew these inferences and advanced these arguments, but after parsing through the record, I find that the evidence does not support Koch's theories.

[228] *See*, *e.g.*, JX 793; JX 850; JX 880; JX 885; *see also* JX 899.

[229] *See, e.g.*, JX 850; JX 856; *see also* JX 796 (O'Donnell emailing regarding problems created by Koch micromanaging confidentiality agreements).

[230] *See, e.g.*, JX 768; JX 838; JX 861; JX 901; *see also* JX 863.

Volpert to have Chu assist her in analyzing Koch's personal finances,[231] but after a positive meeting with Koch, decided she did not need Chu's help.[232] Koch sees the request for Chu's help as manipulative and duplicitous,[233] but I believe it was part of O'Donnell's effort to achieve the outcome that she believed was best for everyone.

As a result of these efforts, Oxbow received term sheets from ArcLight, Energy Capital Partners, and Trilantic Capital Partners. The ArcLight term sheet contemplated Koch selling control and Johnson becoming CEO.[234] The Energy Capital term sheet contemplated Koch selling control, and O'Donnell told Koch that Energy Capital wanted Johnson to become CEO.[235] The Trilantic term sheet also contemplated Koch selling down below 50%.[236]

---

[231] JX 848.

[232] JX 852.

[233] *See* Koch Tr. 741-44.

[234] JX 958 at ACP0012544. ArcLight's representative testified that ArcLight included these provisions independently and not because of prompting by O'Donnell and Johnson. *See* Crosby Dep. 46-49, 63-68, 88-90. This testimony is consistent with O'Donnell and Johnson signaling that the points were fair to raise and on the table.

[235] JX 959; JX 3254. Energy Capital's representative testified that they reached their own conclusions about Koch and CEO succession. D'Argenio Dep. 88-90. Again, this testimony is consistent with O'Donnell and Johnson putting the points on the table.

[236] JX 899; JX 998; JX 1308. O'Donnell sent Koch a "short form" version of the term sheet that omitted the fact that he would be selling down below 50%. JX 899. She sent both the short-form and the long-form versions to Volpert. JX 998. Trilantic's representative testified that O'Donnell and Johnson had not urged them to include the provision that called for Koch to give up control. *See* Manning Dep. 116, 138-39. Once again, this testimony is consistent with softer positioning by O'Donnell and Johnson.

**I.      Koch Hires Mintz Levin And Takes Over The Minority Financing Effort.**

Koch did not like any of the term sheets, largely because they endangered his control over Oxbow.[237] Koch asked Pierre Azzi, an in-house lawyer who held roles at both Oxbow and Oxbow Holdings, to analyze Crestview's exit rights. Azzi summarized the Exit Sale Right as follows:

> Exit Sale means a transfer of **all** of the equity of Oxbow to a non-affiliated buyer in a bona fide arms' length transaction (e.g., sale, tender or merger).
>
> ○ The parties must "mutually agree" on the sale process and terms and conditions of any resulting Transaction. So Crestview cannot impose the type of sale.
>
> ○ Crestview can require Oxbow to engage an investment bank and law firm that is mutually acceptable to [Oxbow Holdings], Crestview and Load Line.
>
> ● Note: [Oxbow Holdings] could delay the Exit Sale process by failing to agree on the sale process, terms, conditions, investment bank and/or law firm.[238]

---

[237] *See* Koch Tr. 729-30 (discussing his desire to retain control); *id.* at 732-740 (discussing term sheets); Koch Dep. 537 (Q: "You wanted to keep control?" A: "Absolutely."). Koch appears to have wanted to achieve a transaction in which he (i) did not give up control and remained CEO, while (ii) raising enough money from a minority investment to reduce Crestview's stake or buy them out completely *and* receive $100 to $200 million for himself. *See* JX 914 at Mintz_0010626. Reasonable minds can debate whether this outcome was ever achievable. What seems far more likely is that if Koch wanted to retain control, then to buy out Crestview he would need to go into his own pocket in addition to raising some outside money. If Koch wanted to buy out Crestview or reduce their stake and achieve liquidity for himself, then he could not expect to retain control. *Cf.* JX 933; JX 941.

[238] JX 886 at Oxbow_to_CV_LL0009166.

Although Azzi cited the All Securities Clause, he did not try to interpret the 1.5x Clause. Azzi also prepared a memorandum for Koch analyzing the scope of his authority and rights under the LLC Agreement.[239] Both memoranda seem geared towards protecting Koch's interests rather than considering the best interests of Oxbow.

McAuliffe and O'Donnell recommended that Koch retain separate counsel to advise him personally.[240] In May 2015, after considering several firms, Koch accepted O'Donnell's recommendation and hired R. Robert Popeo and the law firm of Mintz, Levin, Cohen, Ferris, Glovsky & Popeo, P.C.[241] On Tuesday, May 19, 2015, Popeo and one of his litigation partners, Bret Leone-Quick, met with O'Donnell.[242] She briefed them on the situation, including Koch's personal finances, the capital raising effort, and Crestview's rights under the LLC Agreement.[243] They understood that their primary task was to evaluate the situation themselves, then meet with Koch to advise him on what was in his best interests, even if that advice conflicted with his wishes.[244] Consistent with Mintz

---

[239] *Id.* at Oxbow_to_CV_LL0009168-72.

[240] *See* JX 838; JX 869; JX 870.

[241] *See* JX 3759 (email from Azzi advising Ropes & Gray LLP that "Christina convinced [Koch] to hire Mintz Levin on the personal side. I am hopeful that this will be to R&G's benefit in the longer run as . . . Oxbow has not yet retained counsel for the company . . . ."). Popeo had previously represented Koch in several matters, and they had a longstanding relationship. *See* JX 914 at Mintz_0010630.

[242] *See* JX 914; JX 919; Popeo Tr. 1292-93.

[243] *See* JX 914.

[244] *Id.* at Mintz_0010630.

Levin's role as Koch's personal counsel, the firm's engagement letter described the firm as representing Koch and his wife "in connection with your stock ownership of [Oxbow Holdings], [Oxbow] as well as estate planning matters."[245]

Popeo asked Leone-Quick to examine Crestview's rights under the LLC Agreement.[246] Leone-Quick prepared a summary that made the following observations about the Exit Sale Right:

- ○ Members cannot be forced to participate in the sale unless the proceeds of a sale (and all prior distributions to them) equal at least 1.5 times their aggregate capital contributions.

  - ■ Note: because an Exit Sale must, by definition, result in the sale of all outstanding securities of Oxbow, it appears that a single member could block such a sale unless proceeds from the sale (and all prior distributions) equals at least 1.5 of their aggregate capital contributions.[247]

Leone-Quick thus interpreted the 1.5x Clause using the Blocking Theory. His memorandum did not address whether the members could receive a Top Off to satisfy the 1.5x Clause. He also did not parse the Equal Treatment Requirements to develop the Highest Amount Theory.

Popeo and Leone-Quick asked Rich Kelly, a partner in Mintz Levin's corporate group, and Greg Fine, a partner in the private equity group, to help them analyze the term

---

[245] JX 1045.

[246] Popeo Tr. 1293

[247] JX 3129 at Mintz_0034059; *see also* Koch Tr. 755-57.

64

sheets that Oxbow had received.[248] They concluded that that the investments would be disastrous for Koch's control over Oxbow.[249] Koch made clear to Popeo that he did not want to give up control and wanted to continue as CEO.[250]

Over the next two weeks, O'Donnell and Crestview worked to promote a transaction with one of the three private equity firms in which Koch gave up control and Johnson became CEO.[251] After conferring with Mintz Levin, Koch reached the conclusion that O'Donnell, Johnson, and Crestview were trying to use the capital raise to stage a coup. Koch felt that O'Donnell had betrayed him,[252] but he and Mintz Levin decided "to keep [her] on the reservation for now."[253]

To stop the perceived coup, Koch asserted control over the capital-raising process.[254] In June 2015, Koch advised the Oxbow Board that Crestview had "informed the Company of its desire to sell its shares and, absent a negotiated sale, it would exercise

---

[248] *See* JX 920; JX 926; JX 933 at Mintz_0009654-55.

[249] *See* JX 926; JX 933 at Mintz_0009654-55; Popeo Tr. 1299.

[250] *See* JX 933 at Mintz_0009653; *see also* JX 980 at CWO038470.

[251] JX 1013; JX 1035; JX 1062; *see also* JX 1008-10; JX 1015; JX 1019 at Mintz_0011804 (describing conversation between Koch, Volpert, and Hurst).

[252] *See* JX 1037 at Oxbow_to_EJ0006715; JX 1049 at Owbow_to_CV_LL0007446; JX 3785; *cf.* JX 1020.

[253] JX 1059 at Oxbow_to_CWO0004220.

[254] *See* JX 1038; JX 1049; JX 1059.

its put.'"[255] He asserted that "the interests of Crestview . . . are not consistent with the Company's interests."[256] Hurst and Volpert were not pleased by Koch's actions,[257] and they sent a letter of their own to the Board disputing Koch's assertions.[258]

At Popeo's suggestion, Koch engaged Intrepid Financial Partners to help him evaluate the term sheets, negotiate with investors, and continue the search for replacement capital.[259] Koch let O'Donnell and Johnson know that they were no longer involved unless he said otherwise.[260] Despite these instructions, O'Donnell and Johnson continued interacting secretly with Crestview.[261] After a long delay, Koch sent a term sheet to ArcLight that was consistent with his goal of retaining control.[262]

Crestview did not believe that Intrepid was up to the task of raising minority capital.[263] They argued for bringing in Morgan Stanley to run a "transparent, cooperative

---

[255] JX 1101.

[256] *Id.*

[257] *See* JX 1137 at CRESTVIEW000047307 (Volpert describing Koch as "pathetic").

[258] JX 1120.

[259] Koch Tr. 748-49; *see also* JX 1065; Popeo Tr. 1309-10.

[260] *See* JX 1084; JX 1089 at Oxbow_00256425; JX 1096; JX 1139.

[261] *See, e.g.,* JX 1245; JX 1268; JX 1281; JX 1322; JX 1324; JX 1348; JX 1389; JX 1399; JX 1400; JX 1463; JX 1473; JX 1480-81; JX 1496; JX 1511.

[262] JX 1109.

[263] Hurst Tr. 33.

process."[264] When Morgan Stanley pitched for the business, they advised Koch, Popeo, O'Donnell, Hurst, and Volpert that if Crestview exercised the Put, it "will get out to the market and will impact a sale process as bidders will believe there is a potential fire sale."[265] To address Koch's concern that Crestview might exercise the Put at any moment, Koch, Crestview, and Load Line entered into the Fourth Amendment to the LLC Agreement. In that agreement, Crestview committed not to exercise the Put before September 3, 2015, and Oxbow reduced its time to respond to the Put to 135 days.[266]

In July 2015, Koch, Freney, O'Donnell, and Popeo had a follow-up meeting with Morgan Stanley.[267] During the meeting, Morgan Stanley argued that Oxbow needed to raise money immediately. Popeo intervened and disagreed. He explained that the Put had two major weaknesses. One was that the Small Holders had invested at $300 per unit, so the Minority Members could not force them to sell unless they received over $400 per unit. He observed that because of the All Securities Clause, an Exit Sale could not proceed without the Small Holders. In other words, he described the Blocking Theory.

The other weakness derived from corporate statutory and common law limitations on stock redemptions, which only permit a corporation to redeem shares if it has both (i) adequate surplus and (ii) sufficient legally available funds to avoid rendering itself

---

[264] JX 1201.

[265] JX 1242; *see also* JX 1250 at CWO034505; Hurst Tr. 163; Koch Tr. 753-54.

[266] JX 1209 at Oxbow_00105743.

[267] *See* Popeo Tr. 1307-08.

67

insolvent. Popeo explained that because of these limitations, Oxbow could accept the Put, then redeem Crestview and Load Line's equity slowly over time, to the extent it had the financial capacity to do so. Popeo described this theory as the "*Thoughtworks* strategy."[268] After the meeting, Koch began telling people, including McAuliffe, that the Put was defective.[269]

Volpert heard from O'Donnell about the Blocking Theory and the *Thoughtworks* strategy.[270] On August 18, 2015, Volpert met with Popeo. Anticipating that Popeo would raise the Blocking Theory, Volpert led with the Leave Behind Theory.[271] Popeo chose not to get into a legal debate and did not respond. After the meeting, Crestview began investigating the facts surrounding the Small Holders' investment and contacted litigation counsel at Quinn Emmanuel Urquhart & Sullivan LLP.[272] Crestview began analyzing a Top Off as another way to defeat the Blocking Theory.[273] Internally, Quinn Emmanuel

---

[268] *See* Koch Tr. 758-62 (describing meeting); *id.* at 777 (explaining his understanding of the *Thoughtworks* strategy); Popeo Tr. 1308-09, 1311; *see also* JX 1284; JX 1329. Popeo also had a call with Johnson during which he explained the Blocking Theory. *See* Popeo Tr. 1312-13.

[269] *See* JX 1296.

[270] *See* JX 1243; JX 1270; Volpert Tr. 414.

[271] *See* Volpert Tr. 415-16, 539-40; Popeo Tr. 1403-04, 1437-38.

[272] *See* JX 1280; JX 1286-93; JX 1299.

[273] *See* JX 1398.

attorneys debated whether the language of the Exit Sale Right permitted the Leave Behind Option, supported the Blocking Theory, or permitted a Top Off.[274]

Meanwhile, Koch had continued negotiating with ArcLight and Trilantic, but it became increasingly clear that an agreement would not be reached.[275] Mintz Levin's assignment shifted towards efforts to "stop Crestview from exercising the Put . . . or having an Exit Sale."[276] Mintz Levin began search for additional ways to "delay the payment of the Put in order to have negotiating leverage"[277] and to create "serious deadlock in the put process."[278] Koch and Mintz Levin modified the firm's engagement letter so that Mintz Levin represented Oxbow.[279]

Effective as of September 3, 2015, Oxbow and Crestview entered into the Fifth Amendment to the LLC Agreement, which extended the date for exercising the Put until September 17. In exchange, Oxbow reduced its time to respond to the Put to 121 days.[280] Effective as of September 21, Oxbow and Crestview entered into the Sixth Amendment to

---

[274] *See* JX 1385 at QE0017537; JX 1394 at QE00017463, QE00017471; JX 1396-98; *see also* JX 1672.

[275] *See* JX 1302; JX 1304; JX 1341; JX 1357; Hurst Tr. 34-35.

[276] Popeo Tr. 1420-21.

[277] JX 1160.

[278] JX 1362.

[279] JX 1311.

[280] *See* JX 1423.

the LLC Agreement, which extended the date for exercising the Put until September 28. In exchange, Oxbow reduced its time to respond to 113 days.[281] In conjunction with these amendments, Oxbow and Crestview tried to reach a compromise. Those efforts failed.

## J.    Crestview Exercises The Put Right.

On September 28, 2015, Crestview exercised the Put and demanded that Oxbow purchase all of its units.[282] Load Line did the same.[283] Under the Sixth Amendment, Oxbow had until January 19, 2016 to acquire the Minority Members' units. Otherwise, Crestview could exercise the Exit Sale Right.[284]

Attached to Crestview's exercise notice was a valuation prepared by Duff & Phelps, LLC, that appraised the Company's Fair Market Value at $256.56 per unit. Under Article XIII, Section 8(b) of the LLC Agreement, the next step was for Oxbow Holdings to retain an investment bank of its own and have that bank generate an opinion as to Fair Market Value. If the two valuations were within 10% of each other, then Fair Market Value for purposes of the Put Right would be the average of the two. If the two valuations differed by more than 10%, then the two banks would select a third bank, and Fair Market Value

---

[281] *See* JX 1504.

[282] JX1536.

[283] JX1534.

[284] *See* Sixth Am.

70

would be the median of the three valuations.[285] Oxbow Holdings retained Evercore Group L.L.C.

Shortly before the exercise of the Put, Oxbow had interviewed Goldman, Morgan Stanley, and Perella Weinberg Partners L.P. as potential financial advisors to raise capital to satisfy the Put.[286] In October 2015, Oxbow retained Goldman. The evidence suggests that Crestview preferred Goldman over the other banks, which is not surprising given that Hurst and Volpert spent decades at Goldman before founding Crestview.[287] Goldman began the process of preparing an updated confidential information memorandum and reaching out to potential investors. My overall impression is that Goldman executed a professional and independent process under difficult circumstances.

Mintz Levin continued their efforts to brainstorm defenses to the Put Right. They focused primarily on the *Thoughtworks* strategy[288] but also developed other potential arguments.[289] McAuliffe and Clark, the two senior members of Oxbow's legal department,

---

[285] LLCA art. XIII, § 8(b).

[286] *See* JX 1702.

[287] *See* JX 1537; JX 1557. Michael Carr was the lead banker for the Goldman engagement, and he had invested in a later Crestview fund through a trust for his daughters. Carr Dep. 289. Crestview Fund III, in which the trust invested, did not own any equity in Oxbow, which was owned by Crestview Fund I. *Id.* Carr disclosed the investment during his first interview about the project. *Id.* Koch has not shown that the investment was material to Carr. More importantly, there is no evidence that it affected any action that he or Goldman took.

[288] *See, e.g.*, JX 1566 at MINTZ_0011723; Popeo Tr. 1436-39.

[289] *See, e.g.*, JX 1568; JX 4341.

disagreed with the *Thoughtworks* strategy. They consulted with outside counsel[290] and prepared memoranda calling into question the *Thoughtworks* strategy.[291]

Koch hired Ropes & Gray LLP as his personal counsel.[292] They began brainstorming defenses to the Put Right.[293]

Quinn Emmanuel analyzed the Put Right and Exit Sale Right for Crestview. In an internal memorandum, a Quinn Emmanuel attorney concluded that

> [t]he plain language of the contract is arguably ambiguous. On the one hand, Section 8(e)(A) uses the words "other Member" suggesting that the Exercising Put Party can require some Members to engage in an Exit Sale depending on whether the 150% return requirement is satisfied. This language suggests that the failure of some Members to earn a 150% return prevents the Exercising Put Party from requiring such members to engage in an Exit Sale but does not prevent the Exit Sale as to other Members. However, on the other hand, Exit Sale is defined under the contract as a Transfer of **all, but not less than all**, of the then-outstanding Equity Securities of the Company and/or **all** of the assets of the Company. This language could be relied on to suggest that unless all Members receive a 150% return, the Exit Sale cannot occur. [294]

The Quinn Emmanuel attorney argued for the Leave Behind Interpretation, explaining that the small percentage interest owned by the Small Holders counseled in favor of interpreting the 1.5x Clause limiting Crestview's ability to compel the Small Holders to sell, "but it

---

[290] *See* JX 1447-48; JX 1517; JX 1612; JX 1639; JX 1683.

[291] *See* JX 1427; JX 1683; McAuliffe Dep. 61-70.

[292] Koch Tr. 905.

[293] *See, e.g.*, JX 1753.

[294] JX 1656 at QE00018897.

should not be interpreted as giving these minority members the extraordinary right to block the entire sale and thereby affect the rights and obligations of all other members."[295] The attorney suggested a Top Off as a solution: "Perhaps one option would be to offer the [Small Holders] additional consideration in exchange for their agreement to participate in the Exit Sale."[296] The attorney did not analyze the Equal Treatment Requirements.

In November 2015, Mintz Levin prepared a slide deck to present to Oxbow Holdings' appointees to the Oxbow Board. The deck analyzed the structure of the Put Right and presented various options that the Company had available.[297] It noted that Oxbow's preferred outcome was to raise sufficient financing to redeem all of Crestview and Load Line's units.[298] It then discussed three principal alternatives available to the Company.

One option was to negotiate a reduced redemption amount. Mintz Levin thought Oxbow had the leverage to achieve a reduction because "the Put Right does not provide Crestview with as clear a path to full liquidity as it claims."[299] Another option was to reject or ignore the Put, permit Crestview to exercise its Exit Sale Right, then dispute the validity of an Exit Sale based on the Blocking Theory. A third option was the *Thoughtworks*

---

[295] *Id.* at QE00018897-98.

[296] *Id.* at QE00018898.

[297] JX 1735.

[298] *Id.* at 17.

[299] *Id.* at 18.

73

strategy, in which the Company would accept the Put, then take the positon that it only had the capacity to redeem units periodically over time.

The bulk of the presentation described the *Thoughtworks* strategy.[300] Significant portions of the presentation addressed the Blocking Theory. For example, the presentation described the following "potential legal argument" under the Exit Sale Provision:

- Under the Agreement, an Exit Sale cannot occur without **all** members selling their units.

- In other words, an Exit Sale requires that no member be left behind.

- Under the Exit Sale Provision . . . , any member can refuse to participate in an Exit Sale if the proceeds of the sale (along with prior distributions) do not "equal at least 1.5 times such Member's aggregate Capital Contributions . . . ."

- If any such member refuses to participate pursuant to this provision, then by definition, an Exit Sale cannot occur.[301]

The presentation noted that "[i]t appears that at least one investor, [Family LLC], would have the ability to block any Exit Sale based on the current Duff & Phelps valuation."[302] Later, another slide revisited the Blocking Theory, asking "Can [Family LLC] hold up an Exit Sale?"[303] The presentation did not discuss the Equal Treatment Requirements, and it did not develop the Highest Amount Theory.

---

[300] *See id.* at 23-50.

[301] *Id.* at 20-21.

[302] *Id.* at 22.

[303] *Id.* at 53. Popeo testified that Mintz Levin had not yet analyzed whether Executive LLC was in the same position. *See* Popeo Tr. 1335.

Koch's notes from the November 2015 meeting indicate that Mintz Levin advised the Board members that a Top Off provided a viable path around a Blocking Option. Koch wrote that, "[n]ot all [Members were] at 1.5x" because Family LLC had "not received anything" and that "[s]ome[one] has to come up with cash for [Family LLC delta]."[304] This interpretation comports with how Mintz Levin's corporate lawyers interpreted the 1.5x Clause. Kelly had questioned from the outset whether the 1.5x Clause could "halt the train if Crestview and Load Line are willing to divert transaction proceeds to any small holder who would not otherwise receive the minimum."[305]

Koch's advisors suggested other ways to defeat the Put, including by going public through an initial public offering or by merging with a public shell company.[306] Under the LLC Agreement, the Minority Members could not exercise the Put if Oxbow was publicly traded. Koch did not want to go public but was willing to consider it if it blocked the Put.[307] Evercore advised that there was not time to conduct an initial public offering.[308]

Koch's advisors developed these theories because they believed that that if the 1.5x Clause was read to create a Blocking Option, then Crestview could satisfy the 1.5x Clause

---

[304] JX 3199 Oxbow_00366479; *see also* Koch Tr. 977-978.

[305] JX 1725 at Mintz_0015902; Popeo Tr. 1462.

[306] *See* JX 1716; JX 1719; JX 1721.

[307] *See* JX 1721 at GS-Oxbow-Crestview_00031668.

[308] JX 1730.

a Top Off. They did not believe that the Blocking Theory was a showstopper, so they needed other ways to defeat the Put.

In late November 2015, Evercore determined that the Fair Market Value of Oxbow was $145 per unit, dramatically lower than Duff & Phelps' valuation of $256.56 per unit.[309] Because the valuations differed by more than 10%, the bankers had to pick a third banker. They selected Moelis.

## K. The Results of the Goldman-Led Process

In December 2015, bids arrived from interested investors. None of the values exceeded $120 per unit for a minority stake, and several offers fell below $100 per unit.[310] ArcLight offered approximately $115 per unit.[311]

There is evidence that Crestview sought to influence the financing process so that the efforts to raise capital would not succeed and an Exit Sale would become more likely.[312] Crestview perceived that if an Exit Sale took place, it might be able to roll over part of its interest or co-invest with the buyer. This would allow Crestview to continue to own what it regarded as a highly profitable business, but without the headaches of dealing with Koch. In backchannel discussions with Goldman, Volpert observed that "the minority sale is

---

[309] *See* JX 1786.

[310] *See* JX 1845.

[311] *See id.* at Oxbow_00060761-64; *see also* Carr Dep. 69-71; Crosby Dep. 109-13.

[312] *See* Popeo Tr. 1349-51.

76

really hard and this likely results in a wholeco sale."[313] He later told Goldman that the assignment was "really [Crestview's] to allocate," because the Put would likely lead to an Exit Sale that he felt Crestview would have the right to control.[314] One week before the deadline for bids, Volpert was "encouraging" Goldman to have bidders "hang around" because Crestview "would roll a good chunk of [its] stake into a control deal run by one of" the bidders.[315] During the process, Hurst and O'Donnell secretly met with Trilantic,[316] O'Donnell and Johnson had a private dinner meeting with ArcLight,[317] and O'Donnell and Johnson continued to communicate secretly with Crestview.[318]

## L. Oxbow Rejects The Put.

On January 14, 2016, Moelis advised Oxbow Holdings and Crestview that in its opinion, the enterprise value of the Company was $2.65 billion, which equated to a value of $169 per unit.[319] As the median of the three investment banker valuations, this figure established Fair Market Value for purposes of the Put Right.

---

[313] JX 1557 at GS-Oxbow-Crestview_00035662.

[314] JX 1565 at GS-Oxbow-Crestview_00006853.

[315] JX1808 at GS-Oxbow-Crestview_00050155; *see also* JX 1760 at QSPCFLP00001460 (executives within Soros Fund Management, LLC speculating on whether the Oxbow deal was "a test case for a GP wanting to roll their carry and stay on").

[316] JX 1941; *see also* JX 1787.

[317] *See* JX 1792-93; JX 1803.

[318] *See* JX 1797; JX 1809; JX 1872.

[319] JX 2057 (valuation letter); *see also* JX 2056 (supporting presentation materials).

On January 15, 2016, the directors appointed by Oxbow Holdings met for the first of two sessions to discuss whether to accept or reject the Put. They focused on the possible deployment of the *Thoughtworks* strategy. Popeo made a passing reference to the Blocking Theory.[320] I believe he did not emphasize it because Mintz Levin thought that even if the 1.5x Clause gave rise to a Blocking Option, Crestview could use a Top Off to bypass it.

Contemporaneous communications support this view. On January 16, 2016, Kelly wrote to Popeo to recommend against the *Thoughtworks* strategy. He believed that Oxbow did not need to take that aggressive step because the Minority Members would not be able to find a buyer who would pay Fair Market Value. Kelly based his recommendation "on the assumption that the declining value of Oxbow versus FMV of $169/unit precludes an Exit Sale under Article XIII, Section 8(e)," but he warned that "[i]f that premise is wrong, [Koch] could end up an involuntary seller . . . [and he] will need to be OK if, however unlikely, he sells the Company at $169/unit through the Exit Sale."[321] Kelly thought that the Minority Members could force Koch to sell because, if a buyer existed, the Small Holders could be topped off.

On January 17, 2016, Leone-Quick circulated a memorandum describing strategies for defeating an Exit Sale. One was to "[s]tipulate to higher Fair Market Value (Crestview's

---

[320] Popeo Tr. 1347-48; *see also* JX 3192 at DEF_EPJ0021941.

[321] JX 2094 at Mintz_0022835.

original mark of $190)" in order to "[d]ecrease[] the chances of a successful Exit Sale."[322] Leone-Quick's memorandum suggests that he shared Kelly's view about the viability of a Top Off. If Leone-Quick had believed at this point in the Highest Amount Theory, then an Exit Sale would have to generate enough proceeds to yield $414 per unit. Stipulating to Crestview's original mark of $190 would make no difference.[323]

On January 18, 2016, Ropes & Gray drafted a memorandum outlining ways to defeat an Exit Sale, including taking the Company public through a merger with a special purpose acquisition company ("SPAC").[324] Popeo testified that he already had shared the Highest Amount Theory with Ropes & Gray,[325] but their memorandum did not mention it.

On January 19, 2016, the directors appointed by Oxbow Holdings met for a second session on the Put. No one discussed the Blocking Theory, much less the Highest Amount Theory.[326] The directors decided unanimously to reject the Put.[327] Koch ended the meeting

---

[322] JX 2092 at Mintz_0027893.

[323] *See* Popeo Tr. 1472-73.

[324] JX 2137 at CWO_022144.

[325] Popeo Tr. 1509-10.

[326] Koch Tr. 1081-82; Popeo Tr. 1475; Parmelee Dep. 56-57; McAuliffe Dep. 344-46.

[327] JX 2079 at Oxbow_00362782.

by demanding that Oxbow and its counsel work to "obstruct [and] derail" or "delay" the Exit Sale process.[328]

Shortly after the meeting, Koch asked Ropes & Gray and Mintz Levin to "[d]evise a lawsuit" or "devise something on [the Exit Sale]" to avoid having to sell the Company.[329] Each firm analyzed various options, collectively identifying over a dozen different strategies. Neither firm discussed the Highest Amount Theory.[330]

## M. Crestview Exercises The Exit Sale Right.

On January 20, 2016, Crestview exercised the Exit Sale Right.[331] At the time, McAuliffe and Parmelee both believed that the 1.5x Clause could be addressed with either a Top Off or by leaving the Small Holders behind. On January 21, Parmelee emailed McAuliffe to confirm that approximately $28 million was the amount necessary "to top up the two holders that wouldn't yet be at 1.5x."[332] McAuliffe replied: "Or they stay in new entity as shareholders. All members have obligation to support exit sale and vote for it, but

---

[328] JX2068 at DEF-EPJ_00021726.

[329] Koch Tr. 1085-86; *see also* JX2224 at Mintz_0005152.

[330] *See* JX 2092; JX 2137; JX 2262; JX 2276.

[331] PTO ¶ 68; JX 2125.

[332] JX 2144.

their interests can't be sold to buyer absent the 1.5 x figure. At least, that is how I am reading it."[333]

On January 28, 2016, Koch and David Rosow, a director appointed by Oxbow Holdings, met with Volpert and Hurst. Rosow told Crestview, in Koch's presence, that Crestview "had to reach a minimum of $169 [per unit]."[334] Koch did not disagree or raise the Highest Amount Theory.[335] Koch testified that during January and February 2016, he "participated in discussions about the topic of a top off payment" and that he did not "remember anyone telling [him] in January or February that a top-off payment was prohibited under the LLC Agreement."[336]

On February 18, 2016, Parmelee asked Kelly whether the Small Holders could be "paid $414 per unit from the consideration paid, while other unit holders receive substantially less than that on a per unit basis."[337] Parmelee was anticipating a Top Off, and he wanted to know "the mechanics of dividing up the cash consideration in a way that

---

[333] *Id. But see* JX 353 (McAuliffe describing Exit Sale Right and stating, "As I understand it, the drag along right currently allows Crestview to either (1) take the whole company public or (2) have the whole company bought by a strategic buyer, correct?").

[334] JX 2201 at Oxbow_00244123.

[335] Volpert Tr. 427-28; Koch Tr. 1122-25.

[336] Koch Tr. 1119-20.

[337] JX 2279 at Oxbow_00355641.

[the Small Holders] get to 1.5x and the other members share what's left."[338] Kelly deferred, proposing to "discuss sometime soon."[339]

Although Kelly did not answer Parmelee directly, the record reflects that Mintz Levin believed during this period that Crestview could satisfy the 1.5x Clause using a Top Off. Popeo wrote in his notes that "Crestview must net $169 after Investment Bank fee— pay out to [Family LLC] . . . . Calculate amount due [Family LLC] & others re: sale."[340] Popeo was expecting a Top Off.[341]

Kelly and Eric Macaux, an associate in Mintz Levin's corporate department, thought that the Small Holders could be left behind or taken care of with a Top Off. Macaux explained his reasoning in an email dated February 25, 2016:

> There are two possible readings of [Section 8(e)]: (1) that a Member can opt not to participate in [an] Exit Sale, which would go forward without him/her/it, or (2) that a Member could block the Exit Sale entirely. Section 8(e) does not say that the Exit Sale cannot proceed, only that the Exercising Put Party may not compel a Member to participate unless the 1.5x multiple is reached for that Member. That is, Section 8(e) acts as an exception to the definition of an Exit Sale.[342]

Macaux elaborated on this analysis in a memorandum dated February 26, 2016, in which he concluded that "[a]ny Member not receiving at least 1.5x its aggregate Capital

---

[338] *Id.*

[339] *Id.*

[340] JX 2263 at Mintz_0027292-93.

[341] JX 2263 at Mintz_0027292-93; *see also* Popeo Tr. 1484-87.

[342] JX 2319.

Contributions from the Exit Sale (when combined with all prior distributions) can remain in the Company but cannot block the Exit Sale."[343] He reasoned that,

> Unlike the Fair Market Value requirement, the 1.5x threshold is not drafted as a condition to conducting the Exit Sale. Instead, it is included in Section 8(e) as a proviso, suggesting that the 1.5x threshold is a specific requirement intended to modify the general requirement that an Exit Sale be a sale of "all, but not less than all" of the equity securities.[344]

Consequently, he believed that a member failing the 1.5x Clause would have a choice: the member could waive the requirement and participate or "opt out of the Exit Sale and remain a Member of the Company."[345] His memorandum acknowledged that this analysis did not work if the Exit Sale was accomplished as a sale of assets, which would not provide an equivalent ability to opt out. He suggested that, in that setting, the member might have an implied right to block distributions until the 1.5x Clause was met, effectively resulting in a Waterfall Top Off.[346] Macaux's memorandum did not analyze the Equal Treatment Requirements.

Kelly held the same view. He noted in an email dated March 1, 2016, that Popeo and Macaux already knew his opinion, which was "that the proviso that says unit holders can't be forced into an Exit Sale does not . . . enable them or anyone else to block an otherwise agreed to Exit Sale from happening because they don't get their catch-up

---

[343] JX 2327 at Mintz_0022186.

[344] *Id.* at Mintz_0022187.

[345] *Id.*

[346] *Id.*

payments."[347] He believed that Crestview could pay the Small Holders additional amounts to satisfy the 1.5x Clause—a Seller Top Off.[348] Kelly recognized that the Exit Sale Right contained language that cut against this interpretation, such as the All Securities Clause and the language in Article XIII, Section 8(f) that spoke in terms of all unitholders selling in an Exit Sale, but he did not view language as strong enough to prevent an Exit Sale.[349] At this point, Kelly had not yet focused on the Equal Treatment Requirements.

## N.     Oxbow Hires Goldman To Conduct A Full-Company Sale.

The Exit Sale Right provided that at the request of the exercising party, "the Company shall engage a nationally recognized investment banking firm mutually acceptable to Crestview, Load Line and [Oxbow Holdings] to initiate a process for the orderly sale of the Company, as well as one law firm for the Company mutually acceptable to Crestview, Load Line and [Oxbow Holdings]."[350] Crestview wanted Oxbow to retain Goldman. Crestview did not have a strong preference for any particular law firm.

Behind the scenes, Hurst, Volpert, Johnson, and O'Donnell conferred about how best to convince Koch to retain Goldman. On January 22, 2016, Johnson suggested points for Hurst to include in an email to Koch concerning the benefits of retaining Goldman, but cautioned, "[o]bviously you don't want to oversell those points as Goldman needs to feel

---

[347] JX 2331 at Mintz_0025820.

[348] *Id.*

[349] *Id.*

[350] LLCA art. XIII, § 8(f).

84

like his choice."[351] After speaking with O'Donnell for forty-five minutes, Volpert offered Hurst some suggestions of his own.[352]

By this point, Koch had sidelined O'Donnell and repeatedly criticized her. Six months earlier, she had wanted to achieve a solution that would be best for everyone, including Koch. Now, she despised Koch. On January 23, 2016, O'Donnell vented in an email to Johnson:

> Let's take his company from him quickly, not a day of relief, put him through the hell he put us through, let's find $30 million of cost savings if he's not running it. Let's make it very personal, just like he did.

> Let's remind him we know things about him as well. Let's take his plane, his job, and when it's over let's drink his wine before you take me dancing.[353]

She texted Johnson that she "want[ed] [Koch] out with no office and no place to go."[354]

To achieve that outcome, Johnson and O'Donnell suggested that Crestview adopt "the ambush approach."[355] Under this strategy, Crestview would act "as though they have

---

[351] JX 2148.

[352] JX 2153.

[353] JX 2154.

[354] JX 3192 at DEF-EPJ0021942. Koch argues that these communications show O'Donnell's true motivations from the outset, but I disagree. I believe her feelings toward Koch soured during the months following June 2015, when Koch took over the capital raising process after concluding that O'Donnell was working with Crestview and Johnson to attempt a coup. By the time her motives turned aggressively hostile, she was not in a position to do anything meaningful to hurt Koch.

[355] JX 2168 at CWO044025.

85

zero interest to sell or change anything this year."[356] Crestview would be "very subtle" by "creating the illusion that Goldman Sachs is not favored by Crestview, doesn't want to go to market for a year and will be the only firm that can protect all the company's deep dark confidential data."[357] Then, as soon as Oxbow hired Goldman, Crestview would "turn on a dime and sell hard."[358] Johnson and O'Donnell believed that it would be easy to outsmart Koch by following this strategy.[359]

On February 10, 2016, the Oxbow Board met. Koch reported on a recommendation from Goldman to have "a three- to six-month pause in the marketing effort" for an Exit Sale.[360] The minutes recite that Hurst, Volpert, and Coumantaros "agreed in principle with the recommended three- to six-month pause."[361] The minutes state that "it was the consensus of the Board to proceed with the negotiation of an engagement letter with Goldman Sachs."[362]

---

[356] *Id.*

[357] *Id.* at CWO044026.

[358] *Id.* at CWO044025; *accord id.* at CWO44025 ("Once Goldman Sachs is on board, the gloves come off.").

[359] *See* JX 2208; *see also* JX 2159; JX 2165- 69; JX 2171; JX 2193.

[360] JX 2076 at Oxbow_00197059; *see also* JX 2250 at Oxbow_00091028 (Goldman presentation: "we would expect at least a 3-6 month period before markets regain their footing based on current conditions").

[361] JX 2076 at Oxbow_00197059.

[362] *Id.*

The directors next discussed Crestview's right to have the Company retain legal counsel to handle the Exit Sale. Koch "indicated that he felt it was premature to engage a law firm, given the recommended pause."[363] Hurst, Volpert, and Coumantaros argued for accelerating the engagement of a law firm.[364]

After the meeting, Mintz Levin engaged in discussions with Goldman over its engagement letter. Both Koch and Crestview wanted non-customary terms that Goldman resisted.[365] For present purposes, it is significant that the discussions over Goldman's fee reflected a belief that Crestview could satisfy the 1.5x Clause with a Top Off. On February 23, 2016, for example, Kelly sent an email discussing Goldman's potential engagement to conduct "an Exit Sale under Article XIII, Section 8(e) and (f), of the operating agreement, and not any general engagement to sell all or parts of Oxbow."[366] Kelly advised Koch, Clark, Parmelee, and Popeo that he had revised the engagement so that "Goldman's fee increases as a percentage of per Unit value received above a threshold of $190/Unit."[367] He chose this figure to

> cover without broadcasting it at this time that the sale price will need to be above $169/Unit in order for holders of Units to net at least $169/Unit as is

---

[363] *Id.*

[364] *Id.*

[365] *See* JX 2363 (Kelly describing Goldman's objections to terms); *see also* JX 2315.

[366] JX 2304 at Oxbow_00351545.

[367] *Id.*

required for such an Exit Sale (not to mention the extra amounts needed to assure all holder[s] will get at least 1.5 times their respective investments).[368]

Kelly envisioned a Top Off.

A month later, the discussions with Goldman were still ongoing. On March 24, 2016, Goldman agreed to an engagement letter with a lower threshold that nevertheless accounted for a "true up with an enterprise value figure that reflects the unit holders' receiving the $169 per unit FMV as a minimum to be received by them at the end of the day."[369] The final terms of Goldman's engagement letter thus accommodated a Top Off.

## O.    Crestview Solicits An Offer From ArcLight.

To be prepared to "sell hard"[370] once Oxbow retained Goldman, Hurst, Volpert, Johnson, and O'Donnell began working to find a buyer. O'Donnell sent Crestview the list of investors that had signed confidentiality agreements with the Company.[371] A few days later, O'Donnell met secretly with Kevin Crosby, a managing director with ArcLight.[372] After the meeting, O'Donnell reported back to Volpert.[373]

---

[368] *Id.*

[369] JX at 2493 Mintz_0017701.

[370] JX 2168 at CWO044025.

[371] *See* JX 2113.

[372] *See* JX 2121; JX 2141.

[373] *See* JX 2153; *see also* Volpert Tr. 580-83.

On February 1, 2016, Koch fired O'Donnell and removed her from the Oxbow Board.[374] Koch also fired McAuliffe.[375] He promoted Clark to General Counsel.

O'Donnell continued helping Crestview. On February 21, 2016, she set up a meeting between Crosby and Volpert.[376] She also sent Crestview a copy of the confidentiality agreement between Oxbow and ArcLight so that Crestview could evaluate what it could tell ArcLight about Oxbow.[377]

Internally, Crestview modeled a leveraged buyout of Oxbow that contemplated satisfying the FMV Clause by paying a total enterprise value of $2.355 billion, with Crestview rolling a significant portion of its equity into the new ownership structure.[378] Crestview developed its model by working backwards from the Fair Market Value figure of $169 per unit.[379] On February 24, 2016, Volpert sent the analysis to Crestview's co-investor in Oxbow, GSO Capital, and disclosed that the model incorporated the valuation from "the Moelis appraisal."[380]

---

[374] PTO ¶ 70; JX 2207; JX 2209.

[375] PTO ¶ 71; JX 2212.

[376] *See* JX 2293; JX 2325.

[377] *See* JX 2313; JX 2316. Quinn Emanuel reviewed the agreement and "looked into the questions [Volpert] raised regarding the potential meeting with Arc Light." JX 2322 at QE00019722.

[378] JX 2298.

[379] *See* JX 2292.

[380] JX 2308.

On February 26, 2016, Volpert met with Crosby.[381] On March 2, Crosby submitted a report to ArcLight's investment committee that proposed a transaction in which ArcLight would acquire approximately 80% of Oxbow's equity and offer existing investors the opportunity to roll over a portion of their proceeds. His memorandum noted that Crestview had exercised its Put Right and stated: "While the target valuation is unknown, we believe there may be an opportunity to pre-empt a broad sale process and acquire the Company at a [total economic value] of $2.4 billion."[382]

Volpert had a follow-up call with Crosby on March 7, 2016.[383] Afterwards, a Crestview analyst provided Volpert with different per-unit prices for Oxbow based on an enterprise valuation of $2.4 billion.[384]

On March 9, 2016, Hurst asked Koch for the current unit count.[385] Crestview and ArcLight needed the count to confirm whether an offer at an enterprise value of $2.4 billion would clear the FMV Clause. On March 15, the day after Koch provided the unit count,

---

[381] JX 2325; JX 2332 at ACP0010811; Volpert Tr. 589-90; Crosby Dep. 121-22.

[382] JX 2332 at ACP0010811.

[383] JX 2347.

[384] JX 2531.

[385] JX 2368.

ArcLight sent a proposed letter of intent to Crestview.[386] Crestview reviewed it, and Volpert and Crosby had a call to discuss it.[387]

On March 16, 2016, ArcLight sent Oxbow Holdings, Crestview, and Load Line a letter of intent to acquire 100% of Oxbow's equity "for $1,448,990,000 or $176.59 per unit."[388] The per unit figure exceeded the Fair Market Value hurdle of $169 per unit, satisfying the FMV Clause. ArcLight's proposal achieved this result by excluding unvested units, resulting in a lower number of outstanding units than Moelis had used when calculating the per unit figure for Fair Market Value. Including debt, the letter of intent contemplated an enterprise value for Oxbow of $2,399,990,000, or $10,000 less than the $2.4 billion reflected in the ArcLight and Crestview documents.[389] The offer expired at 5:00 p.m. on March 22.[390]

## P.     The Initial Response To ArcLight's Letter of Intent

ArcLight's offer surprised Koch and his advisors, because they had not believed that anyone would make a proposal that satisfied the FMV Clause.[391] They immediately began analyzing the offer to determine whether it really had cleared the threshold.

---

[386] *See id.* (unit count information arrives on March 14); JX 2375.

[387] *See* JX 2377.

[388] JX 2379 at CRESTVIEW000016097.

[389] *Id.* at CRESTVIEW000016097-98.

[390] *Id.* at CRESTVIEW00016099.

[391] Popeo Tr. 1366-67; *see also* JX 2085.

91

One question was whether ArcLight's proposal satisfied the FMV Clause after making the deductions that Koch and his advisors believed were required before determining a per unit value. Freney had joined Oxbow as an executive in the years since he brokered the original 2007 transaction with the Minority Members, and he analyzed the payment waterfall for Koch.[392] In an email dated March 17, 2016, Freney circulated an analysis that deducted $27.9 million as the "[a]mount required to achieve minimum 1.5x aggregate capital contribution for all unitholders."[393] Freney circulated a series of these analyses during March 2016, all of which deducted $27.9 million as the amount "required to achieve 1.5x" for the Small Holders.[394] Freney testified that he was trying to provide "an accurate assessment of [the ArcLight] offer" by treating the 1.5x Clause as calling for a Waterfall Top Off.[395] No one disagreed with this aspect of his analysis.

Because ArcLight's offer contemplated an Exit Sale at the unitholder level, ArcLight had addressed its letter to Oxbow Holdings, Crestview, and Load Line. On March 18, 2016, Koch emailed Crestview and Load Line that, based on his reading of ArcLight's proposal, it was "below the required Fair Market Value . . . after all required deductions

---

[392] Koch Tr. 878-79.

[393] JX 2394 at Oxbow_GS_to_CV_LL_00000343.

[394] *See, e.g.*, JX 2405 at Oxbow_00252217; JX 2407 at Oxbow_00252386; JX 2416 at Oxbow_00026709; JX 2419 at Oxbow_00252451.

[395] Freney Dep. 74-75.

are made."[396] Koch said that he would be consulting with Oxbow, its counsel, and its financial advisor.[397]

Popeo believed that Oxbow might be able to resist the Exit Sale if Goldman advised the Oxbow Board that it was possible to secure a better offer for the Company, at which point the directors could take the position that their fiduciary duties required them to seek out a better offer, notwithstanding the Exit Sale Right. In an email dated March 18, 2016, Popeo told Koch that if Goldman said the ArcLight bid was an "amazing offer," then Oxbow was "dead in the water."[398] His statement was consistent with using a Top Off to take care of the Small Holders.

Over the next several days, Koch and his advisors continued analyzing whether ArcLight's offer still satisfied the FMV Clause even after deducting "transaction specific adjustments," including a Waterfall Top Off payment of $27.9 million.[399] Koch provided the analyses to Goldman.[400] Goldman understood that the $27.9 million deduction represented "the [C]ompany's interpretation" of the 1.5x Clause.[401]

---

[396] JX 2404.

[397] *Id.*

[398] JX 2422 at Oxbow_to_EJ0028393.

[399] *See, e.g.,* JX 2451 at Oxbow_to_EJ0018870; JX 2463 at Oxbow_00247068-69; *see also* JX 2466; JX 2468; JX 2471.

[400] JX 2463 at Oxbow_00247068.

[401] Carr Dep. 270-71.

Goldman analyzed ArcLight's offer using a Waterfall Top Off to satisfy the 1.5x Clause for the Small Holders.[402] At trial, Popeo testified that he did not believe a Waterfall Top Off was possible and had explained the Highest Amount Theory to Carr on March 21, 2016.[403] The weight of the evidence indicates that Popeo misremembered the conversation. All of the contemporaneous documents reflect a Waterfall Top Off; none reflect the Highest Amount Theory. Carr testified that Popeo did not tell him about the Highest Amount Theory.[404] There is an internal Goldman email in which Stephanie Cohen, another senior banker on the deal, asked a junior colleague, "At what enterprise value is the 1.5x threshold met for everyone[?]"[405] The junior banker noted that the Small Holders needed to receive $450 per unit or approximately $414 per unit net of distributions, and he observed that a deal at that price would equate to approximately $4.5 billion in enterprise value, which he described as "nothing reasonable."[406] But he immediately explained the "minor cost associated with truing them up" with a Waterfall Top Off.[407] A longer version of the email chain shows that the Goldman team was discussing a Waterfall Top Off.[408]

---

[402] *See, e.g.*, JX 2532 at GS-Oxbow-Crestview_00014405.

[403] Popeo Tr. 1377; *see also* JX 4273.

[404] Carr Dep. 197-98.

[405] JX 2476 at GS-Oxbow-Crestview_00018164.

[406] *Id.* at GS-Oxbow-Crestview_00018163.

[407] *Id.*

[408] *See* JX 2475.

My sense is that Cohen asked for an enterprise value that included a Waterfall Top Off, and the junior banker either misunderstood or mentioned the $4.5 billion enterprise value in an effort to provide a complete response. Goldman invariably analyzed the ArcLight offer using a Waterfall Top Off.[409]

Ironically, before receiving ArcLight's offer, Oxbow still had not signed off on Goldman's engagement letter. Koch finally executed it on March 24, 2016.[410] It was backdated to March 18.[411]

On March 25, 2016, Koch emailed the Oxbow Holdings appointees about convening "an official board call" to discuss the ArcLight offer. [412] Summarizing the analysis to date, he stated:

> The price they quote is not what the unit holders would get as they have left out the deductions of expenses that will reduce the face amount of their proposal. . . . The Agreement requires that all members receive at least $169/unit while other members are required to receive additional funds which will bring their returns to 1.5 times their original investments.[413]

---

[409] *See, e.g.*, JX 2477 (Goldman analysis); JX 2478 (same); JX 2479 at Oxbow_00366554 (Popeo's notes of conversation with Goldman); JX 2480 (Goldman analysis).

[410] JX 2487.

[411] JX 2401.

[412] JX 2502 at Oxbow_00255249.

[413] *Id.*

This email described a Waterfall Top Off. Koch sent this email after "reading and studying [the LLC Agreement] quite a bit" and after receiving Popeo's advice and comments on a draft version.[414] Koch believed that a Waterfall Top Off was viable.

## Q. The Highest Amount Theory

The Highest Amount Theory did not make its appearance until March 24, 2016. Mintz Levin had been working on a letter that it would send on behalf of the Company to Oxbow Holdings, Crestview, and Load Line. Although nominally prepared on behalf of Oxbow and directed to the member-level participants in the Exit Sale process, in substance it raised objections to the ArcLight offer that served Koch's interests.

On the evening of March 24, 2016, Macaux emailed Leone-Quick with comments on the letter:

> I especially want to flag a point Greg [Fine] raised regarding the 1.5x, which I don't think we have discussed. Because Exit Sale proceeds must be paid pro rata (see Section 8(e), incorporating by reference Section 9(b)), ArcLight cannot simply increase their offer $27.5M to get a handful of Members their 1.5x. Everyone's per Unit price must be the same, so whatever price is required to deliver 1.5x is the price everyone must get.[415]

This is the first reference in the record to the Highest Amount Theory. I have the impression that in analyzing the ArcLight offer, Fine and Macaux worked through the payout mechanics for the first time. Their analysis took them through the Equal Treatment

---

[414] Koch Tr. 865-67, 873.

[415] JX 2494.

Requirements, including the Distribution Provisions, prompting them to recognize the implications of these provisions for the Exit Sale Right.

Leone-Quick emailed back, immediately recognizing that this was a new idea:

Thanks; that is an interesting and promising argument. I want to make sure I understand it fully. Are we saying that 9(b) requires allocation of the purchase price in accordance with Article XI, Section 1 and that section requires distributions to be made per percentage interest? So this precludes any one member from getting a true-up or higher percentage of the proceeds than their ownership percentage? That seems to hang together for me.[416]

Macaux responded: "Correct. Section 9(b) expressly states that the aggregate purchase price must be allocated to the Members pursuant to the waterfall set forth in Art. XI, Section 1 (governing interim cash distributions), which is to say that it must be allocated 'to the Members in accordance with their Percentage Interests."[417]

After this email exchange, Mintz Levin prepared a revised draft of the letter that raised the Highest Amount Theory, but which recognized that this contention represented a change of position for Oxbow. The relevant text stated:

And finally, an Exit Sale cannot occur unless certain Members waive their rights to receive . . . . 1.5 times their aggregate Capital Contributions from the proceeds of the Exit Sale . . . . The LLC Agreement defines an Exit Sale to be "a Transfer of all, but not less than all, of the then outstanding Equity Securities of the Company . . . ." If any Member does not, therefore, receive 1.5 times their aggregate Capital Contributions, they cannot be forced to participate in an Exit Sale, which by definition, can only occur with their participation.

*[T]he Company initially believed that one possible solution to this issue would be to have extra proceeds from the Exit Sale be directed to such*

---

[416] JX 2488.

[417] *Id.*

*Members so that they did hit this 1.5x threshold. But, unfortunately, the LLC Agreement forecloses this possible solution.* Article XIII, Section 8(c) subjects the Exit Sale to the terms set forth in, inter alia, Article XII, Section 9(b). This section provides, in part, that "[a]llocation of the aggregate purchase price payable in an Exit Sale will be determined by assuming that the aggregate purchase price was distributed to [Oxbow Holdings] and the remaining Members in accordance with Article XI, Section 1, hereof. That section, in turn, requires that distributions be made to Members "in accordance with the[i]r Percentage Interests . . . ." Accordingly, the proceeds from any Exit Sale are required to be distributed in accordance with each member's Percentage Interests, and so it is not possible under the LLC Agreement to provide more than this in order to get certain Members over the 1.5x threshold.[418]

These paragraphs captured how Koch and his advisors developed their position. They initially relied on the All Securities Clause to develop the Blocking Theory, but they believed that the 1.5x Clause could be satisfied with a Top Off. Only after Macaux's email on March 24, 2016 did Mintz Levin perceive that the Equal Treatment Requirements mandated the Highest Amount Theory. Over time, as he worked through these additional provisions, even Kelly became more comfortable with the Highest Amount Theory.[419]

On March 28, 2016, Koch sent a final version of the letter to Crestview and Load Line. The final letter deleted the reference to what "the Company initially believed," substituting the phrase, "It has earlier been suggested . . . ."[420] This letter was the first occasion when anyone representing Oxbow or Koch told Crestview and Load Line that it was "not possible under the LLC Agreement to provide more proceeds from an Exit Sale

---

[418] JX 2492 at Mintz_0014471-72 (emphasis added).

[419] *See* JX 2603.

[420] JX 2501 at Mintz_0022671.

98

to particular Members so that those Member[s] meet the 1.5x threshold."[421] Quinn Emmanuel wrote back, invoked the Leave Behind Theory, and argued that the Small Holders simply would not participate in the Exit Sale.[422]

## R.    The Exit Sale Process.

On April 6, 2016, the Oxbow Board met with all directors in attendance. Carr and Cohen attended for Goldman, and Popeo and Leone-Quick attended for Mintz Levin.[423] Goldman made a presentation during which Carr explained that ArcLight had based its proposal on a November 2015 confidential information memorandum. As a result, "many of the assumptions on which the proposal were based were out of date."[424] Goldman analyzed ArcLight's offer using a Waterfall Top Off.[425] The directors and Goldman debated various aspects of Goldman's analysis, including "the 1.5x 'make whole' return mechanism."[426] Carr explained that under Goldman's analysis, the per-unit value of ArcLight's offer did not meet the FMV Clause, but he also advised that Goldman could re-engage with Arclight and "it might be possible to obtain a modified proposal which met or

---

[421] JX 2514 at Oxbow_00093687.

[422] JX 2525 at Oxbow_00174150.

[423] JX 2550 at Obow_00169330.

[424] *Id.* at Obow_00169331.

[425] *See, e.g.*, JX 2532 at GS-Oxbow-Crestview_00014405.

[426] JX 2550 at Oxbow_00169331

exceeded this threshold."[427] Hurst, Volpert, and Coumantaros argued that the Company

should negotiate with ArcLight. Koch and other directors argued for a "broad, competitive

sales process."[428] Carr recommended going back to ArcLight.[429]

After further discussion, by a vote of six to three, the Board authorized Goldman

"to immediately proceed with a broad sales process, including both financial and strategic

investors."[430] The Board also instructed Goldman to "seek clarification of ArcLight's . . .

letter of intent, and advise ArcLight that the Company believes that the indication of

interest set forth in that letter was not pre-emptive."[431]

The Board also resolved to hire legal counsel to advise the Company on the sale

process, as contemplated by Article XIII, Section 8(f) of the LLC Agreement. The Board

decided to hire Robert I. Townsend, III, of Cravath, Swain & Moore LLP.[432]

Although the Board authorized Goldman to pursue a broad sales process, Koch tried

to micromanage the effort. He insisted that "Oxbow's executives [] refer all requests from

anyone, except customers and suppliers, who is requesting information and meetings,

---

[427] *Id.* at Oxbow_00169332.

[428] *Id.*

[429] *Id.*

[430] *Id.*

[431] *Id.*

[432] *Id.* at Oxbow_00169333.

directly to [him]."[433] He told Johnson and Clark that if "Goldman Sacks [sic] . . . and/or any potential buyer and/or investor calls any one of you, refer them to me. Do not answer any of their questions, give them any information written or orally, any gossip about Oxbow, any personal opinions, plans, meetings/calls with Goldman and/or buyers/investors . . . ."[434]

Koch even tried to micromanage Goldman. In one email, he told Carr, "As GS supposedly works for the Company (Oxbow) and since I am CEO of Oxbow, before GS calls ArcLight and/or gives them information I insist on having a conversation with you."[435] When Carr explained the extent of Goldman's communications with ArcLight, Koch berated him.[436] During an update with members of the Oxbow Board on April 18, 2016, Goldman described other limitations on their efforts.[437] Later, Koch accused Goldman of "puffing" Oxbow's numbers in its presentations to ArcLight.[438] The lead bankers from

---

[433] JX 2569 at Oxbow_to_EJ0028428; *see also* Koch Tr. 1206-07.

[434] JX 2564.

[435] JX 2569 at Oxbow_to_EJ0028430.

[436] JX 2570 at Oxbow_to_EJ0028747.

[437] *See* JX 2612 (Volpert's notes of meeting); JX 2658 (Clark's notes of meeting); JX 2662 (Volpert's comments on Clark's notes). The Crestview directors had called this meeting under the provisions of the LLC Agreement. Koch and the other Oxbow Holdings appointees stayed away, defeating a quorum. *See* JX 2594.

[438] *See* JX 2701 at Oxbow_GS_00004404; JX 2703 at LL0000450.

Goldman described the resulting process as the "most constrained" they had encountered in at least thirty years and perhaps ever.[439]

During the sale process, Koch pressured Oxbow's executives to provide prospective investors, including ArcLight, with a negative outlook for Oxbow. In advance of a meeting with ArcLight in late May 2016, Koch instructed Parmelee, Oxbow's CFO, to tell certain executives to dampen their forecasts or risk their bonuses.[440] Koch had never previously given that type of direction.[441]

During the same period, Koch and the Oxbow Holdings' appointees on the Board debated whether to grant units to members of the Board and cause all unvested unit rights to accelerate. Goldman advised that this was not customary, but it helped Koch because taking this step would increase Oxbow's outstanding unit count and make it more difficult to achieve an Exit Sale. Koch, Volpert, and their attorneys began a letter-writing campaign regarding these issues and about the restrictions that Koch was placing on Goldman.[442]

Despite the constraints on the Company's process, ArcLight remained interested and, on May 27, 2016, submitted a revised offer.[443] The new offer raised the equity value for the Company from $1,449 million to $1,476 million, resulting in a net value of $176.59

---

[439] Carr Dep. 180-83.

[440] JX 2762; McIntosh Dep. 117-20; JX 2774 at OXBOW_00204767.

[441] Koch Tr. 1021-22.

[442] *See* JX 2578; JX 2580; JX 2589; JX 2597; JX 2601; JX 2604.

[443] PTO ¶ 81.

per unit. This time, with Oxbow having embraced the Highest Value Theory, Freney did not include a Waterfall Top Off for the Small Holders in his analysis. His report simply stated that the ArcLight offer "fails to comply with key provisions of Oxbow's LLC Agreement, including 1.5x minimum return requirement."[444]

The Board had scheduled its next meeting for June 3, 2016. On June 2, Clark cancelled the meeting. Volpert and Hurst argued in favor of going forward so anyone who could participate could receive an update from Goldman and advice from Cravath. A debate ensued over the propriety of the cancellation.[445] The meeting did not take place.

The next meeting of the Oxbow Board was scheduled for June 10, 2016. During the lead-up to the meeting, Koch concluded that he could kill the ArcLight deal by firing Johnson and suing Crestview.[446]

Just before the Board meeting, Koch terminated Johnson.[447] At the meeting, Koch announced his termination of Johnson and asked for a ratifying vote. Volpert, Hurst, and Coumantaros voted against the resolution. Koch and his appointees voted in favor.[448]

---

[444] JX 2839 at Oxbow_00024174.

[445] JX 2806.

[446] *See* JX 3199; Popeo Tr. 1390-91.

[447] PTO ¶ 83; JX 2855; *see also* Koch Tr. 1010-12.

[448] *See* JX 3835.

During the meeting, Goldman analyzed the ArcLight offer. Goldman continued to include a "1.5x Return 'Make Whole' Adjustment" of $27.8 million,[449] but noted that it was a placeholder pending a final determination on how the 1.5x Clause operated.[450] Carr advised that "the valuation by ArcLight exceeded the fair market value for the Company's units established through the appraisal process."[451] Carr also advised that "under the present circumstances it seemed unlikely . . . that any other purchaser would make a better bid."[452] Goldman provided a timeline for reaching a definitive agreement with ArcLight within three months, while conducting a parallel market check that would extend for an additional month post-signing.[453]

In the midst of the meeting, Koch instructed his attorneys to file a lawsuit against Crestview and Load Line. The attorneys filed the lawsuit at 2:22 p.m., while the meeting was still going on.[454]

Cravath had been prepared to give its views on the Exit Sale process during the meeting, but it adjourned before Townsend could provide his thoughts. His talking points

---

[449] JX 2863 at Oxbow_00246861.

[450] JX 2864 at Oxbow_00364375.

[451] *Id.*

[452] *Id.*

[453] *See* JX 2863 at Oxbow_00246864.

[454] *See* JX 2866; Koch Tr. 832.

noted that "there is a fair amount of ambiguity in the [1.5x Clause]."[455] He planned to say that "[i]n [his] experience, provisions like this are designed to stop a particular member from being dragged along in an exit sale, not to preclude the entire exit sale."[456] For support, Townsend planned to cite "the references to 'such Member' in the 1.5 times provision, rather than 'any Member'" and "the reference to 'any other Member.'"[457] His talking points expressed "full[] support" for Goldman's recommendation that Oxbow seek to "finalize the terms and conditions of a definitive deal with ArcLight," while simultaneously pursuing a market check.[458]

On June 14, 2016, Crosby left a message for Koch. When Koch returned his call, Crosby told him that ArcLight would not be part of a "forced hand deal."[459] Crosby had heard about Koch's lawsuit against Crestview, and Koch informed him that he had fired Johnson. Crosby told Koch that ArcLight would let the current investors work things out and that ArcLight would not buy in with a lawsuit pending.[460]

---

[455] JX 2852 at CSM_X0000287.

[456] *Id.*

[457] *Id.*

[458] *Id.*

[459] JX 2874 at Oxbow_00147815.

[460] *Id.* at Oxbow_00147814; *see also* JX 2899 (Carr referring to "ArcLight's unwillingness to sign the LOI and continue their pursuit of Oxbow while the litigation goes on.").

**S.    This Litigation**

The complaint that Koch's lawyers filed on June 10, 2016, spanned sixty-five pages, contained 134 numbered paragraphs, and asserted six counts. The plaintiffs were Oxbow Holdings, the Small Holders, and Koch himself. The defendants were the Crestview entities, Hurst, Volpert, and Load Line.

- Count I asserted that the Crestview member entities and Load Line had breached the LLC Agreement both before and after exercising the Exit Sale Right.

- Count II asserted a claim for tortious interference with contract against the defendants who were not members of Oxbow.

- Count III sought a declaratory judgment determining that the Highest Amount Theory was the proper interpretation of the 1.5x Clause.

- Count IV sought a declaratory judgment determining that under Article XIII, Section 8(f), the Company alone controlled the Exit Sale process, not Crestview or Load Line.

- Count V sought a declaratory judgment that the ArcLight offer did not satisfy the FMV Clause, the 1.5x Clause, or result from "bona fide, arms'-length" negotiations.

- Count VI sought a declaration that in connection with the Exit Sale, Koch did not owe any fiduciary duties to Crestview or Load Line and had not breached any fiduciary duties that might exist.

The Crestview member entities and Load Line answered and asserted counterclaims. Count I sought declaratory judgments adopting their interpretations of the LLC Agreement, including that Crestview could compel a sale to ArcLight, had the right to control the Exit Sale process, and could compel an Exit Sale under the Leave Behind Theory. Count II asserted claims for breach of the LLC Agreement against Oxbow Holdings.

On June 28, 2016, Koch caused Oxbow to file a separate action against the Crestview member entities, Volpert, Hurst, O'Donnell, and Johnson. This complaint spanned 144 pages, contained 515 numbered paragraphs, and asserted eleven counts.

- Count I asserted a claim for breach of the LLC Agreement against the Crestview member entities.

- Count II asserted a claim for breach of the implied covenant of good faith and fair dealing against the Crestview member entities.

- Count III asserted a claim for breach of fiduciary duty against O'Donnell.

- Count IV asserted a claim for breach of fiduciary duty against Johnson.

- Count V asserted a claim against Johnson to claw back compensation under his employment agreement.

- Count VI asserted a claim for breach of fiduciary duty against Volpert.

- Count VII asserted a claim for breach of fiduciary duty against Hurst.

- Count VIII sought a declaratory judgment that an Exit Sale had to satisfy the All Securities Clause, meaning that the Exit Sale could not leave any member behind and the Blocking Theory was correct.

- Count IX sought a declaration that the Highest Amount Theory was correct.

- Count X sought a declaration that Oxbow did not have to engage with either ArcLight or GSO Capital because an offer from one of those entities would not be a bona fide, arm's-length transaction resulting from an orderly sale process.

- Count XI sought a determination that the Company had the sole right to control the Exit Sale process.

In the requests for relief, the complaint also sought a ruling on the viability of the *Thoughtworks* strategy.

I entered an order consolidating the two actions, and the parties cross-moved for summary judgment.[461] One issue was the proper interpretation of the 1.5x Clause. A second issue was whether the Company or the Minority Members had control of the Exit Sale process. A third issue was whether all members had to use reasonable efforts to effect an Exit Sale.

By order dated August 10, 2016, I held that the plain language of the LLC Agreement, read as a whole, implemented the Highest Amount Interpretation and foreclosed the Leave Behind Interpretation.[462] For reasons set forth below, I continue to adhere to that view. I nevertheless recognized that this imposed a harsh result:

> The Minority Members stress that the 1.5x Return Clause would be satisfied except for the Small Holders. They argue with some force that given the overall structure of the agreement and the concept of the Exit Sale, they never would have agreed that investors with a stake as small as the Small Holders' would be able to block the operation of the Exit Sale Right. That is an implied covenant argument, and it is fairly litigable. One can posit that in the original bargaining position, had the current situation been discussed, then the Minority Members would have insisted on the ability to compensate the Small Holders separately, rather than lose the efficacy of the threat that put teeth into the Put Right. It is also true that the Company, [Oxbow Holdings], and Koch did not historically act as if the Small Holders were an impediment to the Exit Sale Right. But the current cross-motions for summary judgment are not about the implied covenant. They are about the plain language of the Exit Sale Right, which is contrary to the Minority Members' position.[463]

---

[461] The numerous affiliates that Koch lined up to join him in making affirmative claims—Oxbow, Oxbow Holdings, Family LLC, Executive LLC—created nomenclature difficulties in the consolidated action. This decision refers to Koch and his affiliates, collectively, as the "Koch Parties."

[462] Dkt. 142 (the "Summary Judgment Order" or "SJ Order").

[463] *Id.* ¶ 23(b).

In terms of control over the Exit Sale process, the Summary Judgment Order stated that the LLC Agreement "in fact contemplate[s] cooperation between the Minority members and the Company."[464] After quoting the Exit Sale Right, the Summary Judgment Order held that "[i]f the Minority Members can generate an Exit Sale without Company involvement, they are free to do so. If the Exit Sale satisfies the requirements of the Exit Sale Right, then the Company and its members have to comply."[465] The Summary Judgment Order held that once the Minority Members had exercised the Exit Sale Right, then under Article XIII, Section 8(f), each party had an obligation to "use reasonable efforts to take or cause to be taken to do or cause to be done all things necessary or desirable to effect such Exit Sale."[466]

After the issuance of the Summary Judgment Order, the Crestview members and Load Line moved to file amended counterclaims. The counterclaims now spanned ninety-two pages, contained 279 numbered paragraphs, and asserted six counts:

- Count I asserted a claim for breach of the LLC Agreement against Oxbow Holdings.

- Count II asserted a claim for tortious interference with contract against the Small Holders.

- Count III asserted a claim for breach of the implied covenant of good faith and fair dealing against Oxbow Holdings.

---

[464] *Id.* ¶ 24.

[465] *Id.* ¶ 25.

[466] *Id.* ¶ 27.

- Count IV asserted a claim for breach of fiduciary duty against Koch.

- Count V sought declaratory judgments against Oxbow Holdings establishing that Crestview's interpretations of provisions in the LLC Agreement were correct.

- Count VI sought reformation of the 1.5x Clause to conform with the Leave Behind Theory.

Load Line did not assert counterclaims for tortious interference or for breach of fiduciary duty. Crestview and Load Line subsequently withdrew their claim for reformation.

The case proceeded through discovery, which was contentious. It was also complicated, because all five of the individuals who were named parties to the case had served as directors of Oxbow, and three of them continued to serve. Their status raised questions about their ability to access otherwise privileged material prepared by Oxbow's in-house legal department and Mintz Levin. Moreover, the suit was between former clients of the in-house legal department and Mintz Levin, implicating another exception to the attorney-client privilege. The parties filed eleven motions to compel and three motions for protective order. The court issued three memorandum opinions and eleven orders addressing discovery issues.

The case reached trial in July 2017. On the third day of trial, the parties announced a partial settlement. The Koch Parties settled fully with O'Donnell and Johnson, and the Koch Parties and the Minority Members agreed not to press their tort claims against one

another. As a result of that agreement, the case became limited to contract theories and affirmative defenses.[467]

## II.     LEGAL ANALYSIS

The issues for decision consist of contractual disputes and affirmative defenses. The contractual disputes involve requests for declaratory judgments and claims for breach of contract.

## A.     The Challenge To The Small Holders' Status As Members

The Minority Members have challenged whether Oxbow properly admitted the Small Holders as members in 2011 and 2012. If successful, this claim would moot any disputes over the 1.5x Clause, because all of the other members have received sufficient distributions to satisfy it. The Minority Members did not challenge the Small Holders' status as members until August 31, 2016, when they moved to amend their counterclaims to add this theory.[468] Laches bars this claim.

In substance, the Minority Members contend that the parties failed to obtain the necessary approvals and follow the requisite formalities when issuing units to the Small Holders. Historically, if a corporation failed to follow corporate formalities when issuing shares, then a party challenging the issuance had strong grounds to contend that the issuance was void and could not be validated in equity, whether through the invocation of

---

[467] *See* Tr. 622-25.

[468] *See* Dkts. 156-57.

111

equitable defenses or otherwise.[469] To mitigate the harshness of this rule, the General

Assembly added two sections to the Delaware General Corporation Law: (i) Section 204,

which provides a statutory path for ratifying invalid issuances and other defective corporate

acts and (ii) Section 205, which empowers the Court of Chancery to validate defective

corporate acts.[470] When dealing with LLCs, Delaware courts have not approached

membership determinations with the same strict eye for formalities. Instead, Delaware

decisions have taken into account "the flexible and less formal nature of LLCs"[471] and

observed that, under Delaware's LLC Act, "[s]ubstance is supposed to be paramount over

form."[472]

There is no dispute that Oxbow had the power as an entity to issue units and admit

new members. Oxbow could have issued units to the Small Holders and admitted them as

members, if the parties had adhered to the procedures specified in the LLC Agreement.

---

[469] *See STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1137 (Del. 1991); *Olson v. EV3, Inc.*, 2011 WL 704409, at *14 (Del. Ch. Feb. 21, 2011); *Blades v. Wisehart,* 2010 WL 4638603, at *12 (Del. Ch. Nov. 17, 2010) (Strine, V.C.). *See generally* C. Stephen Bigler & Seth Barrett Tillman, *Void or Voidable?--Curing Defects in Stock Issuances Under Delaware Law*, 63 Bus. Law. 1109 (2008).

[470] *See* 8 *Del. C.* §§ 204-05; *In re Numoda Corp.*, 128 A.3d 991, 2015 WL 6437252, (Del. Oct. 22, 2015) (TABLE) (affirming decision validating stock under 8 *Del. C.* § 205). *See generally* C. Stephen Bigler & John Mark Zeberkiewicz, *Restoring Equity: Delaware's Legislative Cure for Defects in Stock Issuances and Other Corporate Acts*, 69 Bus. Law. 393 (2014).

[471] *Mickman v. Am. Int'l Processing, L.L.C.*, 2009 WL 891807, at *2 (Del. Ch. Apr. 1, 2009).

[472] *In re Grupo Dos Chiles, LLC*, 2006 WL 668443, at *2 (Del. Ch. Mar. 10, 2006).

Consequently, assuming for the sake of analysis that the parties failed to follow the requisite procedures, the issuance of units to the Small Holders and their admission as members would be voidable, not void.[473] Voidable acts can be validated by equitable defenses.[474]

"Laches is an equitable defense born from the longstanding maxim 'equity aids the vigilant, not those who slumber on their rights.'"[475] "[L]aches generally requires proof of three elements: first, knowledge by the claimant; second, unreasonable delay in bringing the claim; and third, resulting prejudice to the defendant."[476] As the party raising the

---

[473] *See generally Carsanaro v. Bloodhound Tech., Inc.*, 65 A.3d 618, 648-653 (Del. Ch. 2013) (discussing the concepts of corporate power and capacity for the analogous corporate doctrine of *ultra vires*). Unlike in a different scenario recently addressed by this court, the LLC Agreement does not say that units issued without complying with this provision are void. *See Southpaw Credit Opportunity Master Fund, L.P. v. Roma Rest. Hldgs., Inc.*, 2018 WL 658734, at *2 (Del. Ch. Feb. 1, 2018) (analyzing provision rendering issuances without a joinder to a stockholders' agreement "null and void *ab initio*"). Article XIII, Section 2 of the LLC Agreement enumerates eight circumstances under which a transfer of units is void. If the parties had wanted to agree to a similarly draconian consequence for violations of the provisions governing the admission of new members, they could have done so.

[474] *See Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014) (holding that voidable act was "properly subject to equitable defenses" and finding that challenge was "barred by the doctrine of acquiescence"); *see also Nevins v. Bryan*, 885 A.2d 233, 244-50 (Del. Ch.) (holding that challenged actions were voidable and that equitable defenses barred plaintiff's challenge), *aff'd*, 884 A.2d 512 (Del. 2005).

[475] *Reid v. Spazio*, 970 A.2d 176, 182 (Del. 2009) (quoting *Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982)).

[476] *Whittington v. Dragon Gp. L.L.C.*, 991 A.2d 1, 8 (Del. 2009) (internal quotation marks and citation omitted).

affirmative defense of laches, the Koch Parties bear the burden of proving its elements.[477] The standard of proof is a preponderance of the evidence.[478] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[479]

The Koch Parties proved that the Minority Members knew in 2011 about the plan to issue units to the Small Holders. The Koch Parties proved that the Minority Members knew in January 2012 that Oxbow was treating Family LLC as a member and in April 2012

---

[477] *See Austin v. Judy*, 65 A.3d 616, 2013 WL 1944102, at *2 (Del. May 9, 2013) (TABLE) ("As an affirmative defense, the burden was on [the defendant] to prove all of the elements of laches."); *In re Tenenbaum*, 918 A.2d 1109, 1114 (Del. 2007) ("The party asserting laches bears the burden of proving both that the delay was unreasonable and that prejudice resulted from the delay." (quoting *Bash v. Bd. of Med. Practice*, 579 A.2d 1145, 1152-53 (Del. Super. 1989))).

[478] *See Slovin v. Knotts*, 1980 WL 268097, at *2 (Del. Ch. Dec. 5, 1980) ("[S]tatute of limitations, estoppel and laches are affirmative defenses which must be proven by a preponderance of the evidence."); *see also TA Operating LLC v. Comdata, Inc.*, 2017 WL 3981138, at *21 (Del. Ch. Sept. 11, 2017) ("[D]efendants . . . bear the burden to prove each element of each of their affirmative defenses by a preponderance of the evidence."); 27A Am. Jur. 2d *Equity* § 128 ("The standard of proof generally applied to establish laches is the preponderance of evidence standard . . . ." (citing *Tenneco Auto. Operating Co., Inc. v. Visteon Corp.*, 375 F. Supp. 2d 375 (D. Del. 2005))).

[479] *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (Strine, V.C.) (internal quotation marks and citation omitted); *accord Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *6 (Del. Ch. May 18, 2009) ("Under this standard, [the plaintiff] is not required to prove its claims by clear and convincing evidence or to exacting certainty. Rather, [the plaintiff] must prove only that it is more likely than not that it is entitled to relief."), *aff'd*, 988 A.2d 938 (Del. 2010) (TABLE).

that Oxbow was treating Executive LLC as a member. The Minority Members now argue

that the Koch Parties did not give them sufficient details about the issuances, but for laches

to apply, a party need not have actual knowledge of every element of a claim. "Laches will

bar a claim if the claimant had actual or constructive knowledge of the claim."[480] "Actual

knowledge is defined as direct and clear knowledge. Constructive knowledge is defined as

knowledge that one using reasonable care or diligence should have, and therefore that is

attributed by law to a given person."[481] A party is also "chargeable with such knowledge

of a claim as he or she might have obtained upon inquiry."[482] Consequently, laches will

foreclose recovery if a plaintiff failed to act when "it would have been reasonable for [him]

to inquire into the situation," and further inquiry would have uncovered the claim.[483]

> Inquiry notice does not require full knowledge of the material facts; rather, plaintiffs are on inquiry notice when they have sufficient knowledge to raise their suspicions to the point where persons of ordinary intelligence and prudence would commence an investigation that, if pursued would lead to the discovery of the injury.[484]

---

[480] *All Pro Maids, Inc. v. Layton*, 2004 WL 1878784, at *8 (Del. Ch. Aug. 9, 2004), *aff'd*, 880 A.2d 1047 (Del. 2005) (TABLE).

[481] *Deutsche Bank Nat'l Tr. Co. v. Goldfeder*, 86 A.3d 1118, 2014 WL 644442, at *2 (Del. Feb. 14, 2014) (TABLE) (internal quotation marks and footnotes omitted).

[482] *Fike v. Ruger*, 752 A.2d 112, 114 (Del. 2000) (affirming the Court of Chancery's grant of summary judgment on the issue of laches "because Plaintiffs were on inquiry notice and/or possessed actual knowledge of their present claims").

[483] *Whittington*, 2009 WL 1743640, at *9.

[484] *Pomeranz v. Museum P'rs, L.P.*, 2005 WL 217039, at *3 (Del. Ch. Jan. 24, 2005) (Strine, V.C.); *see also Fike*, 752 A.2d at 114 (charging plaintiff with inquiry notice where

115

The Minority Members were on inquiry notice, at a minimum, starting in 2011. Their representatives participated in 2011 in the votes to approve the issuances of units to the sulfur-company executives and to members of Koch's family. The monthly report that Oxbow sent to its members in January 2012 listed Family LLC as a member, showed the $20 million being distributed to the members, and disclosed that Family LLC received its share as a member.[485] The monthly report that Oxbow sent to all members in April listed Executive LLC as a member, showed $15 million being distributed to all members, and disclosed that Executive LLC received its share of that distribution.[486] Thereafter, for seventy-two consecutive months, Crestview and Load Line received monthly management reports that listed the Small Holders as members on the page titled "Member Equity." The same page showed the Small Holders receiving distributions as members.

The Small Holders likewise appeared as members on Oxbow's audited financial statements. In 2011, 2012, and 2013, the Minority Members received Oxbow's audited financial statements, which reported the issuance of member units to the Small Holders and noted that Koch controlled both entities.[487] In 2012 and 2013, in their report to the Audit Committee, Oxbow's outside auditor identified the issuances to the Small Holders

---

"the facts already known to that plaintiff were such as to put the duty of inquiry upon a person of ordinary intelligence").

[485] JX 232 at CRESTVIEW000222549; *see also* Hurst Tr. 175-78; Koch Tr. 694.

[486] JX 234; Hurst Tr. 179.

[487] *See, e.g.*, JX 273 at Oxbow_00167079.

in the section titled "Membership Units."[488] Hurst chaired Oxbow's Audit Committee. He agreed that he was aware of the investments in 2012 and that Crestview "just didn't make a big deal about it."[489]

As noted, the Minority Members did not challenge the Small Holders' status as members until August 31, 2016. "What constitutes unreasonable delay is a question of fact dependent largely upon the particular circumstances."[490] "The period of time that constitutes an 'unreasonable delay' can range from one month to many years. The length of the delay is less important than the reason for it."[491] Bringing a claim "after the expiration of the analogous limitations period is presumptively an unreasonable delay for purposes of laches."[492] The analogous statute of limitations in this case was three years.[493]

The Koch Parties proved that by waiting until August 31, 2016, the Minority Members delayed unreasonably in bringing suit. The Minority Members contend that they did not know until March 2016 that the Koch Parties were invoking the Highest Amount

---

[488] *See* JX 238 at Oxbow_00149624; JX 275; JX 276 at Oxbow_00149671; JX 277; Hurst Tr. 193-98.

[489] Hurst Tr. 203.

[490] *Whittington*, 991 A.2d at 9 (quoting *Fed. United Corp. v. Havender*, 11 A.2d 331, 343 (Del. 1940)).

[491] *IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 177 (Del. 2011).

[492] *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 769 (Del. 2013).

[493] *See* 10 *Del. C.* § 8106.

Theory, but that is a different issue than whether the Small Holders validly became members.

The final element is prejudice, which need not rise to the level of quantifiable, monetary damages. Prejudice occurs where "the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable and operates as an estoppel against the assertion of the right."[494] "Prejudice can be either procedural, such as when a party is unable to call a crucial witness due to the delay and the witness has since become unavailable, or substantive, such as when a party relies to his detriment on the plaintiff's failure to file a claim in a timely manner."[495] A defendant may be substantively prejudiced where the plaintiff "sit[s] by inactive and in what amounts to silence . . . until affairs had become so complicated that a restoration of former status was difficult, if not impossible."[496]

In this case, everyone has acted since 2011 and 2012 as if the Small Holders were members. The Minority Members received their share of the Small Holders' capital contributions when Oxbow distributed them, and all distributions since then have included the Small Holders. Oxbow's financial statements, and presumably its tax returns, have all

---

[494] 2 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 419d (5th ed. 1941) (citation omitted).

[495] *Meer v. Aharoni*, 2010 WL 2573767, at *8 (Del. Ch. June 28, 2010); *accord Steele v. Ratledge*, 2002 WL 31260990, at *3 (Del. Ch. Sept. 20, 2002).

[496] *Havender*, 11 A.2d at 348.

reflected an ownership structure in which the Small Holders were members. It would be unfairly prejudicial to permit a belated challenge to their status as members to go forward at this point.

Laches bars the Minority Members' objection to the status of the Small Holders as members. That does not mean that this decision will ignore the evidence surrounding the admission of the Small Holders, including evidence that Oxbow failed to adhere to proper formalities. That evidence remains relevant to the Minority Members' claim for breach of the implied covenant of good faith and fair dealing.

## B.     The Requests For Declarations Regarding The Meaning Of The 1.5x Clause

The parties seek competing declaratory judgments regarding the meaning of the 1.5x Clause. The party seeking a declaratory judgment assumes the burden of proving its position.[497] Here, both sides have sought competing declarations, so each theoretically bears the burden of proof to establish its position. The burden in this case is a non-issue,

---

[497] *See San Antonio Fire & Police Pension Fund v. Amylin Pharm., Inc.*, 983 A.2d 304, 316 n.38 (Del. Ch.) ("Because Amylin seeks a declaratory judgment as to its right to approve, it bears the burden of proof here."), *aff'd*, 981 A.2d 1173 (Del. 2009); *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 739 (Del. Ch. 2008) ("[T]he better view is that a plaintiff in a declaratory judgment action should always have the burden of going forward." (internal quotation marks and citation omitted)). *See generally* 26 C.J.S. *Declaratory Judgments* § 157 (2017) ("The plaintiff in an action for a declaratory judgment normally has the burden of proving by a preponderance of the evidence that conditions exist which justify an award of declaratory relief. The plaintiff must prove his or her case in accordance with the general rules even if a negative declaration is sought." (footnotes omitted)).

because the question of the plain meaning of the 1.5x Clause presents an issue of law,[498] and I continue to believe that the meaning of the 1.5x Clause is clear when its language is read in the context of the LLC Agreement as a whole. Because the provision is not ambiguous, the parol evidence rule bars consideration of extrinsic evidence for purposes of construing the meaning of the contract.[499]

The Koch Parties maintain that the plain language of the LLC Agreement, when read as a whole, mandates the Highest Amount Theory. They correctly observe that I already decided this issue in the Summary Judgment Order. The Minority Members renew their contention that the plain language of the provision requires the Leave Behind Theory. They ask that I reconsider the Summary Judgment Order, because the evidence at trial showed that many sophisticated individuals who have looked at the 1.5x Clause thought that the Leave Behind Theory was correct, or at least viable. They correctly point out that I did not have the benefit of this evidence when I issued the Summary Judgment Order.

The Summary Judgment Order is a prejudgment order. "Prejudgment orders remain interlocutory and can be reconsidered at any time, but efficient disposition of the case demands that each stage of the litigation build on the last, and not afford an opportunity to

---

[498] *See AT&T Corp. v. Lills*, 953 A.2d 241, 251-52 (Del. 2008).

[499] *Exelon Generation Acqs., LLC v. Deere & Co.*, – A.3d –, –, 2017 WL 6422337, at *10 (Del. Dec. 18, 2017).

reargue every previous ruling."[500] "Subject to the law of the case doctrine, [a prejudgment order] can be revisited should future developments, including evidence generated by the discovery process, provide a compelling reason for doing so."[501] For the sake of completeness, this decision revisits the question of the proper interpretation of the 1.5x Clause and holds that the plain language of that provision, read in the context of the LLC Agreement as a whole, implements the Highest Amount Theory.

### 1. Principles of Contract Interpretation

The LLC Agreement is a contract governed by Delaware law.[502] When interpreting such a contract, "the role of a court is to effectuate the parties' intent."[503] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[504]

---

[500] *See Siegman v. Columbia Pictures Entm't, Inc.*, 1993 WL 10969, at *3 (Del. Ch. Jan. 15, 1993) (quoting 1B James Wm. Moore et al., *Moore's Federal Practice* ¶ 0.404[1] (2d ed. 1992)).

[501] *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 2014 WL 5465535, at *5 (Del. Ch. Oct. 28, 2014); *see also Zirn v. VLI Corp.*, 1994 WL 548938, at *2 (Del. Ch. Sept. 23, 1994) (Allen, C.) ("Once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears.").

[502] *See* LLCA art. XVII, § 5.

[503] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[504] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks and citation omitted).

"Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[505] "Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it."[506] "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[507] "Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning."[508]

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."[509] "Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan."[510] "It is well established that a court interpreting any contractual provision . . . must

---

[505] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[506] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

[507] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[508] *Alta Berkeley*, 41 A.3d at 385 (footnote omitted).

[509] *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

[510] *Id.*

give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument."[511]

## 2. The Plain Meaning Of The 1.5x Clause

The 1.5x Clause appears as a proviso in the Exit Sale Right. The Exit Sale Right appears in Article XIII, Section 8(e) of the LLC Agreement. In the original LLC Agreement, it stated:

> If (x) the Company rejects the Put Notice in writing or fails to respond to the Put Notice within 180 calendar days of its receipt and (y) the Company is not Publicly Traded, the Exercising Put Party may require all of the Members to engage in an Exit Sale, on the terms set forth in Section 7(c), Section 7(d) and Section 9(b), in which the aggregate consideration to be received by such Members at the closing of such Exit Sale equal [sic] or exceed [sic] Fair Market Value; <u>provided</u>, that the Exercising Put Party may not require any other Member to engage in such Exit Sale unless the resulting proceeds to such Member (when combined with all prior distributions to such member) equal at least 1.5 times such Member's aggregate Capital Contributions through such date.[512]

The Exit Sale Right remained in this form until 2014, when the parties executed the Third Amendment.

The Third Amendment modified the Exit Sale Right by eliminating Crestview's right to exercise it if Crestview owned less than 10% of the Company. The parties achieved this outcome by creating two subsections, one that applied if Crestview owned 10% or more of the Company, and another that applied if Crestview owned less than 10% of the Company. The resulting provision states:

---

[511] *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

[512] LLCA art. XIII, § 8(e).

123

If (x) the Company rejects the Put Notice in writing or fails to respond to the Put Notice within 180 calendar days of its receipt and (y) the Company is not Publicly Traded:

(A) if at such time Crestview owns ten percent (10%) or more of the outstanding Member Interests and Units of the Company, the Exercising Put Party may require all of the Members to engage in an Exit Sale, on the terms set forth in Section 7(c), Section 7(d) and Section 9(b), in which the aggregate consideration to be received by such Members at the closing of such Exit Sale equal or exceed Fair Market Value; provided, that the Exercising Put Party may not require any other Member to engage in such Exit Sale unless the resulting proceeds to such Member (when combined with all prior distributions to such Member) equal at least 1.5 times such Member's aggregate Capital Contributions through such date; and

(B) if at such time Crestview owns less than ten percent (10%) of the outstanding Member Interests and Units of the Company, then notwithstanding any other provision of this Agreement the Exercising Put Party (and if applicable, the Tag Along Put Party) shall have the right (i) to Transfer all of its or their Member Interests and Units that were subject to the Put Notice to any non-Affiliated Person at any time on such terms and conditions as the Exercising Put Party (and if applicable, the Tag-Along Put Party) shall determine, or (ii) to require the Company to use commercially reasonable efforts to complete an Initial Public Offering on customary terms and conditions as promptly as practicable and to include in such Initial Public Offering all Member Interests and Units then held by the Exercising Put Party (and if applicable, the Tag-Along Put Party).

The obligation of the Company to provide cooperation and support as contemplated by Section 8(f) of this Article XIII in the event of an Exit Sale shall apply, *mutatis mutandis*, to any Transfer or Initial Public Offering pursuant to clause (B) above. For the avoidance of doubt, the provisions of Section 6 and 7 of this Article XIII shall not apply to any Transfer or Initial Public Offering pursuant to clause (B) above.[513]

For purposes of an Exit Sale when Crestview owned 10% or more of the Company, the Third Amendment did not change the Exit Sale Right. Other amendments shortened the

---

[513] Third Am.

amount of time that the Company had to respond to the Put, but the substance of the Exit Sale Right remained the same.

Focusing only on the language of Article XIII, Section 8(e), the 1.5x Clause modifies the ability of the Exercising Put Party to force an Exit Sale. Under this provision, the Exercising Put Party

> may require all of the Members to engage in an Exit Sale . . . provided, that the Exercising Put Party may not require any other Member to engage in such Exit Sale unless the resulting proceeds to such Member (when combined with all prior distributions to such member) equal at least 1.5 times such Member's aggregate Capital Contributions through such date.

If the 1.5x Clause is read in isolation, then it is possible to construe its language as an exception to the ability of the Exercising Put Party to "require all of the Members to engage in an Exit Sale." This reading stresses that the proviso speaks in the singular, saying that the Exercising Put Party may not require "any other Member" to engage in the sale unless "such Member" receives sufficient proceeds. Under this view, the Exercising Put Party can compel an Exit Sale involving the other members and leave behind any members for whom the Exit Sale does not satisfy the 1.5x Clause. Those members can choose to participate, but if they do not, the Exercising Put Party cannot compel them to sell. This reading generates the Leave Behind Theory.

The Leave Behind Theory seems plausible, until the 1.5x Clause is considered in conjunction with other aspects of the Exit Sale Right. One such aspect is the definition of an Exit Sale, which the LLC Agreement defines as follows:

> "*Exit Sale*" means as a Transfer of all, but not less than all, of the then-outstanding Equity Securities of the Company, and/or all of the assets of the Company to any non-Affiliated Person(s) in a bona fide arms'-length

125

transaction or series of related transactions (including by way of a purchase agreement, tender offer, merger or other business combination transaction or otherwise.[514]

An Exit Sale thus can take the form of either (i) a transaction at the unitholder level, in which case it must involve "a Transfer of all, but not less than all, of the then-outstanding Equity Securities of the Company," or (ii) an asset sale, in which case it must involve "all of the assets of the Company." These alternatives can be accomplished "by way of purchase agreement, tender offer, merger or other business combination transaction or otherwise."

When the 1.5x Clause is read in light of the definition of Exit Sale, the Leave Behind Theory is no longer viable. The definition of an Exit Sale states that any transaction at the unitholder level must involve "a Transfer of all, but not less than all, of the then-outstanding Equity Securities of the Company," which this decision has referred to as the All Securities Clause. For an Exit Sale to take place at the unitholder level, the All Securities Clause means that no members can be left behind. Read in light of the definition of Exit Sale, the 1.5x Clause becomes another condition that must be met before an Exit Sale takes place. The use of singular terms like "any other Member" and "such Member" becomes recognizable as a straightforward way to ensure that the 1.5x Clause is analyzed on a member-by-member basis. If the requirement fails for any "such Member," then "the Exercising Put Party may not require any other Member to engage in such Exit Sale." Once the requirement to include all members cannot be met, the Exit Sale fails.

---

[514] LLCA art. I.

When confronted with the definition of Exit Sale, adherents of the Leave Behind Theory have contended that the 1.5x Clause is a more specific provision and hence should control over the more general definition of Exit Sale. Under this approach, they argue that an Exit Sale can still leave members behind. But the plain language of the definition of an Exit Sale contemplates a sale of the entire company, either at the entity level through an asset sale or at the member level through a transfer of securities. In an entity-level transaction, there is no means by which some members can be left behind. All of the assets are sold and the proceeds distributed *pro rata* to the members. The Exit Sale is viable if it can satisfy the 1.5x Clause for all holders; it fails if there is a holder who will not receive sufficient consideration. This fact is inherent in the asset-sale alternative, and the All Securities Clause makes it explicit for a member-level transaction.

The outcome of the plain language analysis up to this point is the Blocking Theory, under which an Exit Sale fails if the proceeds will not satisfy the 1.5x Clause for some members. This result led some interpreters to counter with the Top Off Theory, under which some holders could receive greater consideration to satisfy the 1.5x Clause.

The plain language of the Exit Sale Right does not permit some members to receive greater consideration than others in an Exit Sale. The Exit Sale Right states that the Exit Sale must proceed in compliance with Article XIII, Sections 7(c), 7(d), and 9(b). These sections link to the Distribution Provisions. Collectively, they establish the Equal Treatment Requirements. They effectively require equal and ratable treatment of members in an Exit Sale.

One version of the Top Off Theory is a Seller Top Off, in which Crestview, Load Line, or the buyer in an Exit Sale would come up with greater consideration for the Small Holders. Article XIII, Section 7(d) specifies that all units transferred in an Exit Sale "shall be Transferred on the same terms and conditions as each other Unit so Transferred." The price that a member receives for its units is a term of the transfer.[515] Often, it is the most important term. Article XIII, Section 7(d) thus forecloses having certain members receive greater consideration—different terms—than others.

Another version of a Top Off Theory is a Waterfall Top Off, in which the proceeds of an Exit Sale are allocated first to members who have not yet received enough distributions to satisfy the 1.5x Clause, then subsequently allocated *pro rata* to all members. The Exit Sale Right lacks any language that would provide for a priority return of capital, much less a priority return on capital. Instead, the Distribution Provisions establish a payment scheme that forecloses priority returns. They require that the proceeds of an Exit Sale must be distributed first so that members receive their Maximum Permitted Tax Amount, then *pro rata* "in accordance with their Percentage Interests." A Waterfall Top Off would contravene these provisions and is not permitted.

---

[515] *See In re Hypodermic Prods. Antitrust Litig.*, 484 F. App'x 669, 671 (3d Cir. 2012) (discussing the negotiation of "prices of products and other terms and conditions"); *CC Fin. LLC v. Wireless Props., LLC*, 2012 WL 4862337, at *2 (Del. Ch. Oct. 1, 2012) (citing the "purchase price and other material terms and conditions of sale"); *In re Marriott Hotel Props. II Ltd. P'ship Unitholders Litig.*, 1997 WL 589028, at *2 (Del. Ch. Sept. 17, 1997) (discussing disclosure of "offer price and the other terms and conditions of the tender offer").

Working through the Distribution Provisions both forecloses a Top Off Option and gives rise to another reason why the Leave Behind Theory is not reasonable. The Distribution Provisions contemplate distributions to all members in proportion to their Percentage Interests. The definition of Percentage Interests uses all of the outstanding units as the denominator. If an Exit Sale left some members behind, then the math of the Distribution Provisions would not work. Those members would still get their distributions from the Exit Sale, yet they would not have sold.

The Minority Members have pointed out that the last sentence of Article XIII, Section 9(b) uses the word "remaining Members," which they say supports reading the Distribution Provisions to contemplate that an Exit Sale could leave some members behind. The full sentence states: "Allocation of the aggregate purchase price payable in an Exit Sale will be determined by assuming that the aggregate purchase price was distributed to [Oxbow Holdings] and the remaining Members in accordance with Article XI, Section 1 hereof."[516] This sentence does not use "remaining" in the sense of "those who remain" or "those left behind." It uses "remaining" as a synonym for "other" to say that the proceeds will be distributed to "Oxbow Holdings and the other Members in accordance with Article XI, Section 1 hereof." If the word "remaining" meant "those left behind," then this provision would call for distributing the consideration from the Exit Sale to only a subset of members: Oxbow Holdings and the Small Holders. Under the reading that their lawyers

---

[516] *Id.* art. XIII, § 9(b).

have advocated, Crestview and Load Line would not participate in the distribution of consideration from the Exit Sale that they caused to take place! What this language instead means is that all of the members, including Oxbow Holdings as the majority member, get *pro rata* consideration. This provision dovetails with the requirement that all units be sold on the "same terms and conditions" to ensure that Oxbow Holdings cannot demand extra consideration as compensation for its controlling stake.

The Exit Sale Right is not the only type of transaction in the LLC Agreement that uses the concept of an Exit Sale. Article XIII, Section 9 gives Oxbow Holdings the reciprocal Drag-Along Right to force an Exit Sale and drag along all other members. It states:

> Subject to the terms and conditions of Section 7(c), Section 7(d) and this Section 9, following the earlier of (i) the second anniversary of the Effective Date or (ii) the death of William I. Koch, [Oxbow Holdings] may require all of the Members to participate in an Exit Sale on the same terms and conditions as [Oxbow Holdings]; <u>provided</u>, that such Exit Sale must result in proceeds to each of Crestview and Load Line (when combined with all prior distributions to Crestview and Load Line, respectively) equal to at least 2.5 times their respective aggregate Capital Contributions through such date.[517]

This language says plainly that for an Exit Sale to be sufficient for purposes of the Drag-Along Right, it must deliver an amount of proceeds "to each of Crestview and Load Line" that meets the prescribed return hurdle. The language does not contemplate that either Crestview or Load Line could abstain from the transaction and stay in as a minority investor. The Exit Sale either meets the hurdle for both investors and works, or it falls short

---

[517] *Id.* art. XIII, § 9.

130

of the hurdle for both investors and fails. The hurdle in the Drag-Along Right only applies to Crestview and Load Line, so it was easy to draft. The Exit Sale Right strives to achieve a parallel structure, but extends the 1.5x Clause to all other members. The provision therefore speaks in terms of "any other Member," but it operates in a parallel fashion.

The parties could have drafted the LLC Agreement differently. They might have defined a concept called a "Drag-Along Sale" for Koch's Drag-Along Right and included the clauses that protect against Koch obtaining extra consideration for Oxbow Holdings. Having done so, they could have defined an "Exit Sale" differently for purposes of the Exit Sale Right. They might also have drafted different mechanics for implementing a Drag-Along Sale and an Exit Sale.

Another alternative would have been for the parties to keep the unitary Exit Sale concept but revise the definition and the procedures to speak in terms of participating members and make the math work if fewer than all members participated. The parties took this approach in Article XIII, Section 7, which addresses a situation in which Oxbow Holdings might wish to sell some of its units in a member-level transfer and gives the Minority Members a right to tag along in the sale and sell a proportionate number of their own units (the "Tag-Along Right").[518] The Tag-Along Right both (i) contemplates that the Minority Members can choose whether to participate and (ii) permits the Minority

---

[518] *Id.* art. XIII, § 7.

131

Members to participate as to only some of their units.[519] The language that the drafters of the LLC Agreement used to address this situation contrasts with the language they used for the Exit Sale Right, reinforcing the interpretation of the latter as requiring the participation of all members.

Doubtless other approaches are possible. Instead, the drafters used a single definition of Exit Sale that incorporated the All Securities Clause. They made the Exit Sale subject to the Equal Treatment Requirements and called for a *pro rata* payout under the Distribution Provisions.

Contracts must be read as a whole. If the 1.5x Clause were read in isolation, then the Leave Behind Theory would be reasonable. If one ponders what might be commercially reasonable, then a Top Off is viable. When the 1.5x Clause is read in conjunction with the All Securities Clause and Equal Treatment Requirements, including the Distribution Provisions, then neither the Leave Behind Theory nor a Top Off is reasonable.

The practical result of these provisions when read together is to mandate the Highest Amount Interpretation. It an Exit Sale does not satisfy the 1.5x Clause for any member, then it cannot proceed. To satisfy the 1.5x Clause for all members and to pay all members the same consideration, the Exit Sale must provide all members with the highest amount necessary to satisfy the 1.5x Clause for any member.

---

[519] *Id.* art. XIII, § 7(a)-(c).

### 3. Extrinsic Evidence

"If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract, or to create an ambiguity."[520] Because this case proceeded to trial on the implied covenant of good faith and fair dealing and other theories, there is extensive evidence about (i) how different parties interpreted the 1.5x Clause, (ii) the negotiations that led to the 1.5x Clause, and (iii) the circumstances surrounding the issuance of units to the Small Holders, which gives rise to the current controversy over the 1.5x Clause. Because the meaning of the 1.5x Clause is plain when read in the context of the Exit Sale Right and the LLC Agreement as whole, the parol evidence rule forecloses the consideration of that evidence for purposes of interpreting the Exit Sale Right. The evidence remains relevant, however, to the analysis of the implied covenant of good faith and fair dealing.

If I were to consider the negotiating history, it would not change my reading of the Exit Sale Right. Although Crestview and ArcLight initially proposed the 1.5x Clause as a Leave Behind Option for ArcLight, Koch personally revised the provision to change it to a Blocking Option. Koch explained credibly what he was seeking to achieve, which fit with his economic interests at the time and matched up with the plain language of his changes. The lawyers later cleaned up Koch's language in a manner that took a step back towards a Leave Behind Option, but there is no indication that anyone intended the edits to effect a

---

[520] *Exelon*, 2017 WL 6422337, at *4.

133

substantive change. More importantly, no one ever made the types of changes to the All Securities Clause or the Equal Treatment Requirements, including the Distribution Provisions, that would be necessary to implement a Leave Behind Option.

The parallelism between the Exit Sale Right and the Drag-Along Right reinforces this interpretation. The negotiating history indicates that the drafters developed the concept of an Exit Sale for the Drag-Along Right. In this context, the Minority Members wanted to make clear that Oxbow Holdings could not insist on additional consideration to reflect its status as a controller, so their counsel introduced the requirement that an Exit Sale be on the "same terms and conditions" for all members.[521] Oxbow Holdings' counsel suggested "substantially the same terms and conditions," but Crestview rejected the qualifier.[522] The parties later built the same concept into the Equal Treatment Requirements. The Minority Members understandably wanted this protection if Koch was the seller pursuant to the Drag-Along Right and it was their ox potentially being gored. Because the parties used the same definition of Exit Sale and the same Equal Treatment Requirements when structuring the Exit Sale Right and the Drag-Along Right, it follows that the two rights should be interpreted similarly. The result is the Highest Amount Interpretation under which all holders get the highest amount that any holder receives.

---

[521] JX 83 at Oxbow_00075012; *see also* JX 105 at DPW-001454; Hurst Tr. 76-79.

[522] *See* JX 113 at OXBOW_LATHAM_00002986.

The Minority Members and their counsel were not shy about marking up the LLC Agreement. Crestview and its counsel provided extensive comments throughout the negotiations, and the parties substantially redrafted the language implementing the Exit Sale Right to accommodate Load Line. They never attempted to redraft the definition of an Exit Sale or to modify the Equal Treatment Requirements, including the Distribution Provisions, in ways that would accommodate a Leave Behind Option.

The fact that various sophisticated individuals have looked at the Exit Sale Right and reached different interpretations does not mandate a finding of ambiguity or call for adopting the Leave Behind Theory. As Volpert recognized at trial, the Leave Behind Theory was best for Crestview, because it enabled them to exit without paying any extra money.[523] It is unsurprising that Crestview and their counsel advocated for this theory. Their analysis never went meaningfully beyond the 1.5x Clause. Other than making the argument that the specific 1.5x Clause should control over the more general All Securities Clause, they never dealt with other aspects of the LLC Agreement, such as the possibility of an entity-level Exit Sale that could leave no member behind or the implications of the Equal Treatment Requirements, including the Distribution Provisions.

McAuliffe subjectively believed in either the Leave Behind Theory or a Top Up Option, but he never explained why. As discussed in the Factual Background, his analysis does not track the relevant provisions, and the two instances he identified in which a partial

---

[523] *See* Volpert Tr. 607.

Exit Sale would be possible mix up different concepts. Neither of the emails in which he expressed his views parse through the language of the LLC Agreement or reference the Equal Treatment Requirements. My impression is that McAuliffe believed that Crestview should be able to exit and that such an outcome would be in the best interests of Oxbow and, ultimately, Koch. He approached the Exit Sale Right with a view towards getting a transaction done.

The views of the Mintz Levin lawyers evolved. When they considered only the 1.5x Clause and the definition of an Exit Sale, the corporate partners read the former as an exception to the latter, supporting the Leave Behind Theory. The litigators read the latter as trumping the former, supporting the Blocking Theory. Both thought a Top Off Option solved any impediment created by the Blocking Theory. Only after the ArcLight offer arrived and the corporate lawyers worked through the Equal Treatment Requirements, including the Distribution Provisions, did the Highest Amount Interpretation jump out at them. The fact that the Mintz Levin lawyers came to this reading late in the day is a reason to be skeptical about it, but it ends up being the only reading that gives meaning to the LLC Agreement when read as a whole.

Cravath's views are underrepresented in the record, but appear motivated by practicality. Townsend was prepared to advise that in his experience, most provisions like the 1.5x Clause could be addressed with a Top Off. His talking points did not work through the Equal Treatment Requirements. Townsend had interacted regularly with McAuliffe and understood the difficult corporate governance dynamics at Oxbow. Although not as loose

136

in his analysis as McAuliffe, I believe Townsend also examined the Exit Sale Right with a view towards to getting a transaction done.

My overall impression is that when interpreting the 1.5x Clause, many of the lawyers were influenced by their clients' objectives, which is understandable.[524] A court's only client is the integrity of the law and the judicial process.

It also appears that the lawyers' views about the proper interpretation of the contract were influenced by the size of the Small Holders' ownership interest and the circumstances surrounding their admission as members. Those factors made it seem unreasonable that the Small Holders could block an Exit Sale. If the Small Holders had purchased a much larger block, then I doubt that the Blocking Theory or the Highest Amount Theory would have seemed extreme. The language of the Exit Sale Right does not turn on the size of the members' interest or how they became members, so those factors do not affect a plain language interpretation of the LLC Agreement. They are relevant to the analysis of the implied covenant of good faith and fair dealing.

Because the plain language of the Exit Sale Right mandates the Highest Amount Interpretation, extrinsic evidence is not relevant. For the sake of completeness, this decision has considered it. Although it reveals a range of views about the 1.5x Clause, it does not change the fact that the Highest Amount Interpretation is the only reading that gives

---

[524] *See* Andrew M. Perlman, *A Behavioral Theory of Legal Ethics*, 90 Ind. L.J. 1639, 1653-57 (2015) (discussing the effects of partisanship on the judgment of lawyers and other professionals).

meaning to the 1.5x Clause, the Exit Sale definition, and the Equal Treatment Requirements, including the Distribution Provisions. It is the only reasonable reading of the LLC Agreement.

## C.       The Application Of The Implied Covenant

The next issue is the application of the implied covenant of good faith and fair dealing. The Minority Members seek a declaration that the implied covenant prevents the Koch Parties from relying on the Highest Amount Interpretation. At a minimum, they contend that Crestview should be permitted to provide additional proceeds to the Small Holders to satisfy the 1.5x Clause—a Seller Top Off. They would prefer a Waterfall Top Off, and they believe that the implied covenant should permit an Exit Sale to leave the Small Holders behind. The Koch Parties contend that the plain language of the LLC Agreement leaves no room for the implied covenant.

The Minority Members technically seek a declaratory judgment regarding the effect of the implied covenant. As parties seeking this declaration, they bore the burden of proving their claim by a preponderance of the evidence. They did not take the next step and assert a claim for breach of the implied covenant, which requires proof of "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[525] Consequently, this decision only addresses what obligation is implied.

---

[525] *Fitzgerald v. Cantor,* 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998).

138

### 1. The Legal Standard

Under Delaware law, the implied covenant of good faith and fair dealing "attaches to every contract."[526] The implied covenant of good faith and fair dealing is a doctrine that Delaware law deploys to ensure that parties' contractual expectations are fulfilled under circumstances that the parties did not anticipate. In its most common manifestation, the implied covenant "supplies terms to fill gaps in the express provisions of a specific agreement."[527] When a party asserts an implied covenant claim, the court "first must engage in the process of contract construction to determine whether there is a gap that needs to be filled."[528] "Through this process, a court determines whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill."[529] A court must determine whether a gap exists because "[t]he implied covenant will not infer language that contradicts a clear exercise of an express contractual right."[530] "[B]ecause the implied covenant is, by definition, implied, and because it protects

---

[526] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).

[527] *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 182 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015).

[528] *Id.* at 183; *see also* Mohsen Manesh, *Express Contract Terms and the Implied Contractual Covenant of Delaware Law*, 38 Del. J. Corp. L. 1, 19 (2013).

[529] *Nama Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014).

[530] *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010).

the *spirit* of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue."[531] "[I]mplied covenant analysis will only be applied when the contract is truly silent with respect to the matter at hand . . . ."[532]

"If a contractual gap exists, then the court must determine whether the implied covenant should be used to supply a term to fill the gap. Not all gaps should be filled."[533]

> The most obvious reason a term would not appear in the parties' express agreement is that the parties simply rejected that term ex ante when they articulated their contractual rights and obligations. Perhaps, for example, the parties . . . considered the term, and perhaps [after] some give-and-take dickering, the parties agreed the term should not be made part of their agreement. They thus rejected the term by purposefully omitting the term.[534]

The implied covenant should not be used to fill a gap created by a rejected term because doing so would grant a contractual right or protection that the party "failed to secure . . . at the bargaining table."[535] A court must not use the implied covenant to "rewrite [a] contract"

---

[531] *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at \*10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009).

[532] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006).

[533] *Allen*, 113 A.3d at 183.

[534] Manesh, *supra*, at 28 (footnote omitted).

[535] *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch.) (Strine, V.C.), *aff'd*, 861 A.2d 1251 (Del. 2004).

that a party "now believes to have been a bad deal."[536] "Parties have a right to enter into good and bad contracts, the law enforces both."[537]

But a contractual gap may exist for other reasons. "No contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible contingency."[538] Even the most skilled and sophisticated parties will necessarily "fail to address a future state of the world . . . because contracting is costly and human knowledge imperfect."[539] "In only a moderately complex or extend[ed] contractual relationship, the cost of attempting to catalog and negotiate with respect to all possible future states of the world would be prohibitive, if it were cognitively possible."[540] And "parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations."[541]

These or other circumstances may warrant resort to the implied covenant. The Delaware Supreme Court has provided guidance in this area by admonishing against a free-

---

[536] *Nemec*, 991 A.2d at 1126.

[537] *Id.*

[538] *Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 2008 WL 4182998, at *1 (Del. Ch. Sept. 11, 2008).

[539] *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010).

[540] *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *23 (Del. Ch. Dec. 30, 1991) (Allen, C.).

[541] *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (Allen, C.).

wheeling approach. Invoking the doctrine is a "cautious enterprise."[542] Implying contract terms is an "occasional necessity . . . to ensure [that] parties' reasonable expectations are fulfilled."[543] Its use should be "rare and fact-intensive, turning on issues of compelling fairness."[544]

"Assuming a gap exists and the court determines that it should be filled, the court must determine how to fill it. At this stage, a reviewing court does not simply introduce its own notions of what would be fair or reasonable under the circumstances."[545] Although its name includes the concepts of "good faith" and "fair dealing," the implied covenant does not establish a free-floating requirement that a party act in some morally commendable sense.[546] When used with the implied covenant, the term "good faith" contemplates "faithfulness to the scope, purpose, and terms of the parties' contract."[547] The concept of "fair dealing" similarly refers to "a commitment to deal 'fairly' in the sense of

---

[542] *Nemec*, 991 A.2d at 1125.

[543] *Dunlap*, 878 A.2d at 442 (internal quotation marks and citation omitted).

[544] *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998), *aff'd*, 708 A.2d 989 (Del. 1998).

[545] *Allen*, 113 A.3d at 184.

[546] *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418 (Del. 2013), *overruled in part on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013).

[547] *Id.* at 419 (emphasis omitted); *accord* Restatement (Second) of Contracts § 205 cmt. a (Am. Law Inst. 1981) ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . .").

consistently with the terms of the parties' agreement and its purpose."[548] These concepts

turn not on whether a court believes that a particular action was morally or equitably

appropriate under the circumstances, but rather "on the contract itself and what the parties

would have agreed upon had the issue arisen when they were bargaining originally."[549]

To supply an implicit term, the court "looks to the past" and asks "what the parties

would have agreed to themselves had they considered the issue in their original bargaining

positions at the time of contracting."[550] The court seeks to determine

> whether it is clear from what was expressly agreed upon that the parties who
> negotiated the express terms of the contract would have agreed to proscribe
> the act later complained of as a breach of the implied covenant of good
> faith—had they thought to negotiate with respect to that matter.[551]

"Terms are to be implied in a contract not because they are reasonable but because they are

necessarily involved in the contractual relationship so that the parties must have intended

them . . . ."[552] In this manner, the implied covenant "seeks to enforce the parties' contractual

bargain by implying only those terms that the parties would have agreed to during their

original negotiations if they had thought to address them."[553]

---

[548] *Gerber*, 67 A.3d at 419.

[549] *Id.* (emphasis omitted).

[550] *Id.* at 418.

[551] *Id.*

[552] *Cincinnati Bell*, 1997 WL 525873, at *5.

[553] *Gerber*, 67 A.3d at 418.

## 2. The Gap

The gap in this case concerns the terms on which Oxbow admitted the Small Holders. The LLC Agreement that the parties executed in 2007 clearly contemplated the possibility of members later joining Oxbow (for example, by providing for preemptive rights),[554] but it did not specify the rights that later-admitted members would have. Instead, it left the issue open until the Company admitted new members, and it empowered the Board to make the determination.

Article IV, Section 5 of the LLC Agreement (the "New Member Provision") governs the admission of new members. It states:

> Subject to Article XIII, Section 5, upon the approval of the Directors, additional Persons may be admitted to the Company as Members and Units may be created and issued to such Persons as determined by the Directors on such terms and conditions as the Directors may determine at the time of admission. The terms of admission may provide for the creation of different classes or series of Units having different rights, powers and duties. As a condition to being admitted as a Member of the Company, any Person must agree to be bound by the terms of this Agreement by executing and delivering a counterpart signature page to this Agreement, and make the representations and warranties set forth in Section 7 below as of the date of such Person's admission to the Company. The address, Percentage Interest and Capital Contribution of each such additional Member shall be added to Exhibit A, which shall thereby be amended.[555]

This provision grants the Board the power to determine whether "additional Persons" are "admitted to the Company as Members," and it authorizes the Board to create units and

---

[554] LLCA art. XIII, § 5.

[555] LLCA art. IV, § 5. The introductory phrase, "[s]ubject to Article XIII, Section 5," cross-references the preemptive rights provisions in the LLC Agreement.

issue them "on such terms and conditions as the Directors may determine at the time of admission." It further states that "[t]he terms of admission may provide for the creation of different classes or series of Units having different rights, powers and duties."

By deferring until a later point the question of what rights subsequent members would have, the LLC Agreement created a gap. Determining whether that gap persisted for the Small Holders requires examining the terms on which the Company admitted them in 2011.

The Board did not fill the gap in 2011. On April 28, 2011, the Board unanimously adopted the following two resolutions:

> RESOLVED, that the Company is authorized to issue up to $20,000,000 of shares of Company stock to the family of William I. Koch's family, including unit holder Joan Granlund, at a price of $300 per share.
>
> FURTHER RESOLVED, that the Company is authorized to issue up to $10,000,000 of shares of the Company stock to former [sulfur-company] executives at a price of $300 per share.[556]

Neither resolution referred to Family LLC or Executive LLC. Neither specified the rights that the members of Koch's family or the former sulfur-company executives would have as members. The resolutions spoke of "shares of Company stock." As an LLC, the Company did not have stock. If anything, this reference implied a common-stock-like instrument without special rights, powers, preferences, or privileges, such as a preferential right to receive 1.5 times invested capital before being forced to engage in a sale.

---

[556] JX 2539 at Oxbow_00261105.

The Board revisited the issuance to the former sulfur-company executives during a meeting on November 9, 2011. The minutes contain the following:

> Steve Fried discussed the proposed stock purchase plan for the International Commodities Export Corporation (Sulphur group) employees, stating that approximately 12 people had shown an interest in purchasing Company units at the price of $300 per share, for a total of Fifteen Million Dollars ($15,000,000). After some discussion concerning the price to be charged, it was unanimously agreed that $15,000,000 of stock would be offered at the same price discussed in the April board meetings, $300 per share. It was agreed to attempt to get this matter finalized by January 1, 2012.[557]

The action taken at this meeting did not specify the rights that the former sulfur-company executives would have as members. Although the minutes referred at one point to "units," it described the issuance as part of a "proposed stock purchase plan" and later referred to a price of "$300 per share." For purposes of determining the rights of the former sulfur-company executives, the reference to a "proposed stock purchase plan" clouded matters rather than clarifying them. As Volpert testified at trial, employee stock purchase plans (particularly in private companies) often limit a recipient's ability to exercise rights associated with shares. They also frequently give the issuer rights regarding the shares, such as a right to repurchase them under particular circumstances.[558] The directors could have reasonably expected that management would develop the specific terms of the "proposed stock purchase plan" and ask the Board to approve them.

---

[557] *Id.* at Oxbow_00261107.

[558] Volpert Tr. 373.

In considering the evidence, I do not fully credit Hurst and Volpert's testimony that they had no reason to think that the sulfur-company executives and the members of Koch's family would invest through entities rather than individually. Koch had sent emails to the Board that proposed to have the sulfur-company executives invest "via an investment trust."[559] Fried had circulated a more detailed summary describing a "Newco" structure in which "Newco would be a Delaware limited liability company," "Newco would become a member of Oxbow, owning the same class of units as currently exists," and "[a]n affiliate of Oxbow would be an investor in Newco and serve as the Manager of Newco."[560] This description anticipated Executive LLC. But Fried also stated in his email that "[t]he existing members of Oxbow would be required to consent to an amendment to implement the rights of Newco as described above."[561] I personally do not see any basis in the LLC Agreement for believing that the issuance required a formal amendment and member-level consent (as opposed to Board-level consent). Nevertheless, Hurst, Volpert, and the other directors reasonably could have believed that management would present them with more detailed documents regarding the issuance to Newco and that the Board would be able to weigh in at that time.

---

[559] JX 140; *see also* JX 138 at Oxbow_00237109; Hurst Tr. 185-86.

[560] JX 138 at Oxbow_00237125.

[561] *Id.* at Oxbow_00237126.

147

By failing to follow proper formalities, the Koch Parties created a gap regarding the terms on which the Small Holders became members. The Koch Parties' failure to follow proper formalities is all the more significant because Oxbow's CFO flagged that Oxbow was not complying with the preemptive rights section in the LLC Agreement and that the issuance required an additional approval to address it.[562] Both Koch and Oxbow's corporate secretary at the time ignored the issue. Given this lax attitude, it is perhaps less surprising that Oxbow personnel also failed to recognize that, because Koch controlled Family LLC and Executive LLC, and for the additional reason that members of Koch's family owned Family LLC, the issuances were related-party transactions that required approval by Supermajority Vote.[563]

In arguing that no gap exists, the Koch Parties point to the Equal Treatment Requirements, which exist by virtue of Article XIII, Section 8(e) stating that an Exit Sale may only occur "on the terms set forth in Section 7(c), Section 7(d) and Section 9(b)." They also point to the Distribution Provisions, which come in via the reference to Article XIII, Section 9(b). The Koch Parties assert that using the implied covenant to permit a Top Off Option or Leave Behind Option would conflict with these express provisions in the LLC Agreement. But this argument begs the question by assuming that subsequently admitted members have the same rights and obligations as the original members. Through

---

[562] *See* JX 157.

[563] LLCA art. III, § 3(d)(11).

the New Member Provision, the LLC Agreement took a different course. It left open the question of what rights and obligations subsequently admitted members would have, creating an intentional gap. When the Board acted in 2011, it did not act formally to specify those rights and obligations. The gap therefore remains open for the implied covenant to fill.

In arguing that no gap exists, the Koch Parties also cite the negotiations over the Exit Sale Right and the 1.5x Clause that took place in 2007. They observe that Crestview negotiated with the goal of spelling out its exit rights and leaving nothing to implication.[564] They further observe that the parties negotiated over what would count towards satisfying the 1.5x Clause, with the initial draft only considering the Exit Sale proceeds, a later draft adding prior distributions but not tax distributions, and the final LLC Agreement including sale proceeds and all prior distributions, including tax distributions.[565] The Koch Parties conclude that if Crestview wanted the 1.5x Clause to accommodate a Top Off, they needed to bargain for it in 2007. Once again, this argument begs the question by assuming how the LLC Agreement would treat subsequent members for purposes of the Put and Exit Sale Right. In 2007, the parties left this issue open by including the New Member Provision in the LLC Agreement. If the Oxbow Board later admitted new members, it could condition the issuance on the 1.5x Clause not applying to those units, or it could issue a different

---

[564] *See* Hurst Tr. 61-62.

[565] *Compare* JX 25 at Oxbow_00236397, *with* LLCA art. XIII, § 8(e). *See* Hurst Tr. 111-14.

class of units entirely. Once again, the terms of the LLC Agreement do not foreclose the application of the implied covenant where subsequent members are concerned. The focus necessarily shifts from 2007, when the parties left the issue open, to 2011, when Oxbow admitted the Small Holders.

Oxbow's failure to follow proper formalities when admitting the Small Holders leaves the Koch Parties poorly positioned to argue that there is no gap to fill. It is impossible to know what would have happened if Koch and his team had documented the issuances properly. Under those circumstances, Hurst, Volpert, and Coumantaros could have identified the potential threat to the Exit Sale Right from the Small Holders resetting the threshold for the 1.5x Clause. The Supermajority Vote requirement meant that they could have blocked the issuance and forced a negotiation. The Board had the power under the New Member Provision to issue units to the Small Holders on the condition that they not be able to invoke the 1.5x Clause. The Board also could have created a new class or series of units that did not possess the right to invoke the 1.5x Clause. Because of the lax manner in which the Koch Parties proceeded, that discussion never happened, and the gap remained open.

The Minority Members proved at trial that a gap exists in the parties' contract relating to the terms on which the Small Holders became members. The implied covenant can fill that gap and satisfy the parties' reasonable expectations.

### 3. The Implied Provision

To fill the gap, this court must "look[] to the past" and consider "what the parties would have agreed to themselves had they considered the issue" during the time when they

150

were contracting.[566] Because the gap in this case concerns the terms on which Oxbow admitted the Small Holders as members, the time of contracting is *not* 2007, when the parties originally executed the LLC Agreement, but rather 2011, when the issue of admitting the new members arose.

The Minority Members proved at trial that they never would have consented to admitting the Small Holders if they had understood that the admission would reset the 1.5x Clause. At trial, Volpert explained that "[b]y 2011, there was no hurdle [for an Exit Sale]. Everyone had received 1.5 times. So to reset it from zero, in effect, to $450 would have been completely irrational."[567] Hurst testified similarly.[568] I credit their testimony.

The Koch Parties have argued that Crestview did not care about the 1.5x Clause in 2011 because they expected to exit for at least $500 per unit and did not expect the hurdle to matter. There is some evidence to support this contention.[569] At trial, I asked Volpert about this specific point, and he explained that while such an exit "was possible," even "hoped for," that was the upside case.[570] There was risk that it would not happen. "So there

---

[566] *Gerber*, 67 A.3d at 419.

[567] Volpert Tr. 385; *see also id.* at 365-66, 387.

[568] *See* Hurst Tr. 17-18, 22-23.

[569] *See, e.g.*, JX 160 at CRESTVIEW000010924; JX 164 at CRESTVIEW000116055; JX 166 at CRESTVIEW000116078; JX 235 at CRESTVIEW000093138.

[570] Volpert Tr. 386.

was no reason for us to anticipate that we would have an exit at such a high price."[571] There was likewise "no reason for [Crestview] to give up the most important right we had for . . . the company to raise money that they didn't need."[572] On balance, I credit Volpert's testimony that Crestview never would have agreed in 2011 to reset a key exit hurdle to $450 per share.

The Minority Members also proved at trial that the Koch Parties would not have insisted on a Highest Amount Option. Until March 2016, no one among the Koch Parties had identified the Highest Amount Theory, so they would not have insisted upon it during a negotiation in 2011 or 2012. McAuliffe thought that the LLC Agreement allowed an Exit Sale to leave behind the Small Holders or make them whole with a Top Off.[573] Until March 2016, the Mintz Levin legal team, Koch, the other Oxbow Holdings appointees, and key members of management like Freney thought an Exit Sale could make the Small Holders whole with a Waterfall Top Off. The Koch Parties would not have insisted on a position that they had not yet taken based on aspects of the Exit Sale Right that they had not yet identified.

The evidence convinces me that the parties would not have agreed to admit the Small Holders on conditions that implemented a Leave Behind Option. As their initial

---

[571] *Id.*

[572] *Id.*

[573] *See* JX 360; JX 2144 at Oxbow_00254920.

offer, the Minority Members likely would have proposed a set of conditions that implemented a Leave Behind Option, but Koch never would have accepted it. Koch testified credibly that he was adamantly opposed to any provision that would leave behind any member.[574] As discussed in the Factual Background, during the negotiation of the LLC Agreement in 2007, Koch personally redrafted the original 1.5x Clause so that it no longer provided a Leave Behind Option.[575] Hurst and Volpert admitted Koch was a "difficult" and "tough negotiator."[576] I credit that Koch would not have accepted a scenario in which an Exit Sale would have left Family LLC behind. As a matter of principle, he would have insisted that the LLC Agreement treat all members the same, including Executive LLC, just as he had in 2007. A Leave Behind Option was not in the cards.

The evidence convinces me that it was possible, but unlikely, that the parties would have agreed to a Waterfall Top Off. This approach treats the 1.5x Clause as a priority return of capital plus a 50% priority return on capital. It deducts this amount off the top from the Exit Sale proceeds and then distributes the balance *pro rata* to all members. Because Koch and members of his family owned two thirds of Oxbow's units, they would bear two-thirds of the cost of a Waterfall Top Off. As a practical matter, under this approach, Koch and members of his family would have to pay two-thirds of the cost to facilitate a forced sale

---

[574] Koch Tr. 660-62, 675, 679-80.

[575] *See* JX 71; JX 74.

[576] Hurst Tr. 62; Volpert Tr. 387.

153

of their business. It is possible that Koch would have agreed to this, and there is significant evidence that the Koch Parties believed until March 2016 that the Exit Sale Right contemplated a Waterfall Top Off, but Koch would have bristled at paying most of the freight. In a negotiation in 2011, I do not believe that he would have given up easily.

The evidence convinces me that the most likely outcome is that the parties would have agreed to a Seller Top Off. Under that approach, the Minority Members could complete an Exit Sale if they came up with sufficient additional funds to satisfy the 1.5x Clause for the Small Holders. Volpert testified that Crestview would have "insist[ed] on the right to provide a top-up at our cost" and described it as the "commercially logical, reasonable thing to do."[577] A series of individuals who looked at the situation in real time concluded that a Seller Top Off was the commercially reasonable outcome. McAuliffe stated in 2014 and again in 2016 that the Small Holders could be made whole with a Top Off.[578] Kelly, a partner in Mintz Levin's corporate group, argued in March 2016 that the structure of the Exit Sale Right "implied" that the Minority Members would be able to "forego or reallocate whatever is needed in order to top up" the Small Holders.[579] Popeo described Kelly's view as "good corporate practice and custom in the corporate

---

[577] Volpert Tr. 366-67.

[578] *See* JX 360; JX 2144 at Oxbow_00254920.

[579] JX 2495 at Mintz_0023999 (displaying "Rich [Kelly]'s comments").

154

environment."[580] On March 25, 2016, within two days of receiving the ArcLight letter of intent, Koch emailed Oxbow Holdings' other appointees and told them that "[t]he [LLC] Agreement requires that all members receive at least $169/unit while other members are required to receive additional funds which will bring their returns to 1.5 times their original investments."[581] Koch believed in the viability of a Seller Top Off.

The contemporaneous views of these individuals made sense in light of the purpose of the 1.5x Clause, which the trial witnesses agreed was to provide a minimum financial return.[582] Koch explained that he wanted his family members who invested "to receive a minimum return on their investment before being forced to sell their interests" and that it was "an important concept . . . that all Members get at least 1.5 times their investment."[583] A Seller Top Off would achieve that goal by ensuring that each member received at least the bargained-for 1.5-times-return threshold.

Koch testified that during the negotiations in 2007, any request by Crestview for a Top Off Option would have been a "deal killer."[584] Accepting that testimony for purposes

---

[580] Popeo Tr. 1554; *see also* Popeo Dep. 371-72 (noting that corporate partners believed the LLC Agreement permitted a Top Off based on their understanding of "general corporate practice"); *id.* at 440 ("[Kelly's] view was as corporate lawyers would see applying general corporate practice in this environment.").

[581] JX 2502 at Oxbow_00255249; *see also* JX 3199 at Oxbow_00366479 (Koch's notes: "Some[one] has to come up with cash for [Family LLC delta].").

[582] *See* Hurst Tr. 12-13; Volpert Tr. 356-58; Popeo Tr. 1389-90.

[583] JX 2911 ¶ 10 (Koch affidavit).

[584] Koch Tr. 679; *see also id.* at 675-76.

of the private equity investment in 2007, it does not hold true for discussions about the Small Holders in 2011. In 2007, everyone was buying in at the same time and at the same price per unit, so Koch's principle of equal treatment made sense. The parties also were all taking large equity stakes, with Koch and his affiliates taking roughly two-thirds, Crestview taking roughly one-fourth, and Load Line taking roughly a tenth, so again comparable treatment made sense. In 2011, the Small Holders were buying in four years later and taking only 1.4%. They were differently situated than the original investors, so treating them differently made sense. Giving them nominally equal treatment would bestow on them preferential treatment.

Another difference was that in 2007, Koch had leverage. Crestview wanted to buy a sizeable stake in Oxbow, but Oxbow did not need Crestview's capital.[585] In 2011, the situation was reversed. Koch wanted his family members to buy a small additional stake in Oxbow. Oxbow did not need their capital, and Crestview was in a position to block the investment.[586]

In my view, Koch would have compromised on a Seller Top Off for Family LLC. As a matter of principle, Koch likely would have obtained the same terms for Executive LLC. It is possible that he might not have insisted that Executive LLC benefit from the 1.5x Clause and a Seller Top Off. Under Executive LLC's limited liability company

---

[585] *See* Koch Tr. 678-79.

[586] Volpert Tr. 375.

agreement, Koch has the power to dissolve the entity and pay the executives fair market value, without any floor of 1.5 times invested capital.[587] Until this litigation, the executives never knew about the 1.5x Clause.[588] The parties might have agreed that Executive LLC would receive units or invest on terms that did not include a 1.5x Clause. But I think it is more likely that Executive LLC would have received the same terms as Family LLC.

The Koch Parties also have argued that Koch never would have agreed to a Seller Top Off because it would be the equivalent of granting the Minority Members a call option, which had been a nonstarter in 2007.[589] A call option would give the Minority Members the right to buy the Koch Parties' shares themselves. A Seller Top Off for the Small Holders does not create a call option. The Seller Top Off operates *within* the confines of the Exit Sale Right. The Minority Members still must find an offer that satisfies the requirements of the Exit Sale Right, including the FMV Clause and the 1.5x Clause. The only effect of the implied term is to plug the contractual hole that currently permits the Koch Parties to claim that all members must receive the benefit of the clearing price necessary to satisfy the 1.5x Clause for the Small Holders.

---

[587] JX 2545 at CRESTVIEW_000027444; *see also* Hurst Tr. 17-18.

[588] *See* Koch Tr. 1240-41; Zisson Dep. 29.

[589] During the negotiations of the LLC Agreement, Koch asked Crestview to give him a call option, but Crestview rejected it because they "didn't want to be called out at a time that the company's business was doing exceptionally well and had great prospects." Hurst Tr. 116-17; *see also* JX 22 at Oxbow_00075051. Crestview never even considered asking Koch for a call option, knowing he would refuse. Hurst Dep. 258.

By drawing analogy to a call option, the Koch Parties seem to be envisioning a situation in which Oxbow did not do well following the Minority Members' investment, such that the 1.5x Clause was never satisfied for any members. They posit that if a Seller Top Off is permitted in this case for the Small Holders, then it would be permitted in the hypothetical case in which Oxbow never fared well. Under that hypothetical scenario, they envision that the Minority Members could use a Seller Top Off to force a sale of Oxbow even though the 1.5x Clause was not satisfied for anyone.

In my view, the implied covenant would *not* operate to imply the availability of a Seller Top Off under those circumstances. The difference between the two scenarios highlights the narrow role of the implied covenant and the limited nature of the implied term. The implied covenant *only* has a role because of the poorly documented admission of the Small Holders and the resulting unexpected scenario in which the Koch Parties can use that fortuitous circumstance to invoke the Highest Amount Interpretation and block an Exit Sale Right that otherwise indisputably would apply for the other 98.6% of the units. In the hypothetical situation that the Koch Parties posit, that confluence of factors would not exist. In a world where Oxbow never prospered, the Exit Sale would fail as to 100% of the units because of the 1.5x Clause. The admission of the Small Holders, assuming it had happened in that dystopian timeline, would not raise an impediment to an otherwise viable Exit Sale. Rather, a clear term in the parties' original agreement would not have been met. In my view, a court would not deploy the implied covenant under those circumstances.

The Koch Parties also have contended that implying a Seller Top Off would invite "Top Off Creep," because Koch does not enjoy a similar right to achieve an Exit Sale using

158

a Top Off under his Drag-Along Right. Koch has not sought an implied Top Off and the current record would not support one. Moreover, Koch's Drag-Along Right is limited to Crestview and Load Line, so the concept of issuing units to other members does not apply. Nevertheless, it is possible to imagine circumstances that could warrant deploying the implied covenant in a similar fashion for Koch's benefit. Imagine, for example, that Crestview convinced the Oxbow Board to issue it a small number of additional units some years after its original agreement. Further envision that Crestview made statements to the Board that led the directors to issue the units without specifying their terms and conditions. Under those circumstances, if Crestview later argued that Koch could not use his Drag-Along Right unless Crestview and Load Line received a grossed-up price for all of their units equal to 2.5 times what Crestview had paid in the small issuance, then perhaps the implied covenant might come into play. There is no inequity in not implying a comparable term for Koch now, when there is no suggestion of any gap to be filled or unfairness to be addressed.

#### 4. Whether To Use The Implied Provision To Fill The Gap

Just because a contractual gap exists does not meant that the court will use an implied provision to fill it. One compelling reason to eschew filling a gap is if the parties actually negotiated over the issue, and the implied provision would give one side the benefit of a provision that it "failed to secure . . . at the bargaining table."[590] That is not the case

---

[590] *Aspen Advisors*, 843 A.2d at 707.

here. The LLC Agreement intentionally left open the question of what rights and obligations subsequent members would have. The parties did not engage on the question of the rights and obligations of the Small Holders when the issue of their admission arose in 2011, largely because the Koch Parties failed to follow proper formalities.

More broadly, the implied covenant should be deployed cautiously because it has the potential to upset the parties' reasonable expectations and undermine the value of contracting.

> The right to contract is one of the great, inalienable rights accorded to every free citizen. If there is one thing more than any other which public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting and that this freedom of contract shall not lightly be interfered with. We also recognize that freedom of contract is the rule and restraints on this freedom the exception, and to justify this exception unusual circumstances should exist.[591]

"When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement . . . ."[592] "Delaware courts rightly employ the implied covenant sparingly when parties have crafted detailed, complex agreements, lest parties be stuck by judicial error with duties they never voluntarily accepted."[593]

---

[591] *Libeau v. Fox*, 880 A.2d 1049, 1057 (Del. Ch. 2005) (Strine, V.C.) (alterations, internal quotation marks, and citation omitted), *aff'd in part, rev'd in part*, 892 A.2d 1068 (Del. 2006).

[592] *Id.*

[593] *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *7 (Del. Ch. Apr. 20, 2009) (Strine, V.C.).

Deployment of the implied covenant therefore "should be a rare and fact-intensive exercise, governed solely by issues of compelling fairness."[594]

In this case, the issues of compelling fairness call for deploying the implied covenant to permit a Seller Top Off. Enforcing the plain meaning of the LLC Agreement, without addressing the gap created by the admission of the Small Holders, requires giving effect to the Highest Amount Interpretation. Under that circumstances, a clause that all of the witnesses agreed was meant to be "compensatory"[595] transforms into a blocking right that permits holders who bought 1.4% of the Company at $300 per unit to hold up a $2 billion-plus transaction. Fortuitously for the Koch Parties, this result deprives the Minority Members of a bargained-for right they otherwise would have to exit their investment at Fair Market Value, without a minority discount, after having fulfilled their promise to remain invested for at least seven years.

Absent the admission of the Small Holders and the resulting application of the Highest Amount Interpretation, the Minority Members could force Koch and Oxbow Holdings to sell into an Exit Sale that satisfies the FMV Clause, which entails a sale that values Oxbow at approximately $2.4 billion or more. But because Koch controls the Small

---

[594] *Dunlap*, 878 A.2d at 442 (alterations, internal quotation marks, and citation omitted).

[595] JX 2911 ¶ 10 (Koch affidavit); Hurst Tr. 11-13 (explaining that Crestview understood the 1.5x Clause to provide "return on investment criteria" to capture "a minimum return on investment for those who made the investment"); Volpert Tr. 356-58 (same); Popeo Tr. 1389-90; *see also* JX 3199 at Oxbow_00366569.

Holders and can advance the Highest Amount Interpretation, he can refuse to go along with any sale that does not produce the commercially unreasonable sum of $4.5 billion. It makes no sense that Oxbow Holdings has the ability to insist on a right to receive 1.5 times *somebody else's* capital contributions. An unanticipated confluence of events should not bestow on the Koch Parties the power to block the Exit Sale Right and demand a massive windfall.

The Koch Parties argue that the current situation is not unfair, because when Crestview entered into the LLC Agreement, Crestview understood that Oxbow operated in a highly cyclical industry, such that the value of Oxbow and its units would fluctuate with commodity cycles and macroeconomic forces. Crestview recognized that because Oxbow might perform poorly, the 1.5x Clause might not be satisfied when the time to exercise the Put Right arrived.[596] If the Minority Members were simply arguing that the 1.5x Clause was too harsh, then I would reject their position and leave them to the terms they bargained for. In this situation, the Minority Members are objecting to a different scenario: the unforeseen confluence of the poorly documented admission of the Small Holders and the resulting transformation of the 1.5x Clause into a near-absolute transactional barrier.

The Koch Parties also argue that the current situation is not unfair because Crestview has the right to exit simply by selling its stake under Article XIII, Section 6.

---

[596] *See* Hurst Tr. 89-92, 96-97. Crestview's Fund I, which invested in Oxbow, made ten other investments. Four failed to generate a return of 1.5 times invested capital, even after a complete exit, and some failed to return their original investment. *See* Hurst Tr. 92-96.

That right is no substitute for the Exit Sale because it contemplates a minority investor transaction that would carry a minority discount.[597] The buyer also would pay less for other reasons:

> The ability in Section 6 is to transfer the units but not to transfer any rights. So somebody would be stepping into a position where they had no way out and no governance rights. Furthermore, Section 6 has a right of first refusal. So we would have to go out to the market, try to find somebody, try to get the company's cooperation to do due diligence, and tell them that at the end of the day, whatever price they negotiate with us, the company has an option to take it away and do it themselves. So as a practical matter, Section 6 is not a viable exit at all.[598]

At a minimum, it is not a viable substitute for an Exit Sale.

This is the rare case in which issues of compelling fairness call for deploying the implied covenant. The admission of the Small Holders as members creates a gap in the parties' agreement regarding the operation of the 1.5x Clause. That gap is filled by holding that the 1.5x Clause can be satisfied with a Seller Top Off.

## D.     Breach Of The Reasonable Efforts Clause

The Minority Members contend that Oxbow Holdings breached its obligation to use reasonable efforts to effect an Exit Sale. Under Delaware law, the elements of a breach of contract claim are "first, the existence of the contract, whether express or implied; second,

---

[597] Volpert Tr. 348-49.

[598] Volpert Tr. 363.

the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[599] The Minority Members proved their claim.

Article XIII, Section 8(f) provides that once Crestview elected to exercise the Exit Sale Right, each party to the LLC Agreement has to use "its reasonable efforts to take or cause to be taken or do or cause to be done all things necessary and desirable to effect [an] Exit Sale."[600] The Reasonable Efforts Clause specifies that each member "shall vote for, consent to and raise no objections against any Exit Sale pursuant to this Section 8(f) and shall enter into customary definitive agreements in connection therewith."[601]

The Delaware Supreme Court has held that the concept of "commercially reasonable efforts" imposes an "affirmative obligation on the parties to take all reasonable steps" to complete a transaction.[602] At trial, Koch agreed that the Reasonable Efforts Clause required each of the parties to act in "good faith" to "do what it takes to effect . . . an exit sale,"[603] including to "cooperate in trying to get [the Exit Sale] done."[604]

---

[599] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[600] LLCA art. XIII, § 8(f). This decision refers to this provision as the "Reasonable Efforts Clause."

[601] *Id.*

[602] *See Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 273 (Del. 2017).

[603] Koch Tr. 1245-46.

[604] *Id.* at 1109-10.

Koch and Oxbow Holdings breached the Reasonable Efforts Clause by seeking purposefully to obstruct the Exit Sale. At the meeting when the Board decided to reject the Put, Koch told the attendees to "obstruct," "derail," and "delay" the Exit Sale process.[605]

To achieve that outcome, Koch and Oxbow Holdings delayed selecting an investment bank and law firm to run the Exit Sale process until after Oxbow had received the Arclight offer. Koch deliberately slowed the flow of information to Goldman and prospective investors,[606] creating the most constrained process that the Goldman senior bankers had seen in decades, and possibly ever.[607] Koch even instructed Parmelee, Oxbow's CFO, to tell certain executives to dampen their forecasts or risk their bonuses.[608] Meanwhile, Koch had Ropes & Gray explore the possibility of using a SPAC to defeat the Exit Sale right.[609]

Koch and Oxbow Holdings ultimately deployed "[l]itigation as a tool to effectuate [their] strategy" and to "slow down the Exit Sale or keep potential buyers on the sideline."[610] After ArcLight submitted a revised offer at a price above Fair Market Value,

---

[605] JX 2068 at DEF-EPJ00021726; *see* Koch Tr. 1083-86, 1093-94, 1128; *see also* JX 2262; JX 2276 at Mintz_0021744.

[606] *See* Koch Tr. 1206-08; JX 2564; JX 2570; JX 2612.

[607] Carr Dep. 180-83.

[608] JX 2760; JX 2762; JX 2774 at OXBOW_00204767; Johnson Dep. 694-98; McIntosh Dep. 117-33; Parmelee Dep. 111-22; *see also* Crosby Dep. 285-88.

[609] *See, e.g.*, JX 2137; Koch Tr. 1105-08.

[610] JX 2262 at Oxbow_00359001.

165

Koch concluded that he could bring the process to a halt if he fired Johnson, Oxbow's key executive, and sued Crestview.[611] Once Oxbow Holdings and the Small Holders filed suit, ArcLight withdrew.[612] Goldman confirmed that the resulting litigation foreclosed any opportunity to sell Oxbow to any interested purchaser in the near future.[613]

The record regarding Koch and Oxbow Holdings' efforts must be viewed in its totality. Taken as a whole, the clearest evidence that Koch and Oxbow Holdings did not comply with their duty to use reasonable efforts to support an Exit Sale is that they spent most of their energy and resources trying to design ways to thwart it.[614]

The breach of the Reasonable Efforts Clause damaged the Minority Members. During a meeting of the Oxbow Board on June 10, 2016, Goldman advised the Board that the Company could act on the ArcLight offer dated May 27, 2016 (the "ArcLight Offer"), and that it was unlikely to find a better deal.[615] Goldman nevertheless recommended a dual process that involved reaching agreement with Arclight to establish a transaction floor while proceeding in parallel with a limited market check. Goldman believed that the

---

[611] Koch Tr. 1010-12.

[612] JX 2874 at Oxbow_00147814.

[613] Carr Dep. 216-17.

[614] *See WaveDivision Hldgs., LLC v. Millennium Dig. Media Sys., L.L.C.*, 2010 WL 3706624, at *18 (Del. Ch. Sept. 17, 2010) (Strine, V.C.) ("[T]he clearest evidence that [defendant] did not comply with its duty to use its reasonable best efforts . . . was that it spent most of its energy and resources helping to develop an alternative to the sale, efforts designed to thwart, not obtain, consent.").

[615] JX 2863 at Oxbow_00246861.

166

Company could reach an agreement with ArcLight within three months.[616] Townsend's talking points indicated that Cravath supported Goldman's views and was more optimistic about the timeline for signing up a deal with ArcLight.[617] But for Koch's actions, Oxbow would have entered into a deal with ArcLight, and the Minority Members would have received at least the value of the ArcLight Offer.

**E.      Whether The ArcLight Offer Was A Bona Fide Arm's-Length Bid**

The Koch Parties contend that the Minority Members could not compel an Exit Sale based on the ArcLight Offer, because an Exit Sale must be a "bona fide arms'-length transaction."[618] The Koch Parties argue that the ArcLight Offer does not meet this standard because Crestview solicited it. The parties have not devoted nearly the same care to briefing this issue as they did to debating the meaning of the 1.5x Clause. In my view, the ArcLight Offer satisfied this aspect of the definition of Exit Sale.

A transaction involving a third party lacking any affiliation with Oxbow, its controller, or its existing members satisfies the plain language of the requirement that an Exit Sale be a "bona fide arms'-length transaction." Reading the LLC Agreement as a whole, support for this interpretation can be found in Article III, Section 3(d)(11), which requires Board approval by a Supermajority Vote for related-party transactions, defined as:

> [T]he Company's or any Subsidiary's entering into, terminating or amending any transaction, agreement or arrangement with or for the benefit of any

---

[616] *See id.* at Oxbow_00246864.

[617] JX 2852 at CSM_X0000287.

[618] LLCA art. I.

Member or any of its Affiliates (or any member of their "immediate family" as such term is defined in Rule 16a-1 of the Securities Exchange Act of 1934) (other than any benefit derived as a result of its ownership of Membership Interests in the Company as expressly set forth in this Agreement); <u>provided</u>, that the foregoing shall not apply to

(a) this Agreement, the entry into the Administrative Services and Management Agreement and the transactions agreements, agreements and arrangements expressly contemplated hereby and thereby,

(b) any bona fide arms'-length transaction or series of related transactions up to $300,000 individually or $2 million in the aggregate in any one calendar year with respect to any Member or Affiliate thereof (or any member of their "immediate family" as such term is defined in Rule 16a-1 of the Securities Exchange Act of 1934),

(c) any transaction, agreement or arrangement contemplated by an Approved Summary Annual Budget, or

(d) any item set forth on Exhibit E.[619]

This provision would not apply to transactions with a third party, such as ArcLight. Moreover, subsection (b) of this provision indicates that even a related-party transaction could be shown to be a "bona fide arms'-length transaction." Presumably, satisfying that test would involve looking at comparable transactions involving third parties. The ArcLight Offer is already an offer from a third party.

The Koch Parties argue that the ArcLight Offer is not truly bona fide or at arm's length because Crestview solicited it from ArcLight. The Exit Sale Right permits the Minority Members to obtain a qualifying offer, present it to the Company, and force an Exit Sale. As this court held in the Summary Judgment Order,

---

[619] LLCA art. III, § 3(d)(11) (formatting as separate paragraphs added).

The Exit Sale Right states that "the Exercising Put Party may require all of the Members to engage in an Exit Sale." If the Minority Members can generate an Exit Sale without Company involvement, they are free to do so. If the Exit Sale satisfies the requirements of the Exit Sale Right, then the Company and its members have to comply.[620]

Nothing in the Exit Sale Right prohibits the Minority Members from communicating with third parties to develop an Exit Sale.

The Koch Parties contend that Crestview went beyond what the Exit Sale Right permits by communicating the Fair Market Value figure to ArcLight. They have not cited any language in the LLC Agreement that would have prevented Crestview from doing this. The FMV Clause is a hurdle that an Exit Sale must clear. It is logical that when soliciting an Exit Sale, the Minority Members would tell third parties what bid they had to hit. Notably, Fair Market Value is not a depressed or discounted price. It is the price generated through a contractual valuation process that reflects the value of the Company "on a going concern basis, without any discount for lack of liquidity (including the absence of a public market and the presence of transfer restrictions) or minority interest."[621] The FMV Clause protects the Company from a low-ball offer.

In any event, the Koch Parties failed to prove that Crestview provided ArcLight with the Fair Market Value figure. The evidence shows that Volpert met with Crosby, and I am confident that they discussed price. Both Volpert and Crosby testified that Crestview did

---

[620] SJ Order ¶ 25.

[621] LLCA art. XIII, § 8(b).

169

not give ArcLight the specific Fair Market Value number.[622] That is likely true. Volpert did not have to be so specific to help Crosby get to a number that would work.

Volpert had an interest in getting ArcLight to pay the highest possible price, but he did not want to throw around figures that would scare off ArcLight. ArcLight previously had developed a valuation of Oxbow, and I suspect that Volpert encouraged Crosby, directly or through euphemisms, to consider an offer in the range of $2.4 billion. Crosby's memorandum to his investment committee supports this.[623] Crestview had modeled whether a lower valuation would clear the FMV Clause. After a call from Crosby on March 7, 2016, Crestview modeled what a deal would look like at $2.4 billion.[624] This sequence makes me think that during his meeting with Crosby, Volpert sought a higher valuation but signaled that ArcLight needed to bid at least $2.4 billion. The decision to bid $2.4 billion, rather than risk a lower figure, came from ArcLight.

I reach this conclusion even though the facts surrounding Crestview's interactions with ArcLight are less clear than they should be. For example, when Koch asked Hurst whether Crestview had been involved in soliciting the initial indication-of-interest from ArcLight, he responded that Crestview had "not spoken" to ArcLight throughout the process and that Volpert merely bumped into Crosby at a Harvard event.[625] In reality,

---

[622] Volpert Tr. 433; Crosby 154-55.

[623] JX 2332.

[624] JX 2351.

[625] JX 4271 at Mintz_0004939; Koch Tr. 814; Popeo Tr. 1410-11.

O'Donnell set up their meeting.[626] There is also evidence that ArcLight secretly spoke to Johnson,[627] and Crosby's deposition testimony conflicted with the evidentiary record on various points. Nevertheless, although there is smoke around Crestview's interactions with ArcLight, I ultimately do not see any fire. Nor do I think it would have breached the LLC Agreement if Volpert had told Crosby what the Fair Market Value number was.

The ArcLight Offer is a bona fide, arm's-length offer. As Goldman determined, it satisfies the requirements for an Exit Sale.

## F.     Unclean Hands

In their final argument, the Koch Parties group together everything they object to about Crestview's conduct and contend that the defense of unclean hands should result in Crestview having forfeited its Exit Sale Right. They devote the least effort to this argument. Here is the key paragraph from their brief:

> It would take hundreds of pages to detail all of the secret meetings, hidden texts/calls, false information given to potential investors, theft of privileged communications and other duplicitous actions of Crestview and O'Donnell/Johnson acting at Crestview's direction. As summarized supra at 29-50, Crestview repeatedly and materially breached the Agreement and the covenant of good faith and fair dealing by its consistent pattern of deceptive and inequitable conduct aimed to deprive Koch of his ownership and control of Oxbow. For example, Crestview conspired with O'Donnell and Johnson to: (1) forestall the Company's growth to pare it down for sale; (2) deliberately frustrate Oxbow's resulting efforts to attract investors to purchase Crestview's units by demanding an unreasonably high price of $190/unit and interfering with the financing process to try to force Koch to

---

[626] *See* JX 2293; JX 2325.

[627] *See* JX 3183 at CWO083445 (O'Donnell telling Johnson to "make sure Kevin [Crosby] doesn't say something stupid about talking to you pre full company bid").

sell his controlling interest (supra at 30); (3) vitiate Oxbow and Koch's attorney-client privilege by inducing O'Donnell to wrongfully disclose to Crestview privileged legal advice rendered by Mintz Levin and Ropes & Gray; (4) falsely representing it would abide by Goldman's recommendation for a 3-to-6-month pause when it had no intention of doing so; (5) solicit an indication-of-interest from ArcLight outside of the Exit Sale process that would allow Crestview to roll its sales proceeds back into the Company and share control of Oxbow with ArcLight, without disclosing to the Board the role of Crestview and its lawyers in procuring that indication, leaking the crucial FMV number, and then attempting to force the Company to accept the indication without first undertaking any systematic marketing effort to ensure the Company obtained the best sale price.[628]

The Koch Parties then assert that "Crestview's conduct in connection with the ArcLight 'bid' is perhaps most egregious."[629]

This decision has held in the preceding section that Crestview's conduct in connection with the ArcLight Offer was not egregious. It was consistent with the LLC Agreement and the Exit Sale Right. Because what the Koch Parties view as the "most egregious" misconduct does not give rise to a breach, it follows that less serious actions would not either.

As to the other four categories of conduct listed in this paragraph, the Koch Parties made no attempt in their opening post-trial brief to spell out why the actions were wrongful or to provide supporting legal authority. In their reply brief, they summarized the actions that Crestview took in somewhat greater detail, but again did not explain why the actions

---

[628] Dkt. 1188 at 98-99.

[629] *Id.* at 99.

were wrongful or provide supporting legal authority. Their arguments on these points are waived.[630]

Regardless, there is another Minority Member—Load Line—that did not engage in any of this misconduct. Load Line has exercised the Exit Sale Right as well. There is no basis to deprive Load Line of its ability to pursue an Exit Sale.

## G. The Remedy

The Minority Members are entitled to a remedy. The parties' post-trial briefing focused on the merits and devoted minimal effort to explaining what remedy is warranted and why. The remedies that they proposed present potential difficulties that the briefing did not address.

As its preferred remedy, Crestview asks for "an order of specific performance either (i) requiring [Oxbow Holdings] and Koch to redeem Crestview's units of Oxbow for cash at the price per unit offered by ArcLight, plus interest, or (ii) requiring [Oxbow Holdings], Koch, [Family LLC], and [Executive LLC] to allow Oxbow to complete an Exit Sale controlled by Crestview and Load Line."[631] A decree of specific performance is a

---

[630] *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[631] Dkt. 1187 at 92-93.

mandatory injunction implementing a particular contractual provision. It requires the existence of a contractual provision to enforce.[632]

Crestview's first request for specific performance appears problematic. The LLC Agreement does not contain a provision requiring the redemption of the Minority Members' units. The Put was a soft put, not a hard put. There are also open issues surrounding the viability of a redemption right in light of the Company's financial situation. The Exit Sale Right sidestepped those issues.

I suspect Crestview may have proposed a redemption scenario because otherwise calculating compensatory damages is difficult. An award of compensatory damages could be keyed off the value of the ArcLight Offer. The Koch Parties have suggested that the offer was too contingent to support a damages award, but the parties have not really grappled with this issue, much less taken into account relevant case law on damages. Whatever the starting point, an award of compensatory damages would have to take into account that the Minority Members retain their units. To calculate damages, the court would have to ascribe a value to those units and award the delta between that and what the Minority Members would have received in an Exit Sale. Oxbow is a private company, so determining a point value for the Minority Members' units would be difficult in any event. Determining their value becomes even more difficult since the Minority Members can expect to face a hostile controller going forward. A remedy that effects a clean break

---

[632] *See Otto v. Gore*, 45 A.3d 120, 138 (Del. 2012).

between Oxbow and the Minority Members has strong equitable appeal, but it is not clear to me that an order compelling redemption is viable. Perhaps there are answers to these questions, but the abbreviated briefing on remedies does not provide them.

The alternative form of specific performance—an order compelling an Exit Sale—would enforce a contractual right set out in the LLC Agreement. In its current form, however, the request is broad and asks the court to give full control over the Exit Sale process to the Minority Members. As the Summary Judgment Order explained, the Exit Sale Right contemplates a degree of cooperation among the Minority Members, the Company, and the other members. As a practical matter, some degree of cooperation will be essential to achieve a transaction. It seems to me that an order along these lines should spell out in greater detail the procedures that the parties would follow. Given the antagonism between the parties, a receiver might be appointed to oversee the process.

The Minority Members shall submit a single brief of not more than 7,500 words, specifying the remedy that they believe is warranted based on the findings and rulings made in this decision. They shall cite relevant legal authorities that support the requested remedy. The Koch Parties shall have thirty days to submit a brief of similar length in response. Crestview and Load Line shall have two weeks to submit reply of not more than 4,000 words. If the parties believe that additional post-trial proceedings are necessary, they should make that argument in their papers.

## III. CONCLUSION

The Small Holders are members of Oxbow, and the plain language of the Exit Sale Right mandates the Highest Amount Interpretation. Under this reading, all members must receive the same amount per unit in an Exit Sale, and that amount must clear the FMV Clause *and* provide each member with 1.5 times that member's capital contribution, taking into account distributions received. Because the per unit amount must clear this requirement for every holder, and because every holder must receive the same amount, all holders must receive the highest amount needed to satisfy the 1.5x Clause for any particular holder.

Although the plaint language of the LLC Agreement calls for this result, the original LLC Agreement intentionally left a gap: It did not define the terms on which Oxbow subsequently would admit members. When the Board admitted the Small Holders as members in 2011 and 2012, the Board did not fill that gap, largely because Oxbow did not follow proper formalities. The implied covenant of good faith and fair dealing can fill that gap. The analysis required by the implied covenant demonstrates that in 2011, when Oxbow admitted the Small Holders, the parties would have agreed that a Seller Top Off could be used to satisfy the 1.5x Clause for the Small Holders. Issues of compelling fairness call for deploying the implied covenant here because, otherwise, the fortuitous and poorly documented admission of the Small Holders would vitiate the Exit Sale Right.

Separately, the Koch Parties breached the Reasonable Efforts Clause by seeking to disrupt, derail, and delay an Exit Sale. The ArcLight Offer satisfied the requirements for

176

an Exit Sale. The doctrine of unclean hands does not bar the Minority Members from seeking a remedy.

The parties shall provide supplemental briefing as requested by this decision. In addition, within thirty days, the parties shall submit a joint letter identifying any other matters that the court needs to address to bring this matter to a conclusion at the trial level.